**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARAH GOOLDEN,<br><br>        Plaintiff<br><br>            v.<br><br>HAMED WARDAK,<br><br>            Defendant. | 19 CV 6257<br><br>Hon. J. Paul Oetken |
| HAMED WARDAK,<br><br>            Counterclaim-Plaintiff<br><br>            v.<br><br>SARAH GOOLDEN,<br><br>            Counterclaim-Defendant. | **DEFENDANT'S ANSWER,**<br>**COUNTERCLAIM AND THIRD**<br>**PARTY CLAIM** |
| HAMED WARDAK,<br><br>        Third-Party Plaintiff<br><br>            v.<br><br>WALKER HARMAN JR., and BRIAN<br>CAVANAUGH,<br><br>        Third-Party Defendants. | |

## <u>ANSWER</u>

Defendant Hamed Wardak hereby answers the Complaint of plaintiff Sarah Goolden as follows:

1.    Defendant denies the allegations in Paragraph 1 of the Complaint.

2.    Paragraph 2 is plaintiff's characterization of this action as to which no response is required.  To the extent a response is required, defendant denies the allegations in Paragraph 2.

3.    Paragraph 3 is plaintiff's characterization of this action as to which no response is required.  To the extent a response is required, defendant denies the allegations in Paragraph 3.

4.      Paragraph 4 is plaintiff's characterization of this action as to which no response is required.  To the extent a response is required, defendant denies the allegations in Paragraph 4.

5.      The allegations in Paragraph 5 set forth legal conclusions to which no response is required.  To the extent a response is required, defendant denies knowledge or information sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 5(a), and admits the allegations in Paragraph 5(b).

6.      The allegations in Paragraph 6 set forth legal conclusions as to venue to which no response is required.  To the extent a response is required, defendant disputes plaintiff's assertion that a "substantial part of the events giving rise" to plaintiff's legal claims, which "events" defendant denies ever occurred, supposedly occurred in this venue; but notes that the issue of venue was already adjudicated and upheld by a prior ruling of this Court.

7.      Paragraph 7 is plaintiff's characterization of this action as to which no response is required.

8.      Defendant denies knowledge or information sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 8.

9.      Defendant admits the allegations in Paragraph 9.

10.      Defendant denies the allegations in Paragraph 10.

11.      Defendant denies knowledge or information sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 11.

12.      Defendant denies the allegations in Paragraph 12, except admits that plaintiff and defendant met in or about 2010.

13.      Defendant denies the allegations in Paragraph 13.

14.    Defendant denies the allegations in Paragraph 14, except admits that defendant bought plaintiff gifts.

15.    Defendant denies the allegations in Paragraph 15.

16.    Defendant denies the allegations in Paragraph 16.

17.    Defendant denies the allegations in Paragraph 17.

18.    Defendant denies the allegations in Paragraph 18, except admits defendant hosted a party on or about July 4, 2018 and plaintiff and her friends attended.

19.    Defendant denies the allegations in Paragraph 19, except admits that plaintiff and two of her friends were overnight guests at defendant's Miami apartment.

20.    Defendant denies the allegations in Paragraph 20.

21.    Defendant denies the allegations in Paragraph 21.

22.    Defendant denies the allegations in Paragraph 22.

23.    Defendant denies the allegations in Paragraph 23.

24.    Defendant denies the allegations in Paragraph 24.

25.    Defendant denies the allegations in Paragraph 25.

26.    Defendant denies the allegations in Paragraph 26.

27.    Defendant denies the allegations in Paragraph 27.

28.    Defendant denies the allegations in Paragraph 28.

29.    Defendant denies the allegations in Paragraph 29.

30.    Defendant denies the allegations in Paragraph 30.

31.    Defendant denies the allegations in Paragraph 31.

32.    Defendant denies the allegations in Paragraph 32

33.    Defendant denies the allegations in Paragraph 33.

34.     Defendant denies the allegations in Paragraph 34.

35.     Defendant denies the allegations in Paragraph 35, except admits that defendant paid for lunch at Carpaccio in Bal Harbor.

36.     Defendant denies the allegations in Paragraph 36, except admits that plaintiff drank heavily over the course of the July 4, 2018 week.

37.     Defendant denies the allegations in Paragraph 37.

38.     Defendant denies the allegations in Paragraph 38, except admits that defendant proposed marriage to plaintiff at Scarpetta in Miami.

39.     Defendant denies the allegations in Paragraph 39.

40.     Defendant denies the allegations in Paragraph 40, except admits that plaintiff accepted defendant's marriage proposal.

41.     Defendant denies the allegations in Paragraph 41.

42.     Defendant denies the allegations in Paragraph 42.

43.     Defendant denies the allegations in Paragraph 43.

44.     Defendant denies the allegations in Paragraph 44.

45.     Defendant denies the allegations in Paragraph 45.

46.     Defendant denies the allegations in Paragraph 46.

47.     Defendant denies the allegations in Paragraph 47.

48.     Defendant denies the allegations in Paragraph 48.

49.     Defendant denies the allegations in Paragraph 49.

50.     Defendant denies the allegations in Paragraph 50.

51.     Defendant denies the allegations in Paragraph 51.

52.     Defendant denies the allegations in Paragraph 52.

53.     Defendant denies the allegations in Paragraph 53.

54.     Defendant denies the allegations in Paragraph 54.

55.     Defendant denies the allegations in Paragraph 55.

56.     Defendant denies the allegations in Paragraph 56.

57.     Defendant denies the allegations in Paragraph 57.

58.     Defendant denies the allegations in Paragraph 58.

59.     Defendant denies the allegations in Paragraph 59.

60.     Defendant denies the allegations in Paragraph 60.

61.     Defendant denies the allegations in Paragraph 61.

62.     Defendant denies knowledge or information sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 62.

63.     Defendant denies the allegations in Paragraph 63.

64.     Defendant denies the allegations in Paragraph 64.

65.     Defendant denies the allegations in Paragraph 65.

66.     Defendant denies the allegations in Paragraph 66.

67.     Defendant denies the allegations in Paragraph 67.

68.     Defendant denies the allegations in Paragraph 68.

69.     Defendant denies the allegations in Paragraph 69.

70.     Defendant denies the allegations in Paragraph 70.

71.     Defendant denies the allegations in Paragraph 71.

72.     Defendant denies the allegations in Paragraph 72.

73.     Defendant denies the allegations in Paragraph 73.

74.     Defendant denies the allegations in Paragraph 74.

75.     Defendant denies the allegations in Paragraph 75.

76.     Defendant denies the allegations in Paragraph 76.

77.     Defendant denies the allegations in Paragraph 77.

78.     Defendant denies the allegations in Paragraph 78.

79.     Defendant denies the allegations in Paragraph 79.

80.     Defendant denies the allegations in Paragraph 80.

81.     Defendant denies the allegations in Paragraph 81.

82.     Defendant denies the allegations in Paragraph 82.

83.     Defendant denies the allegations in Paragraph 83.

84.     Defendant denies the allegations in Paragraph 84.

85.     Defendant denies the allegations in Paragraph 85.

86.     Defendant denies the allegations in Paragraph 86.

87.     Defendant denies the allegations in Paragraph 87.

88.     Defendant denies the allegations in Paragraph 88.

89.     Defendant denies the allegations in Paragraph 89.

90.     Defendant denies the allegations in Paragraph 90.

91.     Defendant denies the allegations in Paragraph 91.

92.     Defendant denies the allegations in Paragraph 92.

93.     Defendant denies the allegations in Paragraph 93.

94.     Defendant denies the allegations in Paragraph 94.

95.     Defendant denies the allegations in Paragraph 95.

96.     Defendant denies the allegations in Paragraph 96.

97.    Defendant realleges his responses to Paragraphs 1 through 96.  To the extent a further response is required, defendant denies the allegations in Paragraph 97.

98.    Defendant denies the allegations in Paragraph 98.

99.    Defendant denies the allegations, other than gender, in Paragraph 99.

100.    Defendant denies the allegations in Paragraph 100.

101.    Defendant denies the allegations in Paragraph 101.

102.    The allegations in Paragraph 102 set forth legal conclusions to which no response is required.  To the extent a response is required, defendant denies the allegations.

103.    Defendant realleges his responses to Paragraphs 1 through 102.  To the extent a further response is required, defendant denies the allegations in Paragraph 103.

104.    Defendant denies the allegations in Paragraph 104.

105.    Defendant denies the allegations in Paragraph 105.

106.    Defendant denies the allegations in Paragraph 106.

107.    Defendant denies the allegations in Paragraph 107.

108.    The allegations in Paragraph 108 set forth legal conclusions to which no response is required.  To the extent a response is required, defendant denies the allegations.

109.    Defendant realleges his responses to Paragraphs 1 through 108 and asserts that the allegations in Paragraph 109 are moot because this cause of action for defamation *per se* was dismissed with prejudice by the Decision and Order filed July 23, 2020 and Order filed August 15, 2020.  To the extent a further response is required, defendant denies the allegations in Paragraph 109.

110.    The allegations in Paragraph 110 are moot because this cause of action for defamation *per se* was dismissed with prejudice by the Court's Decision and Order filed July 23,

2020 and Order filed August 15, 2020.  To the extent a further response is required, defendant denies the allegations in Paragraph 110.

111.    The allegations in Paragraph 111 are moot because this cause of action for defamation *per se* was dismissed with prejudice by the Court's Decision and Order filed July 23, 2020 and Order filed August 15, 2020.  To the extent a further response is required, defendant denies the allegations in Paragraph 111.

112.    The allegations in Paragraph 112 are moot because this cause of action for defamation *per se* was dismissed with prejudice by the Court's Decision and Order filed July 23, 2020 and Order filed August 15, 2020.  To the extent a further response is required, defendant denies the allegations in Paragraph 112.

113.    The allegations in Paragraph 113 set forth legal conclusions to which no response is required and, in any event, are moot because these legal conclusions were rejected by the Court when this cause of action for defamation *per se* was dismissed with prejudice by the Decision and Order filed July 23, 2020 and Order filed August 15, 2020.  To the extent any response is required, defendant denies the allegations in Paragraph 113.

114.    Defendant realleges his responses to Paragraphs 1 through 113.  To the extent a further response is required, defendant denies the allegations contained in Paragraph 114.

115.    Defendant denies the allegations in Paragraph 115.

116.    Defendant denies the allegations in Paragraph 116.

117.    Defendant denies the allegations in Paragraph 117.

118.    Defendant denies the allegations in Paragraph 118.

119.    The allegations in Paragraph 119 set forth legal conclusions to which no response is required.  To the extent a response is required, defendant denies the allegations.

120.    The allegations in Paragraph 120 set forth legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations.

**GENERAL DENIAL**

Unless specifically admitted herein, defendant denies each and every allegation in the Complaint and demands strict proof thereof.

**AFFIRMATIVE DEFENSES**

Without assuming the burden of proof where such burden properly rests with plaintiff and without waiving, and hereby expressly reserving, the right to assert any and all such defenses at such time and to such extent as discovery and factual or legal developments may establish a basis therefore, defendant hereby asserts, as and for separate and additional defenses to the Complaint, as follows:

**First Affirmative Defense**

Plaintiff's Complaint fails to state a claim upon which relief may be granted or for which the damages sought can be awarded.

**Second Affirmative Defense**

Plaintiff's claims are barred, in whole or in part, by the doctrines of bad faith, unclean hands, laches, and/or estoppel.

**Third Affirmative Defense**

To the extent plaintiff is entitled to any damages recovery on any of her claims, which defendant denies, plaintiff has failed to take action or has taken insufficient action to mitigate those damages.  Consequently, any damages suffered by plaintiff must be reduced in an amount by which she could have mitigated those damages.

## Fourth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, on the basis that plaintiff would be unjustly enriched if allowed to recover all or any portion of the damages alleged in the Complaint.

## Fifth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, to the extent plaintiff's injuries or damages, which injuries or damages are denied, were not caused in fact or proximately caused by acts and/or omissions of defendant.

## Sixth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, to the extent she has not suffered any actual injury or damages as a result of the conduct alleged in the Complaint.

## Seventh Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations, statutes of repose and/or equitable doctrines, including laches.

## Eighth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, on the basis of the plaintiff's intentional acts and/or omissions, including fraud.

## Ninth Affirmative Defense

Defendant is not liable for punitive damages because neither defendant, nor any of his employees or agents, committed any act with malice or reckless indifference to plaintiff's federally or state protected rights, or approved, authorized or ratified, or had actual knowledge of any such acts.

**Tenth Affirmative Defense**

Plaintiff's claims are not brought in good faith, and defendant shall seek attorneys' fees and costs under all applicable fee-shifting statutes.

**Eleventh Affirmative Defense**

If any judgment is awarded in plaintiff's favor, any damages award should be set off by the damages caused by plaintiff and incurred by defendant, including the damages sought in connection with the counterclaims asserted herein.

## RESERVATION OF RIGHTS

Defendant reserves his right to amend and supplement his answer to assert any other defenses as may appear during the course of this action.

\*        \*        \*

**WHEREFORE**, defendant hereby demands judgment against plaintiff, dismissing the Complaint in its entirety with prejudice, and awarding to defendant his attorneys' fees, costs, interest, and such other and further relief as the Court deems equitable and just.

## COUNTERCLAIM

Defendant/counterclaim-plaintiff Hamed Wardak, for his counterclaim against plaintiff/ counterclaim-defendant Sarah Goolden and third-party defendants Walker Harman Jr. and Brian Cavanaugh (collectively, "counterclaim-defendants"), alleges, upon knowledge as to himself and otherwise upon information and belief, as follows:

## NATURE OF ACTION

1.      In a subversion of the groundswell social movement for redress of sexual and physical assault in the workplace, Goolden, a New York model who frequents "party" nightclubs in New York, Miami, Los Angeles, London and Ibiza, falsely cloaked herself in fabricated "#me-too" claims to perpetrate a shakedown of Wardak, an upcoming music producer in the close-knit music industry in Miami and New York.  Goolden, who has known Wardak socially for years, played on his genuine affection for and desire to marry her to lure him into spending large sums – over $300,000 – on luxury items, alcohol-fueled "partying," and travel for her and her "entourage," including her father, in the course of just a few months in the summer of 2018. When Wardak confronted her, Goolden and her conspirators kept him at bay with a confusing web of deception, and, after that failed, threatened that she would falsely charge him with rape in order to destroy his start-up music career and reputation unless he stopped pursuing his demands for restitution.

2.      Wardak did not stop.  Goolden made good on her threat.

3.      In the summer of 2019, she made knowingly false claims that Wardak had raped her a year before on the morning of July 6, 2018 in his Miami apartment, while her friends who were overnight guests were in the apartment. Her rape claim is false.  It is an utter fabrication from start to finish.  There was no rape, no sexual assault, and no assault and battery.

4.      That false claim, however, is the culmination of her unlawful, defamatory and extortionate scheme to force Wardak to abandon his lawful efforts to recover the large sums that she defrauded him into paying in the summer of 2018 for the benefit and enjoyment of her and her coterie.  By filing various court filings, first in Family Court and then this action in July 2019, Goolden made knowingly false and defamatory charges against Wardak, using sham legal pleadings to try to shield herself from liability for defamation and solely to publish her false defamatory *per se* charges so as to maximize injury to Wardak.

5.      She and her then-lawyer, third-party defendant Harman, published their false claims to news outlets, including the New York Post, which published the false charge of rape and also published additional defamatory claims made by Harman and Goolden that Wardak is "sick" and has to be "stopped," implying – falsely and without any basis – that he is a dangerous criminal who has a past history of violence and sex crimes.  In their sham complaint in this action, for example, they make the knowingly false and outrageous claims that Wardak is "merciless," that he inflicted "sexual and physical violence" on Goolden, that he "knows no bounds and has followed and attacked other women" (Compl. ¶ 1) and that he has a "long, documented history of stalking and attacking woman [sic]."  (*Id*. ¶ 10).  That is a blatant, demonstrable falsehood.  And counterclaim-defendants knew each of these claims are false when they published these defamatory claims solely to defame and harm Wardak.

6.       In truth, Goolden fleeced Wardak.  Over the course of a few months, between May and July 2018, Goolden using false pretense cajoled and induced Wardak to pay for expensive first-class flights to Puerto Rico and Miami for her, her friends and her father.  While in Miami during the July 4 holiday, she imposed on Wardak's hospitality, staying at his Miami apartment with two of her friends, going on all-expense-paid shopping trips, a yacht cruise and

luxury meals and nightclubs – all paid for by Wardak.  She implored Wardak to propose marriage, and she and one of her male friends importuned him to buy her a five-carat Harry Winston engagement ring valued at approximately $160,000.  They then pushed him to continue the splurge and to buy her and each of her friends approximately $40,000 worth of high-end clothes and expensive handbags.

7.     While Wardak drinks only in moderation at social gatherings, Goolden and her friends spent that July week on a bender, getting drunk day and night.  Goolden asked Wardak to arrange for intravenous-drip hydration services in the mornings to cure their hangovers.

8.     The Friday night and Saturday morning that Goolden alleges the "assault" and "rape" occurred, Goolden had been drinking heavily and, after a tryst with one of the house guests, she passed out in the guest bedroom with her two friends.  No assault or battery occurred.

9.     In fact, Goolden stayed with Wardak at his apartment until the following Monday. Shortly thereafter, Goolden traveled to London and Ibiza, where social media posts showed her going out with European friends, including Richard Abrazi (her now current "boyfriend"), and "partying" at nightclubs and other party venues in those locations for weeks afterward.

10.    Around that time, Goolden blocked Wardak and certain of his friends from her social media accounts, and switched her Instagram profile from "public" to "private."

11.    Wardak later learned of Goolden's trips to London, Ibiza, and Brazil.  He was alternately angry, hurt and confused.  He suspected he had been badly used by Goolden and her friends and told them he would take lawful measures, including instituting lawsuits, to seek recompense.

12.    Goolden's father, third-party defendant Cavanaugh, then intervened to continue to string Wardak along.  In an effort to stall Wardak, he told him that Goolden had a substance

14

abuse problem and was mentally unstable. He insisted to Wardak that Wardak was "special" to Goolden. According to Cavanaugh, Goolden never introduced her past boyfriends to her father, but she wanted him to meet Wardak. Cavanaugh said Wardak was a "hero" for caring so much for Goolden, despite her mental/emotional problems, and told Wardak that Goolden needed his continued love and support to work out her personal mental health issues.

13.    At first, Wardak took this at face value and expressed his love and support for Goolden, imploring her to speak to him so he could get her whatever help she needed. Genuinely confused and fearful for her, Wardak persisted in trying to communicate with her despite her failure to respond. Goolden, however, continued to ignore him, at first, which increased his confusion. After Wardak re-raised his suspicions that he had been defrauded, Goolden then, following Cavanaugh's direction, responded with text messages asking him to cease all contact and stating (falsely) that he was frightening her. None of that was true. Cavanaugh, who is a lawyer, told Goolden to make these claims in written communications so that they could be used as a paper trail for making false charges of harassment and "stalking" against Wardak if he did not relent.

14.    In September 2018, Goolden used her self-serving fabricated record as a basis for filing a false police report against Wardak, accusing him of harassment. That same day, Goolden told Farris El-Alwan, one of her friends who had been with her during the July 4 Miami trip, that she would not return the engagement ring, saying "I am not giving him shit."

15.    Goolden's and Cavanaugh's efforts to confuse and deceive Wardak began to fail in the fall of 2018. After Wardak instituted legal actions against them in early 2019, Cavanaugh, acting at Goolden's direction and as her agent, told Wardak that unless he stopped trying to

recover the money he spent on them Goolden would falsely accuse him of sexual assault and rape to destroy his reputation and music career.

16.    Around that same time, Goolden went to multiple music venues in New York where Wardak had business contacts and was an up-and-coming musical artist and producer. Goolden told managers at 1Oak, Gospel, and Knock Down Center, all nightclubs and music venues in New York City, that Wardak was stalking her, which was not true.  Worse, she told music managers, on whom Wardak's fledgling music business depended for work, that he had a "rape case" pending against him – which was doubly untrue, since no rape occurred and at the time of these false statements no "rape case," however knowingly false, had been filed.  She also falsely stated to the club managers that Wardak (whose family is from Afghanistan) is an illegal arms dealer and that he threatened to kill her like his father (supposedly) killed his mother (which is, needless to say, untrue).  She knew that these falsehoods would injure his music business and prevent him from continuing to work in these music venues that were vital to launching his business.  She made similar defamatory statements to venue managers in Miami, including managers of the club Space and Ultra Music Festival, a music festival in Miami.  Her smear campaign had its intended effect.  Wardak lost the opportunity to perform at Ultra and his bookings at clubs in New York and Miami and related party venues were reduced after Goolden made these false charges.

17.    In addition to damaging Wardak's music business, Goolden, with the help of the other counterclaim-defendants, filed a sham petition in Family Court and a sham pleading in this case, in January and July 2019, respectively.  During the Family Court proceeding, Goolden testified in June 2019 that she had been raped by Wardak in July 2018 at his Miami apartment. This was the first time she made such a charge publicly – *nearly a year after* the non-existent

sexual assault supposedly happened and *only after* Wardak made clear to her and her father that

he would not relent in his efforts to recover his money.  In this action, filed the following month

in July 2019, she embellished that false rape charge with yet other falsehoods.

18.    Wardak accordingly now counter-sues seeking compensatory and punitive

damages for the counterclaim-defendants' scheme to defame him through Goolden's sham

pleadings in this action and other defamatory publications to third parties, her injurious

falsehoods against, and tortious interference with, his start-up music business, costing him at

minimum $100,000 in losses, and her prima facie tortious extortion scheme.

## PARTIES

19.    Defendant/counterclaimant-plaintiff Hamed Wardak resides in and is domiciled in

the Commonwealth of Puerto Rico.

20.    Plaintiff/counterclaim-defendant Sarah Goolden resides in and is domiciled in the

State of New York, New York County.

21.    Third-party defendant Brian Cavanaugh resides in and is domiciled in the State of

New York.

22.    Third-party defendant Walker Harman, Jr. resides in and is domiciled in the State

of Texas.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 on the

basis of diversity of citizenship between the parties and the matter in controversy exceeds the

sum or value of $75,000, exclusive of interest and costs.

24.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in New York and this Judicial District.

**TRIAL BY JURY**

25.     Counterclaim-plaintiff demands trial before a jury.

**FACTS**

**A.  Goolden's Pretextual Engagement and Exploitation of Wardak's Wealth**

26.     Goolden met Wardak in 2010 while both were living in Washington D.C.  They maintained a social friendship over the years.

27.     In the 2013-14 time frame, Goolden began to confide in Wardak about her romantic relationships.  She told him that the man she was dating at that time had assaulted her and asked Wardak to pay for her to fly to Miami, claiming a need to get away from her boyfriend and that her father was destitute and not able to help financially.  Out of genuine affection for her, Wardak paid for her Miami flight and offered other financial assistance.

28.     In early 2018, Goolden again importuned Wardak for financial help.  She told him that she was supposed to move to Brazil to be with her then-"boyfriend," Arthur, and had sent her personal belongings to Brazil, but that Arthur had been unfaithful with one of her friends (a Russian model) and she needed money to relocate from Brazil and to clear up crushing credit card debt she incurred in connection with the move.  She insisted on a bulk money transfer, not itemized payments of specified debts or upcoming costs.  In May 2018, Wardak wired her $30,000.

29.     After this episode, Goolden and Wardak started dating, although Wardak was aware that she stayed in contact on social media and otherwise with Arthur and his family in Brazil.

30.     Playing on Wardak's affection for her and his insecurity about Arthur, Goolden wheedled Wardak into paying for her trips, including flights from New York to Florida and to Puerto Rico.  Goolden also requested, with the involvement of her father, that Wardak wire her $20,000 to set up a trust for care of her dog (a Chow Chow), and $20,000 for personal expenses.

31.     Thus, on May 29, 2018, Wardak wired $30,000 to Goolden's personal bank account.  One month later, on or about June 28, 2019, Wardak wired an additional $41,000 to Goolden's personal bank account for her living expenses and for her dog's medical care.  And around that same time he also gave Goolden $5,000 in cash to pay for her travel to attend her brother's college graduation.

32.     Around the same time that Wardak paid for Goolden's Manhattan apartment, Goolden told him that she did not "trust" him alone in Miami while she lived in Manhattan and asked him to move to New York.  Again acceding to her requests, Wardak, whose music career took him to Manhattan frequently in any event, took a year lease ($32,500/mo.) on a Chelsea apartment that her friend, Farris El-Alwan, selected for Wardak and that Goolden said would eventually be a residence for the both of them as a married couple.

33.     Additionally, in June 2018, at her request, Wardak agreed to pay to fly her, her father, and her dog in first-class to Puerto Rico, where he paid for their entire stay, including tours on yachts and "Island-hopping" trips in the Caribbean.

34.     For the July 4 holiday that year, Goolden asked, and Wardak agreed, to fly her and two of her friends, Stephanie Raphael and her male friend El-Alwan, to Miami to be house-guests in his Miami apartment and to pay their expenses during the trip.

35.     During that trip, Goolden cajoled Wardak to propose to marry her, telling him that he could buy an engagement ring and turn the weekend into a celebratory engagement party.

19

Goolden repeatedly professed a sincere desire to marry him, again playing on his genuine love for her and genuine interest in marriage to her.  Goolden threatened that unless Wardak proposed – with the ring she selected – her ex-boyfriend, Arthur, would propose first, suggesting that she would take Wardak's failure to propose right away as a lack of resolve that would lead to a life-long missed opportunity for them to be together as a loving married couple.

36.    But Goolden, as Wardak would only later learn, was insincere and her entreaties for marriage manipulative.

37.    The night of July 4 of that holiday week, Wardak treated Goolden and her group to a lavish dinner and drinks at a restaurant/dance venue.  After a night of heavy drinking by both Goolden and her friends, the party broke up and Goolden and her friends, who were drunk, retired to Wardak's Miami apartment.  Wardak who was not heavily drinking went to RockWell, a Miami club to meet with one of his friends and colleagues on the Miami music scene.  Upon returning home, Wardak discovered Goolden and El-Alwan in his guestroom bed together, both naked.

38.    The next morning, Wardak confronted Goolden about her behavior, leading to a verbal argument.  Goolden said, in sum and substance, "you need to give me a ring or Arthur will."

39.    Wardak revealed his marriage-proposal plans to El-Alwan and Raphael, who had already been told by Goolden.  El-Alwan told Wardak that he and Goolden had previously picked out the exact ring she wanted:  A five-carat Harry Winston.  El-Alwan went with Wardak to the Harry Winston boutique in Bal Harbor Shops, and immediately selected the same 5-carat ring, which Wardak purchased for approximately $160,000.

40.     At Goolden's insistence, Wardak then went shopping with her and her friends to high-end clothing and hand bag stores, including the Yves Saint Laurent boutique, buying Goolden and her two friends some $40,000 worth of clothing and handbags.

41.     With Goolden's friends looking on, Wardak proposed to her at Scarpetta, a high-end Miami restaurant, on the evening of July 6, and Goolden accepted.  They continued celebrating into the early morning hours with expensive bottle service at Liv, a nightclub at the Fontainebleau hotel.

42.     Goolden stayed the rest of the weekend with Wardak in Miami, even after her friends left.  She and Wardak planned for her to stay with him in Miami an additional two weeks. But she precipitously changed her plane ticket, and left Miami on Monday, July 9, 2018.

43.     Upon leaving, she told Wardak she is "confused" and is leaving to spend time with her grandmother in Syracuse, New York.  But that was all a lie.

## B.  Goolden's and Cavanaugh's Extortionate Scheme

44.     Goolden did not go to Syracuse.  She traveled to Europe using the money that Wardak had given to her over the last few months.  She spent time in London with friends and then "partying" at clubs in Ibiza, a city with a notorious nightlife, including traveling with another "boyfriend," Richard Abrazi, with whom she has an ongoing romantic relationship. During this period, while social media tracked her high-flying social life, including posts labeled "Gangsters in Paradise," she ignored Wardak's entreaties to talk with him.

45.     Given Wardak's understandable confusion and his increasingly frantic efforts to talk with Goolden, Goolden arranged for her father to intercede to keep Wardak from pursuing the matter.  Goolden's father, third-party defendant Cavanaugh, is a lawyer who has a criminal conviction for felony mail fraud related to fraudulent loans and embezzlement of funds from an

irrevocable trust he established for a 90-year old legally blind client who had no family or support system.  Wardak – who at the time was unaware of Cavanaugh's criminal past (Cavanaugh changed his name after his release from prison) – had previously established a relationship with Cavanaugh, believing that he would soon be his father-in-law.  Wardak had generously assisted Cavanaugh with various financial needs (all at Goolden's request), sending him tens of thousands of dollars in early 2018, and out of a sense of cultural propriety and respect, asked Cavanaugh for his "blessing" of his proposed marriage to Goolden, which Cavanaugh readily gave.

46.     In the months after Goolden left Miami for Europe and Ibiza (when Wardak believed Goolden was with her mother and grandmother in Syracuse), Cavanaugh stayed in contact with Wardak, trying to reassure him with false assurances that Goolden had no ill intent or false motive.  He tried to dissuade Wardak from concluding that he had been defrauded by Goolden by telling him, for example, that he would facilitate the return of the engagement ring and return of money if they could not reconcile and save their engagement to be married.

47.     He also told Wardak that Goolden was mentally unstable, had substance abuse issues and needed his help, including his continued love, understanding and support.  That greatly concerned Wardak, who, if nothing else, did not want to end his relationship with Goolden over a misunderstanding or misperception if she was genuinely ill and acting out of mental illness or due to a real disability caused by alcohol and/or drug dependency.

48.     Cavanaugh and Goolden coordinated their communications with Wardak to keep him from pursuing his claim for the return of the ring and money.  At the same time that Cavanaugh sought to reassure him with yet more falsehoods, Goolden ignored his entreaties to talk, eventually creating a paper trail in email and texts that she wrote following Cavanaugh's

direction demanding that Wardak cease and desist communicating with her, creating a false foundation on which to claim criminal harassment.

49.    Cavanaugh's false assurances kept Wardak in a state of emotional confusion and turmoil, especially given the contradictory "mixed" signals from Goolden demanding that he "cease and desist."  That confusion led to frantic efforts by Wardak, who genuinely believed Cavanaugh's claims that Goolden was emotionally unstable and ill, to insist on speaking with her so he could assure her that he would stand by her and help her with whatever she was going through.  But those communications, motivated by Wardak's genuine love and affection, were perverted by Goolden and turned against him as trumped-up evidence of "harassment" and "threats."

50.    With Cavanaugh's duplicitous assistance, Wardak attempted to arrange a family-based intervention for Goolden.

51.    After creating her false "cease and desist record," Goolden filed a police report in New York against Wardak for harassment in late September 2018.  In that report, she falsely claimed that Wardak had engaged in "harassment, blackmail, slander, verbal abuse, obsessive texting, emailing, and calling constantly to send things to my apartment and my father's house. Threatening to ruin my life and threatening to show up at my house."

52.    Wardak did not learn of this police report until months later.  Cavanaugh falsely told him in the fall of 2018 that he had stopped Goolden from filing any police report.

53.    The same day she filed the police report without any notice to Wardak, Goolden sent El-Alwan a series of text messages stating "If I return the ring he's going to ask for more shit [.]  Sorry but not gonna return shit."

54.     Throughout September and October, Goolden's and Cavanaugh's attempts to keep Wardak at bay with a confused web of deceit began to falter and, while Wardak was genuinely confused and not certain, he told both Cavanaugh and Goolden that he was fast coming to the conclusion that he had been "played" and that he would turn the matter over to his attorneys and otherwise pursue the return of the ring and money taken from him through false pretenses.

55.     On or about October 12, 2018, Kevin Goolden, Goolden's brother – whom Wardak met while preparing for the substance-abuse intervention – told Wardak that Goolden was never in love with him and that he had been targeted to take whatever money she could wheedle out of him.  He said Wardak was not her first victim.  He specifically named other men, including a professional hockey player, against whom she had perpetrated the same scam.

56.     Wardak then hired counsel.  Starting in January 2019 he instituted legal action against both Cavanaugh and Goolden.

57.     Later, in May 2019, Cavanaugh, on behalf of and acting as Goolden's agent, told Wardak that he had no choice but to drop the matter and cease any and all efforts to recover any of his money from either Cavanaugh or Goolden.  He told Wardak that, if he did not drop the matter, Goolden would make false allegations of criminal conduct, and that he would be falsely accused by Goolden of not only criminal harassment but rape and sexual assault.  In sum and substance, Cavanaugh informed Wardak that these false criminal charges would be made publicly and that Goolden would publish them directly to music managers and promoters in New York and Miami, which would cause immediate economic injury to his fledging music career.

58.     Goolden thereafter made good on her extortionate threats.

24

C.  **Goolden's Injurious Falsehoods**

59.     In 2019, Goolden frequented music clubs and venues in New York where she knew Wardak had music-business interests and contacts, including Knock Down, 1Oak and Gospel, as well as various venues for private music/dance parties.  At these events, starting in or around May 2019, she told managers and promoters that Wardak was an unreliable liar, that he was "crazy" and criminally violent, and that he had committed rape.

60.     In May 2019, Goolden attended a private music/dance event held in a warehouse music venue Brooklyn, New York and hosted by Black Matt with V.I.P. sections managed by Provocateur.  At that event, Goolden saw Matteo Garzia, a well-known event promoter based in Miami, interacting with Wardak.  When Garzia was alone Goolden approached him, and said in sum and substance that Wardak is a "liar."  She stated to Garzia that Wardak was lying when he told people that she had been engaged to him and she said that Wardak is "crazy" to the point of being dangerous.  She told Garzia that Wardak had committed rape and had a "rape case" pending against him, which was a knowing falsehood.

61.     In that same period, Goolden showed up at another party she knew Wardak attended, at Gospel, and made her intentions clear:  she brought with her an Order of Protection, described below, and showed it to the event managers, asking them to eject Wardak from the venue, knowing full-well that this was a key business opportunity for him and that her false allegations of harassment were part of her relentless drumbeat of innuendo and falsehood intended by her to undermine and injure his music business.

62.     She also made the same false claim concerning rape and a pending rape case to promoters affiliated with Ultra Music Festival, a widely-known and important music festival held in Miami annually.

25

63.     She made other false statements about Wardak to multiple mangers and promoters in the music business community, including to managers and promoters affiliated with the New York nightclubs 1Oak, Knock Down Center, and Gospel and the Miami nightclub Space.  She made statements either directly or through her agent, Erin Gross, to various music industry participants that in sum and substance falsely stated that Wardak is an "illegal arms dealer" and "stalker."  Those defamatory statements were made to (i) the owners of the Space nightclub in Miami, Florida and the owner and manager of Gospel in New York; (ii) Mateo Milleri and Carmine Conte, members of the disc jockey duo Tale of Us, and (iii) Steve Martinez, James Zumarraga and Alex Jas, who are all affiliated with the famous disc jockey duo, the Martinez Brothers.

64.     Just as Wardak is not a stalker and has never been truthfully accused or convicted of stalking, Wardak has nothing to do with arms deals, never mind illegal arms dealing, and Goolden knows that these claims were false when she made them.  To the contrary, Goolden made these statements intending to appeal to ethnic biases, racist assumptions and discriminatory fears to imply that Wardak, as a Middle Eastern businessman from a prominent Afghani family, was a dangerous, violent criminal involved in illegal international arms deals.

65.     As a result of Goolden's false and defamatory statements, Wardak – who had prior business relationships with the owners of Space, Tale of Us, and the Martinez Brothers – lost several crucial music-business opportunities.  In particular, Wardak was unable to book any future musical performances at Space during any Ultra weekend in Miami, and both the Martinez Brothers and Tale of Us refused to collaborate on projects with him.  Specifically, directly due to Goolden's false statements, managers of various music venues in New York and Ibiza blackballed Wardak, banning him from clubs owned and/or managed by the Tao Group, 1Oak,

and the Brooklyn Mirage.  Promoters of Burning Man events in New York and Nevada and various other promotors of events and venues in Ibiza followed suit, refusing to book Wardak at their music events and venues.

**D.   The Sham Goolden Actions and Publication of False Claim of Rape**

66.     At the same time that she was making defamatory statements about Wardak in the New York music community, Goolden and Harman instituted sham legal actions to further propagate their injurious falsehood assault against Wardak.

67.     In January 2019, Goolden filed a petition for a no contact order against Wardak with the Family Court of the State of New York.  In that petition, she made the knowingly false claims that Wardak "blackmailed me, threatened me, and harassed me and swore he would ruin my life if I wouldn't be with him."  She further falsely stated that Wardak "told me his father murdered his mother so just watch what he could do."  Goolden filed this false petition and made these false statements solely as a means to cloak her defamatory publications with the litigation privilege.

68.     Based on these falsehoods, the court granted Goolden an unopposed ex parte temporary order of protection.

69.     Goolden later falsely accused Wardak of rape and sexual assault in testimony at a June 2019 hearing for a permanent order of protection in the Family Court action, even though her petition in that action made no reference to any assault, much less rape.

70.     Three weeks later, on or about July 5, 2019 – a year after her Miami July 4 trip with Wardak and her friends in 2018 – she filed this federal action, which, based on knowing falsehoods, is a sham.  Her fact and legal allegations in this action are a complete sham, brought

27

maliciously by Goolden for the sole purpose of defaming Wardak under the guise of litigation and its attendant qualified immunity.

71.     In her pleading in this action, Goolden realleges her false claim that Wardak sexually and physically assaulted and raped her.  Goolden and Harman make the knowingly false and outrageous claims that Wardak is "merciless," that he inflicted "sexual and physical violence" on Goolden, that he "knows no bounds and has followed and attacked other women" (Compl. ¶ 1) and that he has a "long, documented history of stalking and attacking woman [sic]." (*Id*. ¶ 10).

72.     These statements are false, and both Goolden and Harman knew they were false (or at least Harman is charged with knowledge of falsity).

73.     Goolden's false allegations include claims that Wardak "forcibly pulled Ms. Goolden out of bed, picked her up, and then carried her to his bedroom, where he then "threw her onto his bed" (Compl. ¶ 24); Wardak "[threw] glasses and plates at her" (*id.* ¶ 25), and "[d]uring the assault, Defendant Wardak threatened Ms. Goolden that he would ruin her life if she did not stay with him and agree to do what he wanted." (*id.* ¶ 26).  None of that is true.

74.     Wardak never physically assaulted Goolden.  He did not forcibly pull her from bed, pick her up, or carry her to his bedroom.  He also did not throw her onto his bed or throw plates and glasses at her.  Goolden's allegations of physical assault are false, and Goolden knew or reasonably should have known them to be false.

75.     Most egregiously, Goolden claimed that Wardak "climbed on top of Ms. Goolden, pulled off of her underwear, and forcefully held her down while he performed oral sex on her," and thereafter "pulled out his penis and sexually assaulted Ms. Goolden."  (Compl. ¶¶ 51, 53.)

Goolden also alleged that Wardak "admitted to raping Ms. Goolden." (*Id.* ¶ 73.) Again, none of that is true.

76.    Wardak never sexually assaulted or raped Goolden, and certainly never admitted to a rape that never occurred.

77.    In addition to allegations of rape, Goolden also alleged that Wardak threatened to murder her and bragged about combating terrorists. Goolden alleged that Wardak threatened to "murder her and her entire family, tap her phones, and have her followed and watched," and "bragged [that he] took on Al Qaeda and The Taliban." (Compl. ¶¶ 66, 67.) Once again, this is a complete falsehood, and Goolden knew it.

78.    Goolden knew that Wardak never threatened to murder her and her family, or that he had any association or interactions of any kind with terrorist organizations. Goolden's allegations of such threats are false, and Goolden knew it.

79.    Finally, Goolden alleges that in May 2019, Wardak "threatened to murder Ms. Goolden's father and sent him multiple death threats." (Compl. ¶ 94.) That too is false.

80.    Wardak never threatened to murder Goolden's father. Goolden's allegations of such threats are false, and Goolden knew it.

81.    Immediately after her sham complaint was filed (and even before service of the summons and complaint), Goolden and Harman arranged for media coverage, contacting the New York Post to publish her false allegations as widely as possible. Both Goolden and Harman spoke with the reporter, making additional defamatory and knowingly false claims with the intent to damage Wardak's reputation and injure his music business.

82.    On July 20, 2019, the New York Post published an article, titled "Model claims former Afghan minister's son raped her" (the "New York Post article"). In that article, the

author states that Goolden "told the Post" that Wardak "uses his money as a tool to influence almost everybody in his life," and that, "[t]his has been the most traumatic thing I've ever gone through . . . It's a nightmare that will not end."

83.    Goolden's attorney Harman was quoted as stating "Wardak 'is a sick person . . . and he needs to be stopped." *Id.* Harman knew this statement was false at the time he made it and that he had no good faith basis for making this claim, which in the context of the false allegations in the complaint falsely implied that Wardak is a serial rapist and, unless "stopped," has been perpetrating and will continue to commit crimes.

84.    In publishing these statements about Wardak, Harman betrayed his professional obligations and violated basic canons of professional ethics and the New York Rules of Professional Conduct, which prohibit making false statements, falsely sensationalizing court actions so as to increase the risk of biasing potential jurors, and otherwise acting to bring disrepute on and to impair the judicial system.

85.    The New York Post article was picked up and published by several other media outlets, including, but not limited to, The Daily Mail Online, ATN News, and The Khaama Press. The Daily Mail republished the false and defamatory statements made by Ms. Wardak and her counsel. As Goolden and Harman intended, the story prompted online commentators on social media engaging in diatribes about Wardak's race, appearance, and the supposed truth of the heinous and outrageously knowingly false accusations in Goolden's complaint.

E.  **Wardak's Reputational and Economic Damages**

86.    The counterclaim-defendants' wrongful conduct severely damaged Wardak's reputation and injured his music business.  The false claims of rape are defamatory *per se*, and the damage to reputation is self-evident.

87.    But Goolden also made such false claims, and related defamatory allegations, to managers and promoters in the close-knit nightclub and dance music community in New York and Miami specifically to injure Wardak's fledgling music business.  And her false and injurious statements had the intended effect.

88.    After Goolden made the defamatory statements to music managers and promoters noted above, Wardak lost gigs playing at various venues and private parties, including for example losing his opportunity to play at Ultra, a well-known music festival in the spring of 2019.

89.    His lost economic income is at least $100,000, which reflects his investment in the music business that he otherwise would have recouped in 2019 if not for Goolden's malicious and knowingly false accusations of rape she made to the music managers and promoters, as set forth above.

90.    In addition, after the New York Post article was published with the false allegations, not just of Goolden's false rape charge in this action, but that Wardak is a "sick" criminal who has a "long record" of sexual and physical violence against numerous "women," bankers and other entrepreneurs cancelled meetings and refused to take future meetings with Wardak, negatively affecting not only his music career but his myriad of other business ventures.

91.    Wardak also expended significant sums of money on legal fees to defend this action, and for search engine optimization to mitigate the further propagation of the false and defamatory statements made by Goolden and Harman to the press.

### FIRST CAUSE OF ACTION
### DEFAMATION *PER SE*
(Against Goolden and Harman)

92.    Counterclaim-plaintiff realleges all preceding paragraphs of his counterclaim as though fully set forth herein.

93.    The oral statements by Goolden identified above as false and defamatory are in fact untrue.

94.    The written statements identified above as false and defamatory and that were published in Goolden's complaint in this action, the Family Court action, and/or in the New York Post article identified above are in fact untrue.

95.    Counterclaim-defendant Goolden made all such defamatory statements concerning Wardak, as set forth above, knowingly and intentionally.

96.    Counterclaim-defendant and third-party defendant Harman knowingly and intentionally made the false and defamatory written statements concerning Wardak, as set forth above.

97.    These counterclaim-defendants made the defamatory statements with knowledge of each statement's falsity or at least with reckless disregard of the truth.

98.    These counterclaim-defendants published these false and defamatory statements about Wardak to third parties, including the third parties identified above, and these third parties understood the defamatory meaning and that the defamatory statements concerned Wardak.

99.     The false and defamatory statements concerning "rape" and a "rape case," as set forth above, both in writing and orally, falsely charge that Wardak committed a "serious crime," to wit, sexual assault and rape.

100.     These counterclaim-defendants made these defamatory written and oral statements to malign Wardak's integrity, credibility, honesty, ethics, trustworthiness, dependability, professional abilities, and fitness to perform in his business in the music industry.

101.     These counterclaim-defendants' actions were malicious, wanton, and reckless, and intended to damage Wardak's business reputation and interfere with his business.

102.     These counterclaim-defendants made the defamatory statements about Wardak to bully, harass, and intimidate him and his business counterparties.

103.     The publication of these defamatory statements, as alleged herein, served no legitimate purpose and had no valid connection with the present federal action or the Family Court action, both of which are sham litigations.

104.     These counterclaim-defendants' defamatory statements were neither privileged nor authorized by law.

105.     These counterclaim-defendants' defamatory statements are defamatory *per se* because they falsely charge Wardak with a serious crime, namely rape and sexual assault, and/or accuse him of being untrustworthy, dangerous and otherwise not fit to conduct his profession or trade in the music industry.

106.     In publishing the false and defamatory statements, these counterclaim-defendants injured Wardak, including injuring his personal and business reputations as a matter of law.

107.     As a direct and proximate result of these counterclaim-defendants' defamatory statements, Wardak incurred damages, including *per se* injury to reputation, pecuniary loss due

to business disruption and loss of business opportunities, and mental and emotional suffering, in an amount to be determined at trial.

108.    Because these counterclaim-defendants' actions were malicious, wanton, outrageous and reckless, Wardak also seeks an award of punitive damages.

**SECOND CAUSE OF ACTION**
**<u>INJURIOUS FALSEHOOD</u>**
(Against Goolden)

109.    Counterclaim-plaintiff realleges all preceding paragraphs of his counterclaim as though fully set forth herein.

110.    Counterclaim-defendant made the oral and written false and defamatory statements noted above with the expectation and intention of discouraging current and potential business associates and music industry participants from working with Wardak.

111.    Counterclaim-defendant's false and defamatory statements made to participants in the music industry were intended to, and did, denigrate the quality of Wardak's business services in the music industry.

112.    A reasonably prudent person would know that making these types of false statements to nightclub and venue owners, musicians, managers, promoters and producers, and in public testimony, court filings and the press, would deter and disrupt Wardak's business relationships in this music industry in New York, Miami and elsewhere.

113.    As a result of counterclaim-defendant's conduct, and as she intended and expected, Wardak lost business in the music industry, including the specific business opportunities and music jobs specified above, and his music business has suffered economic and pecuniary harm in an amount to be determined at trial, but in any event in an amount no less than $100,000, which is the amount of his investment in his start-up music business that the business

would have recouped in 2019 but for counterclaim-defendant's wrongful and injurious falsehoods described herein.

### THIRD CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE BUSINESS RELATIONS
(Against Goolden)

114.    Counterclaim-plaintiff realleges all preceding paragraphs of his counterclaim as though fully set forth herein.

115.    As specified with particularity above, Wardak had existing and prospective business relationships with the third-party musicians, managers, promoters, and club and venue owners identified herein.

116.    Counterclaim-defendant knew about these existing business relationships and about Wardak's prospective business opportunities with these third parties.

117.    Counterclaim-defendant interfered knowingly and intentionally with these business relationships by unlawfully, and without privilege or other legitimate purpose: (i) falsely stating that Wardak is untrustworthy, a liar and a danger to others; and (ii) falsely stating that Wardak had committed rape and that a "rape case" is pending against him.

118.    As a direct and proximate result of counterclaim-defendant's interference with Wardak's business relationships and prospective economic opportunities with these third parties, Wardak suffered damages, including pecuniary loss due to business disruption and loss of business opportunities in the music industry in an amount to be determined at trial, but not less than $100,000.

**FOURTH CAUSE OF ACTION**
**PRIMA FACIE TORT**
(Against Goolden and Cavanaugh)

119.    Counterclaim-plaintiff realleges all preceding paragraphs of his counterclaim as though fully set forth herein.

120.    Counterclaim-defendant Goolden, through her actions and third-party defendant Cavanaugh's actions taken at her behest and for her benefit – as described above, including making extortionate threats to make false claims of rape in legal proceedings and acting on that threat to make such false claims in legal actions – intentionally inflicted harm on Wardak.

121.    These counterclaim-defendants' sole motivation for these extortionate acts was a malicious intent to injure Wardak.

122.    These counterclaim-defendants acted without excuse or justification, using means, including instituting legal actions as described above, that would otherwise be lawful were they premised on good faith claims and not a sham.

123.    As a result of their wrongful acts, Wardak incurred special damages, including the loss of specified business opportunities identified above, tens of thousands of dollars in legal fees and costs associated with defending Goolden's sham litigations in this Court and in Family Court, and costs and fees associated with Internet search engine optimization to mitigate the damage to Wardak's business relationships resulting from Goolden's smear campaign.

124.    As a result, and based upon the foregoing, counterclaim-defendants Goolden and Cavanaugh committed a prima facie tort for which Wardak is entitled to judgment, in an amount to be determined at trial, but in no event less than $100,000.

## PRAYER FOR RELIEF

**WHEREFORE**, defendant/counterclaim-plaintiff Wardak demands judgment against counterclaim-defendants awarding Wardak as follows:

a.      Compensatory damages permitted at law in an amount to be determined at trial;

b.      Punitive damages;

c.      Costs and disbursements of this action, together with attorneys' fees, where provided for by law;

d.      Pre-judgment interest and post-judgment interest available under law; and

e.      Such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
        September 21, 2020

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: /s/ *Michael Paul Bowen*
Michael Paul Bowen
(mbowen@kasowitz.com)
Michelle G. Bernstein
(mgenet@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

*Attorneys for Defendant/ Counter-
claim-Plaintiff Hamed Wardak*