**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARAH GOOLDEN,<br><br>        Plaintiff,<br><br>        v.<br><br>HAMED WARDAK,<br><br>        Defendant. | No. 19-CV-06257 (ALC)<br><br>ECF Case |
| HAMED WARDAK,<br><br>        Counterclaim-Plaintiff,<br><br>        v.<br><br>SARAH GOOLDEN,<br><br>        Counterclaim-Defendant. | |

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF MARCH 18, 1970, ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

***Request for International Judicial Assistance***

1.  The United States District Court for the Southern District of New York (this "Court") presents its compliments to the Senior Master of the Queen's Bench Division of the Senior Courts of England and Wales (the "English Court") and respectfully requests international judicial assistance to obtain evidence to be used in the civil proceedings before this Court in the above-captioned matter (the "Proceedings"). This Court respectfully requests that the English Court recognize this Letter of Request and arrange for its execution, in adherence to the Hague Convention and in the interest of comity.

2.  Specifically, this Court requests the English Court's assistance to cause the oral testimony under oath of Farris El-Alwan, an individual residing in London, England at Flat 5, 4 Queens Gardens, London, United Kingdom, W2 3BA ("Mr. El-Alwan"), to be taken within its jurisdiction, to be used as evidence in the Proceedings between Sarah Goolden, plaintiff and counterclaim-defendant ("Ms. Goolden"), and Hamed Wardak, defendant and counterclaim-plaintiff ("Mr. Wardak").

3.  This Court further requests that the English Court cause the testimony of Mr. El-Alwan to be videotaped and reduced to writing, and that the English Court cause this Letter of

Request and the testimony (both in videotaped and written form), with all marked and attested exhibits, to be returned under cover, duly sealed and addressed. A verbatim transcript and videotape should be produced because the testimony will be taken for trial purposes.

4. The Court further requests international judicial assistance to compel, within 21 days of the issuance of an order by the English Court effectuating this Letter of Request, production of certain documents by Mr. El-Alwan that are relevant to the Proceedings, in a manner that is not inconsistent with the laws of England and Wales, to be used in the same Proceedings.

### *Purpose of the Evidence Sought*

5. This Court requests the assistance more specifically described herein as necessary in the interests of justice. It has been shown to this Court that justice cannot be completely done between the parties without the testimony of Mr. El-Alwan concerning his knowledge of the events relevant to these Proceedings, as detailed below, and without production of the requested documentation by Mr. El-Alwan. The requested documents and testimony will be used by the parties in support of their claims or defenses.

6. Accordingly, this Court respectfully requests a prompt response to this Letter of Request. In conformity with Article 3 of the Hague Convention of March 18, 1970, on the Taking of Evidence Abroad in Civil or Commercial Matters, the undersigned applicant has the honor to submit the following request:

**Requesting Judicial Authority**
The Honorable Andrew L. Carter, Jr.
United States District Court for the Southern District of New York
40 Foley Square
New York, New York 10007
United States

**Recipient – Senior Master**
Master Fontaine, Senior Master and Queen's Remembrancer
Queen's Bench Foreign Process Unit
Royal Courts of Justice
London
WC2A 2LL
United Kingdom

**Name of the Proceedings and Identifying Number**
All evidence requested will be used in relation to the above-captioned civil lawsuit, which can be identified by the following information:
Case name:   *Sarah Goolden v. Hamed Wardak*
Court:       United States District Court for the Southern District of New York
Case Number: 16-CV-6257-ALC

7.    The names and addresses of the parties and representatives or agents of the parties are:

**Plaintiff/Counterclaim-Defendant**
Plaintiff/Counterclaim-Defendant Sarah Goolden is a citizen of the United States of America, currently domiciled in the State of New York, United States of America.

**Plaintiff/Counterclaim-Defendant's Representative**
Aurore C. DeCarlo, Esq.
C.A. Goldberg PLLC
16 Court Street, 33rd Floor
Brooklyn, NY 11241
United States
Telephone: (646) 666-8908
aurore@cagoldberglaw.com

**Defendant/Counterclaim-Plaintiff**
Defendant/Counterclaim-Plaintiff Hamed Wardak is a citizen of the United States of America, currently domiciled in the Commonwealth of Puerto Rico, in the territory of the United States of America.

**Defendant/Counterclaim-Plaintiff's Representatives**
Rhett O. Millsaps II, Esq.
Millsaps & Associates PLLC
745 Fifth Avenue, Suite 500
New York, NY  10151
United States
Telephone:  (646) 535-1137
rhett@millsaps-law.com

*and*

Ian Bean, Esq.
Greenberg Traurig, LLP
The Shard, Level 8
32 London Bridge Street
London, SE1 9SG
United Kingdom
Telephone:  0203 349 8733
beani@gtlaw.com

8.    This Court hereby requests that the executed Letter of Request and all documents and materials covered by this Letter of Request be returned to the following attorney for the defendant and counterclaim-plaintiff, Mr. Wardak, as an officer of this Court:

Ian Bean, Esq.

Greenberg Traurig, LLP
The Shard, Level 8
32 London Bridge Street
London, SE1 9SG
United Kingdom
Telephone:  0203 349 8733
beani@gtlaw.com

As an officer of this Court, he will act as confidential courier of this Court and deliver the executed Letter of Request and all related documents and materials directly to me at the following address:

The Honorable Andrew L. Carter, Jr.
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 435
New York, New York 10007

All documents and materials deposited with the Court in accordance with this Letter of Request will be available to all parties and their counsel.

### *Nature of the Proceedings and Summary of the Case and Relevant Facts*

9.     The above-captioned case is a civil lawsuit brought by Ms. Goolden under the laws of the State of New York seeking money damages for alleged injuries resulting from the alleged physical and sexual assault and intentional infliction of emotional distress by Mr. Wardak.  *See* **Exhibit A** (Complaint) attached hereto.  Ms. Goolden alleges (i) that Mr. Wardak physically assaulted her on the morning of July 6, 2018, while she and Mr. El-Alwan were visiting Mr. Wardak's home in Miami, Florida, by pulling her by her hair out of the bed that she was sharing with Mr. El-Alwan and physically carrying her to Mr. Wardak's bedroom; (ii) that Mr. Wardak sexually assaulted and raped Ms. Goolden in Mr. Wardak's home where Mr. El-Alwan also was staying on July 7, 2018, the morning after Ms. Goolden accepted Mr. Wardak's marriage proposal at a celebratory dinner at a restaurant in Miami with an assembly of their friends; and (iii) that Mr. Wardak intentionally inflicted emotional distress on Ms. Goolden by threatening, stalking, and harassing Ms. Goolden and her father after she broke off the engagement.

10.     Mr. Wardak is countersuing Ms. Goolden for defamation, alleging that Ms. Goolden has made these allegations to third parties and brought this case maliciously and solely to defame him.  *See* **Exhibit B** (Answer and Counterclaim) attached hereto.  Mr. Wardak specifically alleges that he and Ms. Goolden had an on-and-off romantic friendship for eight years, which became an exclusive relationship beginning in or around May 2018. Beginning around that time, Mr. Wardak alleges that Ms. Goolden inveigled several hundred thousand dollars in cash and gifts from him over the course of two months, including an approximately $160,000 Harry Winston diamond engagement ring that Mr. Wardak purchased for Ms. Goolden at her insistence while she, Mr. El-Alwan, and their

4

friend Stephanie Raphael were staying with Mr. Wardak at his home in Miami around the July 4, 2018 holiday.  It is alleged that Mr. El-Alwan accompanied Mr. Wardak to Harry Winston in Miami and identified the ring that Ms. Goolden had selected, which Mr. Wardak immediately purchased.  As Mr. Wardak alleges, the parties then had a lavish engagement dinner with friends paid for by Mr. Wardak, Ms. Goolden got "cold feet" the next day and left Mr. Wardak's apartment for a hotel with Mr. El-Alwan before texting Mr. Wardak to apologize and returning to his home that evening, and two days later Ms. Goolden left Miami with the engagement ring and "ghosted" Mr. Wardak while she went to Mykonos, Greece with her purported ex-boyfriend.

11.    According to the allegations in both Ms. Goolden's Complaint and Mr. Wardak's Answer and Counterclaim, Mr. El-Alwan is a central witness in this case.  Both Ms. Goolden and Mr. Wardak allege that Mr. Wardak came home to find Ms. Goolden in bed with Mr. El-Alwan in Mr. Wardak's guest room on the morning of July 5 or 6, 2018.  Ms. Goolden alleges that Mr. Wardak proceeded to physically assault her in front of Mr. El-Alwan, while Mr. Wardak avers that the parties had a verbal argument but no such physical assault took place.  Mr. Wardak alleges that following this incident, Mr. El-Alwan accompanied him to Harry Winston, where Mr. El-Alwan pointed out the ring that Ms. Goolden wanted Mr. Wardak to buy for her.  Both parties allege that Mr. El-Alwan was in Mr. Wardak's apartment when Ms. Goolden alleges that Mr. Wardak raped her on the morning of July 7, 2018, and that Ms. Goolden and Mr. El-Alwan left Mr. Wardak's home together that day to go to a hotel before returning to Mr. Wardak's home.

12.    Additionally, Mr. El-Alwan remained in contact with Mr. Wardak by various electronic means for months following the alleged July 2018 incidents in Miami, and Ms. Goolden has produced documents showing that she and Mr. El-Alwan exchanged thousands of text, image, and audio messages between June 2019 and May 2021, many of which relate to this case and the parties' dueling allegations.  A few examples of such communications are attached hereto as **Exhibit C**.  Ms. Goolden has been unable to locate her communications with Mr. El-Alwan prior to June 2019, so Mr. El-Alwan likely is the only source of those documents to the extent they are in his possession, custody, or control.

13.    On July 23, 2021, Mr. Wardak's counsel wrote to Mr. El-Alwan to ask if he would voluntarily attend a deposition in London; Mr. Wardak's counsel additionally sent Mr. El-Alwan an email on July 26, 2021 to inform Mr. El-Alwan that Mr. Wardak would consider conducting such a deposition remotely by video link as well.  Those communications are attached hereto as **Exhibit D**.  Mr. El-Alwan has not responded to those communications to date.

### *Evidence to Be Obtained*

14.    Based on the foregoing, this Court respectfully requests that the English Court provide assistance to obtain the following documents and testimony from Mr. El-Alwan in response to this Letter of Request that may be lawfully obtained by the English Court, or any other department, division, or office of the government of the United Kingdom, that

relates to Ms. Goolden's and Mr. Wardak's respective allegations.

15.  This letter requests oral testimony under oath or affirmation of Mr. El-Alwan for use as evidence in the Proceedings.  Mr. El-Alwan was the only first-hand witness to certain central incidents alleged by the parties in this case, including Mr. Wardak's alleged physical assault of Ms. Goolden while she was in bed with Mr. El-Alwan and Mr. Wardak's purchase of the engagement ring allegedly pre-selected by Ms. Goolden.  This information cannot be obtained from any source within the jurisdiction of this Court and cannot be obtained by any means other than an order by the English Court compelling Mr. El-Alwan to appear for examination.

16.  The subject matter on which Mr. El-Alwan will be examined is his personal knowledge regarding: (i) Ms. Goolden's allegations that Mr. Wardak physically assaulted her in front of Mr. El-Alwan at Mr. Wardak's Miami home in July 2018; (ii) the events surrounding the engagement of Ms. Goolden and Mr. Wardak, including Mr. Wardak's purchase of the engagement ring and the parties' engagement dinner; (iii) Ms. Goolden's allegations that Mr. Wardak raped her the morning after their engagement while Mr. El-Alwan was in the apartment with them; and (iv) Mr. El-Alwan's subsequent communications with Ms. Goolden, Mr. Wardak, and friends and family members of the parties.

17.  It is requested that the examination of Mr. El-Alwan be conducted in accordance with the applicable laws of England and Wales for the taking of oral testimony under oath or affirmation.  To the extent allowed by any judicial authority executing this request, it is specifically requested that counsel for Mr. Wardak be permitted to conduct questioning of Mr. El-Alwan.  It is further requested that the examination be recorded by videographic and stenographic means, and continue from day to day until completed.  It is requested that Mr. El-Alwan give his testimony at such place and at such time as shall be agreed between Mr. El-Alwan and the parties, at the address below:

Greenberg Traurig, LLP
The Shard, Level 8
32 London Bridge Street
London, SE1 9SG
United Kingdom

***Documentation to Be Obtained***

18.  The following documents (together, the "Documents") are requested from Mr. El-Alwan:

   a.  All documents and communications concerning or with Hamed Wardak.

   b.  All documents and communications concerning or with Sarah Goolden from April 1, 2018 to present.

   c.  All documents and communications concerning Mr. El-Alwan's trip to Miami, Florida in or around July 3, 2018 to July 8, 2018, including without limitation all

photographs taken and social media posts published during the trip.

d.  All documents and communications concerning the planning of Ms. Goolden's and Mr. Wardak's engagement celebration at Scarpetta and other venues in Miami, Florida on or around July 6, 2018 (the "Engagement Celebration").

e.  All documents and communications concerning the Engagement Celebration, including without limitation all photographs and videos taken at the Engagement Celebration and all social media posts, including without limitation any deleted posts, concerning the Engagement Celebration.

f.  All documents and communications concerning the engagement ring given to Sarah Goolden by Hamed Wardak, including without limitation all photographs of Sarah Goolden wearing said engagement ring.

g.  All documents and communications concerning gifts of any kind that Mr. El-Alwan received from Hamed Wardak, including without limitation wire transfers, cash payments, travel tickets, tangible items, and offers of services by third parties introduced by Mr. Wardak.

h.  All documents and communications concerning services performed by Mr. El-Alwan for Hamed Wardak or any company owned or controlled by Hamed Wardak.

i.  All documents and communications concerning any drugs or alcohol consumed from July 3, 2018 to July 8, 2018 by Mr. El-Alwan or Sarah Goolden.

j.  All documents and communications concerning the W Hotel in Miami, Florida from July 3, 2018 to July 8, 2018.

k.  All documents and communications concerning stalking, harassment, assault, or rape by any person from April 1, 2018 to present.

l.  All documents and communications concerning any police report filed by Mr. El-Alwan from April 1, 2018 to present.

m.  All documents and communications concerning or with Stephanie Raphael from April 1, 2018 to present.

n.  All documents and communications concerning or with Alexandra Wu from April 1, 2018 to present.

o.  All documents and communications concerning or with Brian Cavanaugh from April 1, 2018 to present.

p.  All documents and communications concerning or with Arthur Bahia from April

1, 2018 to present.

q.   All documents and communications concerning or with any person with whom Sarah Goolden was romantically involved, other than Hamed Wardak and Arthur Bahia, from April 1, 2018 to present.

r.   All documents and communications concerning or with Sarah Goolden's attorneys in this case and any other action in which Sarah Goolden is or was a party.

s.   All documents and communications concerning this case.

19.   To Mr. Wardak's knowledge and belief, the Documents are in the possession, custody, or control of Mr. El-Alwan.

20.   If the Documents were in the possession, custody, or control of a person within the United States, Mr. Wardak would be able, pursuant to United States Federal Rule of Civil Procedure 45, to issue a subpoena to that person commanding the production of the Documents.

21.   From the documents produced by the parties so far in this case, examples of which are attached hereto as Exhibit C, it appears to be common ground that the Documents exist or may exist and are in the possession of Mr. El-Alwan.

22.   The Documents are not available from any source within the jurisdiction of this Court and cannot be obtained by any means other than an order by the appropriate judicial authority of England and Wales requiring their production.

23.   It is requested that Mr. El-Alwan produce the Documents to the attention of Mr. Bean acting as an officer of this Court, as set out below, within 21 days of the issuance of an order by the English Court effectuating this Letter of Request, or as ordered by the English Court:

Ian Bean, Esq.
Greenberg Traurig, LLP
The Shard, Level 8
32 London Bridge Street
London, SE1 9SG
United Kingdom
beani@gtlaw.com

24.   With regard to the Documents, if Mr. El-Alwan contends that the contents of a Document requested to be produced for inspection and copying are protected from disclosure by virtue of a privilege, it is intended and requested that a description of the Document in question be provided, which shall include with respect to each document:

    a.   each privilege that Mr. El-Alwan contends protects the Document from disclosure;

    b.   the facts upon which Mr. El-Alwan relies to support the claim of privilege;

    c.   an identification of the type of Document (*e.g.*, e-mail, letter, notes or memoranda of telephone conversation, etc.);

    d.   the author(s) of each Document;

    e.   the person(s) to whom each Document was directed;

    f.   the person(s) who received or obtained copies of each Document;

    g.   the general subject matter of each Document; and

    h.   the person(s) to whom copies were supplied.

### *Fees and Costs*

25.    The fees and costs incurred that are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by Mr. Wardak.  This Court is prepared to enforce all rights of the English Court with respect to such requested reimbursement.

### *Conclusion*

26.    This Court expresses its sincere willingness to provide similar assistance to the English Court, if future circumstances so require.

27.    This Court, in the spirit of comity and reciprocity, hereby requests international judicial assistance in the form of this Letter of Request seeking information and documents described herein from the Senior Master of the Queen's Bench decision of the High Court of England and Wales.  This Court extends to all judicial and other authorities of the United Kingdom of Great Britain and Northern Ireland the assurances of its highest consideration.

DATED:  _____

                **BY THE COURT:**

                _____
                The Honorable Andrew L. Carter, Jr.
                United States District Court

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------×

SARAH GOOLDEN,

                     *Plaintiff,*                  **19 CV 6257**

     *v.*

                                                **COMPLAINT**

HAMED WARDAK,

                     *Defendant.*

------------------------------------------------------------------------×

Plaintiff Sarah Goolden, by her counsel, The Harman Firm, LLP, alleges for her

Complaint against Defendant Hamed Wardak as follows:

### PRELIMINARY STATEMENT

1.       Plaintiff, Sarah Goolden, is the victim of sexual and physical violence by a

merciless individual, Defendant Wardak, who knows no bounds and has followed and attacked

other women.  Defendant Wardak has been stalking Ms. Goolden for over a year and has been

arrested numerous times for his illegal and relentless pursuit of Ms. Goolden.

2.       Ms. Goolden seeks damages and costs against Defendant Wardak for assault,

battery, and intentional infliction of emotional distress from Defendant Wardak's sexual assault

of Ms. Goolden.

3.       Ms. Goolden also seeks damages and costs against Defendant Wardak intentional

infliction of emotional distress from his continued stalking of Ms. Goolden.

4.       Ms. Goolden also seeks damages and costs against Defendant Wardak for

defamation *per se*.

## JURISDITION AND VENUE

5.      Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over Plaintiff's claims, as the matter in controversy exceeds $75,000 and is between citizens of different states:

   a. Plaintiff is a citizen of the State of New York, as she is domiciled in the State of New York.

   b. Upon information and belief, Defendant is a citizen of Puerto Rico, as he is domiciled in the Commonwealth of Puerto Rico.

6.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

## TRIAL BY JURY

7.      Plaintiff respectfully requests a trial before a jury.

## PARTIES

8.      Plaintiff, at all times relevant hereto, was and is a resident of New York County in the State of New York.

9.      Upon information and belief, at all times relevant hereto, Defendant was and is a resident of Dorado County in the Commonwealth of Puerto Rico.

## STATEMENT OF FACTS

10.     Defendant Wardak is a multi-millionaire with seemingly unlimited resources, who has a long, documented history of stalking and attacking woman.

11.     Ms. Goolden, in her late 20s, is a working model and student.

12.     Ms. Goolden met Defendant Wardak in 2010, and soon thereafter, they became friends.

13.     In the summer of 2018, Defendant Wardak continually pressured Ms. Goolden into a romantic relationship.

14.     As part of his courtship, Defendant Wardak bought Ms. Goolden numerous gifts.

15.     Defendant Wardak told Ms. Goolden that he purchased the gifts only "as a friend" and that there were "no strings attached."

16.     After giving Ms. Goolden the gifts, Defendant Wardak told Ms. Goolden that she absolutely had to give him a chance romantically and accept him as her boyfriend.

17.     In and around early June 2018, feeling pressured by Defendant Wardak, Defendant, Ms. Goolden surrendered to his attempt to forge a closer relationship.

18.     In and around the week of July 4, 2018, Ms. Goolden traveled to Miami with friends, Stephanie and Ferris, to attend Defendant Wardak's Fourth of July party.

19.     Ms. Goolden and her friend stayed at Defendant Wardak's home.

20.     On or about July 5, Defendant Wardak began an argument with Ms. Goolden in which he falsely and baselessly accused Ms. Goolden of sleeping with her friend, Ferris.

21.     After threatening Ms. Goolden and Ferris, Defendant Wardak left his home to go to a nightclub.

22.     Ms. Goolden, fearful of sleeping in the same room as Mr. Wardak, decided to sleep with Ferris and Stephanie in the guest room.

23.     In the early morning of July 6, Ms. Goolden awoke to Defendant Wardak screaming and pulling her by her hair.

24.     In front of Mr. Al-Awan, Defendant Wardak forcibly pulled Ms. Goolden out of bed, picked her up, and then carried her to his bedroom, where he then threw her onto his bed.

3

25.     Defendant Wardak resumed the previous argument with Ms. Goolden and began throwing glasses and plates at her.

26.     During the assault, Defendant Wardak threatened Ms. Goolden that he would ruin her life if she did not stay with him and agree to do what he wanted.

27.     Ferris was fearful of Defendant Wardak and attempted to leave.

28.     However, the elevator was stuck.

29.     Regardless of the elevator trouble, Ms. Goolden also attempted to leave, beginning to pack her suitcase.

30.     While she packed, Defendant Wardak told Ms. Goolden that if she forgave him for his actions, he would calm down and not hurt her or her friends.

31.     Ms. Goolden was terrified of Defendant Wardak, and with the elevator stuck and having no other place to stay at 5:00 a.m., she decided to stay for the night.

32.     Ms. Goolden, however, only got a few hours of sleep when she awoke suddenly to Defendant Wardak on top of her.

33.     Defendant Wardak demanded that Ms. Goolden speak to him and work things out.

34.     Defendant Wardak apologized to Ms. Goolden and Ferris.

35.     Later that day, July 6, 2019, Defendant Wardak treated Ms. Goolden, her friends, and his entourage to food and drinks at a Bal Harbour restaurant.

36.     Everyone was drinking heavily and Ms. Goolden felt extremely vulnerable and afraid.

37.     Defendant Wardak then began buying multiple shots of tequila for Ms. Goolden, stating, "Sarah is only fun when she takes shots of 1942."

4

38.     Shortly thereafter, Defendant Wardak proposed marriage to Ms. Goolden in front of his entourage.

39.     Ms. Goolden felt publicly pressured and scared that Defendant Wardak would retaliate by physically assaulting her if she declined.

40.     Thus, Ms. Goolden publically accepted Defendant Wardak's proposal.

41.     In private, however, Ms. Goolden told Defendant Wardak that the proposal was a bad idea, and that she could not go through with the marriage.

42.     Defendant Wardak brushed off Ms. Goolden's feelings and concerns, and told Ms. Goolden as-a-matter-of-fact, that she was "locked in now" because she had already said, "Yes."

43.     When Ms. Goolden attempted to privately talk to her friend Alexandra about the matter, Defendant Wardak prevented Ms. Goolden from being alone with Alexandra by ordering his bodyguards to follow them into the bathroom.

44.     Ms. Goolden increasingly became more uncomfortable being alone with Defendant Wardak.

45.     Later that night at a hotel, Defendant Wardak was still drunk from the all-day drinking and initiated another argument with Ms. Goolden, yelling at Ms. Goolden, "It's a romantic night," and, "You should want to be alone with your fiancé."

46.     Defendant Wardak also screamed as Ms. Goolden, telling her that she was a terrible person because she did not show him any affection.

47.     Ms. Goolden was emotionally exhausted and tried to go to sleep.

48.     Defendant Wardak joined Ms. Goolden in bed and told her that she is his fiancée now, and he "couldn't wait to make love" to her.

49.     Ms. Goolden responded, saying that she did not want to engage in any sexual activity, that she was not ready, and that she wanted to rethink the engagement.

50.     Defendant Wardak yelled multiple times, "No! You're my fiancé! You need to make love to me!"

51.     Defendant Wardak then climbed on top of Ms. Goolden, pulled off of her underwear, and forcefully held her down while he performed oral sex on her.

52.     Ms. Goolden pleaded with him to stop.

53.     Defendant Wardak then stopped performing oral sex, pulled out his penis and sexually assaulted Ms. Goolden.

54.     While Ms. Goolden loudly cried with her eyes shut, Defendant Wardak continued to shout, "You should want this because you're my fiancé!"

55.     Throughout the sexual assault, Ms. Goolden repeatedly begged him to stop, which Defendant Wardak ignored.

56.     At the end of the sexual assault, Defendant Wardak exclaimed, "This was the worst sexual experience of my life."

57.     Ms. Goolden felt ashamed, terrified and defeated, and forced herself to sleep that night.

58.     On July 7, the next morning, Ms. Goolden suffered an extreme anxiety attack.

59.     Ms. Goolden then told Defendant Wardak that what happened last night "was not okay" and "would never happen again."

60.     She also told Defendant Wardak that she wanted nothing to do with him and did not want to be engaged.

61.     This led to another argument that ended with Ms. Goolden and Ferris leaving Defendant Wardak's home with their belongings and booking a room at a local hotel.

62.     Ms. Goolden then informed her friend, Stephanie, that they left Defendant Wardak's apartment.

63.     Defendant Wardak did not allow Stephanie to retrieve her belongings, and then called Stephanie and Ferris, yelling and threatening to harm Ms. Goolden if she did not return and speak with him.

64.     Specifically, Defendant Wardak told them that he would ruin Ms. Goolden's life, make her look like a con-artist, get her dad thrown in jail, have someone follow her, and ruin her reputation.

65.     In an attempt to retrieve Stephanie's belongings, Ms. Goolden, Stephanie and Ferris returned to Defendant Wardak's apartment.

66.     Defendant Wardak allowed the retrieval, but then threatened Ms. Goolden further, telling Ms. Golden that he would sue her and force her into bankruptcy with legal fees, murder her and her entire family, tap her phones, and have her followed and watched.

67.     Defendant Wardak also said to Ms. Goolden, "You're just a little blonde model—who will believe you?" and then bragged, "I took on Al Qaeda and The Taliban," before stating that Ms. Goolden was no match for him.

68.     Mere moments after delivering these threats to Ms. Goolden, Defendant Wardak offered Ms. Goolden $3 million to marry him.

69.     He then continued to threaten her by stating that he would do everything within his means to ruin Ms. Goolden if she chose not to be with him.

7

70.     Defendant Wardak then told Ms. Goolden that the reason she did not love him was because she had not gotten over her ex-boyfriend.

71.     Defendant Wardak disturbingly explained to Ms. Goolden that "a woman has an emotional attachment to a man after they have sex" and that both him and Ms. Goolden needed to keep having sex in order to grow an attachment."

72.     Defendant Wardak further explained that Ms. Goolden would not initially like the sex, but they need to keep having sex repeatedly until she grew to like it, and eventually love him.

73.     Defendant Wardak then admitted to raping Ms. Goolden.

74.     Ms. Goolden was so traumatized and disturbed that the next day, on July 8, she left Miami and returned to her home in New York City.

75.     Thereafter, in New York, Defendant Wardak then carried out the majority of his threats upon Ms. Goolden.

76.     After Ms. Goolden returned to New York in July 2018, Defendant Wardak began to severely harass, stalk, and defame Ms. Goolden well into 2019; much of this conduct continues to this day, as Defendant Wardak was even arrested recently for violating a Court Order to stay away from Ms. Goolden.

77.     Defendant Wardak, with the intention to maliciously harm Ms. Goolden's reputation, told Ms. Goolden's brother, Kevin Goolden, and her friend, Yura Shabetayev, that Ms. Goolden suffered from a drug addiction.

78.     Defendant Wardak knew that these statements were false when he made them.

79.     With the intention to harm Ms. Goolden, Defendant Wardak then maliciously made false public posts on social media regarding drug addiction, knowing that associates of Ms. Goolden could view them.

80.     Defendant Wardak further harassed Ms. Goolden via email on multiple occasions, stating that she had a drug addiction and sending her links to articles that discussed the effects of such addiction.

81.     Defendant Wardak also sent Ms. Goolden links to get help for bipolar disorder, a mood disorder that Ms. Goolden never had.

82.     He falsely accused Ms. Goolden via text messaging and email of being an escort, a sex trafficker, and a racist.

83.     Defendant Wardak also posted a message on his social media page that falsely insinuated Ms. Goolden was sleeping with her lawyer.

84.     However, this long-distance harassment was not enough for Defendant Wardak.

85.     So, in September 2018, Defendant Wardak obtained an apartment in New York, a few blocks from Ms. Goolden, with the intent to ruin her life and reputation.

86.     Defendant Wardak then began to stalk Ms. Goolden and bribe her family members.

87.     For example, Defendant Wardak gave Ms. Goolden's father plane tickets, hotel rooms, and other lavish gifts in exchange for Ms. Goolden's father's encouraging of Ms. Goolden to speak with Defendant Wardak.

88.     Defendant Wardak also attempted to bribe Ms. Goolden's brother.

89.     Due to Defendant Wardak's bribery and harassment, Ms. Goolden's relationship with her father became strained for months.

90.     Defendant Wardak threatened to show up at Ms. Goolden's apartment and her father's house.

91.     Ms. Golden lived every day in fear that he would arrive at her apartment and physically assault her again.

92.     Ms. Goolden became distressed to the extent that she saw a therapist for Defendant Wardak's psychological and emotional abuse, which affected all aspects of her life, including her modeling career.

93.     Although Ms. Goolden filed multiple reports against Defendant Wardak from September 2018 to January 2019, blocked his number and multiple email addresses, Defendant Wardak's harassment continues.

94.     In May 2019, Defendant Wardak threatened to murder Ms. Goolden's father and sent him multiple death threats.

95.     Since Ms. Goolden's sexual assault, Defendant Wardak has delivered almost all of his previous threats, thereby isolating Ms. Goolden from her family, causing severe emotional and psychological trauma, and ruining her reputation and career.

96.     To date, Defendant Wardak continues to harass Ms. Goolden through frivolous legal means.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**Assault**

97.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 96 with the same force as though separately alleged herein.

98.     Defendant Wardak intentionally threatened to inflict injury on Ms. Goolden.

99.     Defendant Wardak, a male individual much larger than his victim, had ability to cause the harm to Ms. Goolden.

100.    Defendant Wardak's actions created the apprehension of bodily harm and offensive contact for the victim, Ms. Goolden.

101.    Defendant Wardak's actions caused Ms. Goolden damages, including, but not limited to, emotional distress.

102.    Defendant Wardak's conduct shows a high degree of moral culpability, which manifests a conscious disregard of the rights of Mr. Goolden and otherwise amounts to conduct so reckless as to amount to such disregard.

## SECOND CAUSE OF ACTION
### Battery

103.    Plaintiff hereby repeats and incorporates each and every allegation contained in paragraphs 1 through 102 with the same force as though separately alleged herein.

104.    Defendant Wardak intentionally applied force to the body of Ms. Goolden by attacking her both physically and sexually.

105.    These actions were extremely harmful and offensive to Ms. Goolden.

106.    Ms. Goolden did not consent to the applied force to her body.

107.    Defendant Wardak's actions caused Ms. Goolden damages, including, but not limited to, physical injury and emotional distress.

108.    Defendant Wardak's conduct shows a high degree of moral culpability, which manifests a conscious disregard of the rights of Mr. Goolden and otherwise amounts to conduct so reckless as to amount to such disregard.

## THIRD CAUSE OF ACTION
### Defamation *Per Se*

109.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

110.     Defendant made false and defamatory statements of facts regarding Plaintiff, namely, that she was a drug addict, prostitute, sex trafficker, and a racist.

111.     Defendant's statements were made with malicious intent and have resulted in injury to Plaintiff by damaging her reputation and business relationships.

112.     As a result of Defendant's slander and libel, Plaintiff has suffered substantial damages.

113.     Defendant Wardak's conduct shows a high degree of moral culpability, which manifests a conscious disregard of the rights of Mr. Goolden and otherwise amounts to conduct so reckless as to amount to such disregard.

## FOURTH CAUSE OF ACTION
### Intention Infliction of Emotional Distress

114.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 113 with the same force as though separately alleged herein.

115.     The above-described actions of Defendants are extreme and outrageous and were undertaken with the intent to cause Plaintiff severe emotional distress.

116.      Such extreme and outrageous acts did in fact cause Plaintiff severe emotional distress.

117.     As a proximate result of extreme and outrageous acts, Plaintiff has experienced pain, suffering, severe emotional distress, mental distress, shame, humiliation, embarrassment and related physical ailments.

118.     As a further and proximate result of such conduct, Plaintiff has suffered loss of income, as well as other career opportunities.

119.     Defendant's acts alleged herein are malicious, oppressive, fraudulent, despicable, and in conscious disregard of Plaintiff's privacy, dignity and emotional well being.  As such, punitive damages are warranted.

120.     Defendant Wardak's conduct has a high degree of moral culpability, which manifests a conscious disregard of the rights of Mr. Goolden and otherwise amounts to conduct so reckless as to amount to such disregard.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A.  For the first cause of action, compensatory damages not less than $1,000,000, punitive damages, and any other damages to be determined at trial;

B.  For the second cause of action, compensatory damages not less than $1,000,000, punitive damages, and any other damages to be determined at trial;

C.  For the third cause of action, compensatory damages not less than $1,000,000,

D.  For the fourth cause of action, compensatory damages not less than $1,000,000 punitive damages, and any other damages to be determined at trial; and

E.  For such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        July 5, 2019


By:      _(signature)_
            Walker G. Harman, Jr. [WH-8044]
            Edgar M. Rivera [ER-1378]
            THE HARMAN FIRM, LLP
            381 Park Avenue South, Suite 1220
            New York, NY 10016
            (212) 425-2600
            wharman@theharmanfirm.com
            erivera@theharmanfirm.com


            *Attorneys for Plaintiff*

# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARAH GOOLDEN, | No. 19-CV-06257 (JPO) |
|       Plaintiff, | |
|       v. | ECF Case |
| HAMED WARDAK, | |
|       Defendant. | |

| | |
|---|---|
| HAMED WARDAK, | **DEFENDANT'S SECOND AMENDED ANSWER AND COUNTERCLAIM** |
|       Counterclaim-Plaintiff, | |
|       v. | |
| SARAH GOOLDEN, | |
|       Counterclaim-Defendant. | |

## <u>ANSWER</u>

Defendant/Counterclaim-Plaintiff Hamed Wardak hereby answers the Complaint of Plaintiff/Counterclaim-Defendant Sarah Goolden as follows:

1. Defendant denies the allegations in Paragraph 1 of the Complaint.

2. Paragraph 2 is Plaintiff's characterization of this action as to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 2.

3. Paragraph 3 is Plaintiff's characterization of this action as to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 3.

4. Paragraph 4 is Plaintiff's characterization of this action as to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 4.

5. The allegations in Paragraph 5 set forth legal conclusions to which no response is required. To the extent a response is required, Defendant denies knowledge or information

sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 5(a) and admits the allegations in Paragraph 5(b).

6.       The allegations in Paragraph 6 set forth legal conclusions as to venue to which no response is required. To the extent a response is required, Defendant disputes Plaintiff's assertion that a "substantial part of the events giving rise" to Plaintiff's legal claims, which "events" Defendant denies ever occurred, supposedly occurred in this venue, but notes that the issue of venue was already adjudicated and upheld by a prior ruling of this Court.

7.       Paragraph 7 is Plaintiff's characterization of this action as to which no response is required.

8.       Defendant denies knowledge or information sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 8.

9.       Defendant admits the allegations in Paragraph 9.

10.       Defendant denies the allegations in Paragraph 10, except admits that Defendant became wealthy through his successful entrepreneurship.

11.       Defendant denies knowledge or information sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 11.

12.       Defendant denies the allegations in Paragraph 12, except admits that Plaintiff and Defendant met in or about 2010.

13.       Defendant denies the allegations in Paragraph 13.

14.       Defendant denies the allegations in Paragraph 14, except admits that Defendant bought Plaintiff gifts.

15.       Defendant denies the allegations in Paragraph 15.

16.       Defendant denies the allegations in Paragraph 16.

17.     Defendant denies the allegations in Paragraph 17.

18.     Defendant denies the allegations in Paragraph 18, except admits that Defendant paid for Plaintiff and her two friends to fly to Miami to visit Defendant during the July 4th holiday week in 2018.

19.     Defendant denies the allegations in Paragraph 19, except admits that Plaintiff and her two friends stayed at Defendant's home during their July 2018 Miami trip.

20.     Defendant denies the allegations in Paragraph 20.

21.     Defendant denies the allegations in Paragraph 21, except admits that Defendant left his home to meet a friend at a lounge in the early morning hours of July 5, 2018.

22.     Defendant denies the allegations in Paragraph 22.

23.     Defendant denies the allegations in Paragraph 23.

24.     Defendant denies the allegations in Paragraph 24.

25.     Defendant denies the allegations in Paragraph 25.

26.     Defendant denies the allegations in Paragraph 26.

27.     Defendant denies the allegations in Paragraph 27.

28.     Defendant denies the allegations in Paragraph 28.

29.     Defendant denies the allegations in Paragraph 29.

30.     Defendant denies the allegations in Paragraph 30.

31.     Defendant denies the allegations in Paragraph 31.

32.     Defendant denies the allegations in Paragraph 32.

33.     Defendant denies the allegations in Paragraph 33.

34.     Defendant denies the allegations in Paragraph 34.

35.     Defendant denies the allegations in Paragraph 35, except admits that Defendant

paid for lunch for Plaintiff and her friends at Carpaccio in Bal Harbor.

36.    Defendant denies the allegations in Paragraph 36, except admits that Plaintiff drank heavily over the course of the July 4, 2018 week.

37.    Defendant denies the allegations in Paragraph 37.

38.    Defendant denies the allegations in Paragraph 38, except admits that Defendant proposed marriage to Plaintiff at Scarpetta in Miami on the evening of July 6, 2018.

39.    Defendant denies the allegations in Paragraph 39.

40.    Defendant denies the allegations in Paragraph 40, except admits that Plaintiff accepted Defendant's marriage proposal.

41.    Defendant denies the allegations in Paragraph 41.

42.    Defendant denies the allegations in Paragraph 42.

43.    Defendant denies the allegations in Paragraph 43.

44.    Defendant denies the allegations in Paragraph 44.

45.    Defendant denies the allegations in Paragraph 45.

46.    Defendant denies the allegations in Paragraph 46.

47.    Defendant denies the allegations in Paragraph 47.

48.    Defendant denies the allegations in Paragraph 48.

49.    Defendant denies the allegations in Paragraph 49.

50.    Defendant denies the allegations in Paragraph 50.

51.    Defendant denies the allegations in Paragraph 51.

52.    Defendant denies the allegations in Paragraph 52.

53.    Defendant denies the allegations in Paragraph 53.

54.    Defendant denies the allegations in Paragraph 54.

55.    Defendant denies the allegations in Paragraph 55.

56.    Defendant denies the allegations in Paragraph 56.

57.    Defendant denies the allegations in Paragraph 57.

58.    Defendant denies the allegations in Paragraph 58.

59.    Defendant denies the allegations in Paragraph 59.

60.    Defendant denies the allegations in Paragraph 60.

61.    Defendant denies the allegations in Paragraph 61, except admits that Plaintiff and her friends left Defendant's home for the day on July 7, 2018.

62.    Defendant denies knowledge or information sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 62.

63.    Defendant denies the allegations in Paragraph 63.

64.    Defendant denies the allegations in Paragraph 64.

65.    Defendant denies the allegations in Paragraph 65.

66.    Defendant denies the allegations in Paragraph 66.

67.    Defendant denies the allegations in Paragraph 67.

68.    Defendant denies the allegations in Paragraph 68.

69.    Defendant denies the allegations in Paragraph 69.

70.    Defendant denies the allegations in Paragraph 70.

71.    Defendant denies the allegations in Paragraph 71.

72.    Defendant denies the allegations in Paragraph 72.

73.    Defendant denies the allegations in Paragraph 73.

74.    Defendant denies the allegations in Paragraph 74.

75.    Defendant denies the allegations in Paragraph 75.

76.     Defendant denies the allegations in Paragraph 76, except admits that Defendant was arrested for violating a Court Order to stay away from Plaintiff.

77.     Defendant denies the allegations in Paragraph 77.

78.     Defendant denies the allegations in Paragraph 78.

79.     Defendant denies the allegations in Paragraph 79.

80.     Defendant denies the allegations in Paragraph 80, except admits that Defendant sent Plaintiff emails regarding Plaintiff's alleged drug addiction.

81.     Defendant denies the allegations in Paragraph 81, except admits that Defendant sent Plaintiff links regarding mental health resources.

82.     Defendant denies the allegations in Paragraph 82, except admits that Defendant sent Plaintiff messages asserting that he thought she was an escort, sex trafficker, and/or racist based on her behavior and Defendant's discussions with Plaintiff and her father.

83.     Defendant denies the allegations in Paragraph 83.

84.     Defendant denies the allegations in Paragraph 84.

85.     Defendant denies the allegations in Paragraph 85.

86.     Defendant denies the allegations in Paragraph 86.

87.     Defendant denies the allegations in Paragraph 87, except admits that Defendant gave Plaintiff's father plane tickets, travel expenses, and money for a personal trainer and other expenses, and arranged for legal representation for Plaintiff's father to reinstate his law license.

88.     Defendant denies the allegations in Paragraph 88.

89.     Defendant denies the allegations in Paragraph 89.

90.     Defendant denies the allegations in Paragraph 90.

91.     Defendant denies the allegations in Paragraph 91.

6

92. Defendant denies the allegations in Paragraph 92.

93. Defendant denies the allegations in Paragraph 93.

94. Defendant denies the allegations in Paragraph 94.

95. Defendant denies the allegations in Paragraph 95.

96. Defendant denies the allegations in Paragraph 96.

97. Defendant realleges his responses to Paragraphs 1 through 96. To the extent a further response is required, Defendant denies the allegations in Paragraph 97.

98. Defendant denies the allegations in Paragraph 98.

99. Defendant denies the allegations, other than gender, in Paragraph 99.

100. Defendant denies the allegations in Paragraph 100.

101. Defendant denies the allegations in Paragraph 101.

102. The allegations in Paragraph 102 set forth legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

103. Defendant realleges his responses to Paragraphs 1 through 102. To the extent a further response is required, Defendant denies the allegations in Paragraph 103.

104. Defendant denies the allegations in Paragraph 104.

105. Defendant denies the allegations in Paragraph 105.

106. Defendant denies the allegations in Paragraph 106.

107. Defendant denies the allegations in Paragraph 107.

108. The allegations in Paragraph 108 set forth legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

109. Defendant realleges his responses to Paragraphs 1 through 108 and asserts that the allegations in Paragraph 109 are moot because this cause of action for defamation *per se* was

dismissed with prejudice by the Decision and Order filed July 23, 2020 and Order filed August 15, 2020. To the extent a further response is required, Defendant denies the allegations in Paragraph 109.

110.    The allegations in Paragraph 110 are moot because this cause of action for defamation *per se* was dismissed with prejudice by the Court's Decision and Order filed July 23, 2020 and Order filed August 15, 2020. To the extent a further response is required, Defendant denies the allegations in Paragraph 110.

111.    The allegations in Paragraph 111 are moot because this cause of action for defamation *per se* was dismissed with prejudice by the Court's Decision and Order filed July 23, 2020 and Order filed August 15, 2020. To the extent a further response is required, Defendant denies the allegations in Paragraph 111.

112.    The allegations in Paragraph 112 are moot because this cause of action for defamation *per se* was dismissed with prejudice by the Court's Decision and Order filed July 23, 2020 and Order filed August 15, 2020. To the extent a further response is required, Defendant denies the allegations in Paragraph 112.

113.    The allegations in Paragraph 113 set forth legal conclusions to which no response is required and, in any event, are moot because these legal conclusions were rejected by the Court when this cause of action for defamation *per se* was dismissed with prejudice by the Decision and Order filed July 23, 2020 and Order filed August 15, 2020. To the extent any response is required, Defendant denies the allegations in Paragraph 113.

114.    Defendant realleges his responses to Paragraphs 1 through 113. To the extent a further response is required, Defendant denies the allegations contained in Paragraph 114.

115.    Defendant denies the allegations in Paragraph 115.

116.     Defendant denies the allegations in Paragraph 116.

117.     Defendant denies the allegations in Paragraph 117.

118.     Defendant denies the allegations in Paragraph 118.

119.     The allegations in Paragraph 119 set forth legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

120.     The allegations in Paragraph 120 set forth legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

## GENERAL DENIAL

Unless specifically admitted herein, Defendant denies each and every allegation in the Complaint and demands strict proof thereof.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof where such burden properly rests with Plaintiff and without waiving, and hereby expressly reserving, the right to assert any and all such defenses at such time and to such extent as discovery and factual or legal developments may establish a basis therefore, Defendant hereby asserts, as and for separate and additional defenses to the Complaint, as follows:

### First Affirmative Defense

Plaintiff's Complaint fails to state a claim upon which relief may be granted or for which the damages sought can be awarded.

### Second Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrines of bad faith, unclean hands, laches, and/or estoppel.

### Third Affirmative Defense

To the extent Plaintiff is entitled to any damages recovery on any of her claims, which Defendant denies, Plaintiff has failed to take action or has taken insufficient action to mitigate those damages. Consequently, any damages suffered by Plaintiff must be reduced in an amount by which she could have mitigated those damages.

### Fourth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, on the basis that Plaintiff would be unjustly enriched if allowed to recover all or any portion of the damages alleged in the Complaint.

### Fifth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff's injuries or damages, which injuries or damages are denied, were not caused in fact or proximately caused by acts and/or omissions of Defendant.

### Sixth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, to the extent she has not suffered any actual injury or damages as a result of the conduct alleged in the Complaint.

### Seventh Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations, statutes of repose, and/or equitable doctrines, including laches.

### Eighth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, on the basis of the Plaintiff's intentional acts and/or omissions, including fraud.

10

### Ninth Affirmative Defense

Defendant is not liable for punitive damages because neither Defendant, nor any of his employees or agents, committed any act with malice or reckless indifference to Plaintiff's federally or state protected rights, or approved, authorized, ratified, or had actual knowledge of any such acts.

### Tenth Affirmative Defense

Plaintiff's claims are not brought in good faith, and Defendant shall seek attorneys' fees and costs under all applicable fee-shifting statutes.

### Eleventh Affirmative Defense

If any judgment is awarded in Plaintiff's favor, any damages award should be set off by the damages caused by Plaintiff and incurred by Defendant, including the damages sought in connection with the counterclaims asserted herein.

## RESERVATION OF RIGHTS

Defendant reserves his right to amend and supplement his answer to assert any other defenses as may appear during the course of this action.

\*       \*       \*

**WHEREFORE**, Defendant hereby demands judgment against Plaintiff, dismissing the Complaint in its entirety with prejudice, and awarding to Defendant his attorneys' fees, costs, interest, and such other and further relief as the Court deems equitable and just.

## COUNTERCLAIM

Defendant/Counterclaim-Plaintiff Hamed Wardak ("Wardak"), for his counterclaim against Plaintiff/Counterclaim-Defendant Sarah Goolden ("Goolden"), alleges, upon knowledge as to himself and otherwise upon information and belief, as follows:

1.      In a subversion of the groundswell social movement for redress of sexual and physical assault against women, Goolden, a New York socialite who frequents nightlife parties and clubs in New York, Miami, Los Angeles, London, and Ibiza, falsely cloaked herself in fabricated "#MeToo" claims to perpetrate a shakedown of Wardak, a successful self-made entrepreneur and an up-and-coming music producer. Goolden, who met Wardak in 2010 and was romantically involved with him on and off in the years leading up to this case, played on his genuine affection for and desire to marry her to lure him into spending large sums – over $300,000 – on luxury goods and services, alcohol-fueled partying, a trust fund for her dog, and travel for her father and friends in the course of just a few months around the summer of 2018. After cajoling Wardak into publicly proposing to her with a $160,000 diamond ring that she had pre-selected, Goolden abruptly broke off the engagement and soon thereafter became hostile to Wardak. When Wardak confronted her, Goolden and her father kept him at bay with a confusing web of deception, and, after that failed, threatened that she would falsely charge him with rape in order to destroy his career and reputation unless he stopped pursuing his valid demands for restitution.

2.      Wardak did not stop. Goolden made good on her threat.

3.      In the summer of 2019, Goolden made knowingly false and malicious claims that Wardak had assaulted and raped her the previous summer in his Miami apartment, while her friends who were overnight guests also were in the apartment. Her claims are false. They are an

utter fabrication from start to finish, intended solely to destroy Wardak's reputation and career. There was no rape, no sexual assault, and no assault or battery.

4.      In truth, Goolden fleeced Wardak.  Over the course of a few months, between May and July 2018, Goolden cajoled and induced Wardak to pay for a trust fund for her dog, her personal expenses to the tune of tens of thousands of dollars, and luxury travel expenses for her, her friends, and her father, and to arrange for top-notch legal representation for her father to reinstate his law license following his disbarment after pleading guilty and serving prison time in a criminal case against him for defrauding his 90-year-old blind client.  While in Miami during the July 4th holiday, Goolden imposed on Wardak's hospitality, staying at his Miami apartment with two of her friends, going on all-expense-paid luxury shopping trips, a yacht cruise, and expensive meals and nightlife benders – all paid for by Wardak.

5.      During the trip, Goolden implored Wardak to propose marriage, telling him that if he did not propose, her purported ex-boyfriend Arthur would.  She and one of her male friends importuned Wardak to buy her a five-carat Harry Winston engagement ring valued at approximately $160,000.  They then pushed him to continue the splurge and to buy her and her friends approximately $40,000 worth of designer clothes and handbags.

6.      While Wardak drinks sparingly, Goolden and her friends spent that July week on a bender, getting drunk day and night at Wardak's expense.  Goolden even asked Wardak to arrange for an intravenous-drip hydration service at Wardak's home after one such daytime bender so that Goolden and her friends could continue drinking heavily into the night.

7.      The Thursday morning when Goolden falsely alleges that Wardak first assaulted her, July 5, 2018, Goolden had been drinking heavily and had passed out in the guest bedroom (of Wardak's apartment) with her two friends; more particularly, Goolden was topless in bed with

her male friend, with whom she had publicly and ostentatiously engaged in a long, passionate kiss at dinner the previous evening. No assault or battery occurred then by Wardak, just as no assault or rape occurred the following Saturday morning, July 7, 2018, as falsely alleged by Goolden. Simply, Wardak has never assaulted, battered, or raped Goolden at any time.

8.      Instead, Goolden successfully pressured Wardak to publicly propose to her on Friday, July 6, 2018, with an exorbitant engagement ring and before an audience of her and his friends. Goolden, Wardak, and two of Goolden's friends were bedecked in expensive clothes paid for by Wardak, on Goolden's insistence, for this engagement party.

9.      Then, the next day, Goolden hastily left Wardak's apartment in a fit of anxiety with her friends, saying that she and her friends were going to stay at a hotel. Goolden later text messaged Wardak that evening to apologize repeatedly for her behavior earlier in the day, saying, among other things, that she was "really in need of working on" herself, that Wardak did not "deserve to deal with [her] anxiety attacks and erratic emotions," that she "just really panic[s] a lot," that she has "commitment issues," and that she would "do whatever [she] can to make things right." Goolden then returned to Wardak's apartment and stayed until the following Monday, when she abruptly left with the $160,000 engagement ring on her finger.

10.     Soon thereafter, Goolden broke off her engagement to Wardak and traveled to London and Ibiza, where social media posts showed her partying with European friends, including Richard Abrazi (her current or recent boyfriend), at nightlife venues in those locations. Around that time, Goolden blocked Wardak and certain of his friends from her social media accounts and switched her Instagram profile from public to private. She then traveled to Brazil, where she visited with her purported ex-boyfriend, Arthur – the same one she had referenced to pressure Wardak to propose to her several weeks earlier.

14

11.    Following Goolden's dramatic departure from Miami and sudden shift in communications with Wardak, Wardak was alternately in shock, concerned, hurt, angry, and confused.  He and his friends suspected that he had been badly used by Goolden and her friends, and Wardak told Goolden that he would take lawful measures, including instituting lawsuits, to seek recompense.

12.    Goolden's father, Brian Cavanaugh, continued to string Wardak along. Cavanaugh corroborated others who had told Wardak that Goolden had a substance abuse problem and was mentally unstable.  He insisted that Wardak was "special" to Goolden.  According to Cavanaugh, Goolden had never introduced her past boyfriends to him, but she had wanted him to meet Wardak.  Cavanuagh told Wardak that he was a "hero" for caring so much for Goolden, despite her mental and emotional problems, and he told Wardak that Goolden needed Wardak's continued love and support to overcome her mental health issues.

13.    Genuinely confused and alternating between concern for Goolden and suspicion and anger that she had played him for his generosity – or worse, used him as a pawn to make her on-and-off again boyfriend Arthur jealous – Wardak persisted in trying to communicate with Goolden despite her failure to respond.  When Wardak reiterated his suspicion that he had been defrauded, demanding restitution or promising legal action, Goolden only then responded with text messages asking Wardak to cease all contact and stating that he was frightening her.

14.    In September 2018, rather than attempting to settle the matter amicably, Goolden filed a self-serving, duplicitous police report against Wardak, accusing him of harassment; notably, nowhere in the police report did Goolden allege that she had been physically or sexually assaulted by Wardak at any time.  The same day, Goolden told Farris El-Alwan, one of her friends whom Wardak had flown to Miami for the July 4th weekend, and the same friend whom

15

Goolden passionately, publicly kissed and then was topless in bed with, that she would not return the engagement ring, saying, "If I return the ring / He's going to ask for more shit / Sorry but not gonna return shit."

15. Meanwhile, throughout the autumn of 2018, Cavanaugh maintained contact with Wardak and even made attempts to build a seemingly genuine relationship with him. Wardak paid for Cavanaugh to travel to and stay in New York City to visit him and gave Cavanaugh gifts, believing that Cavanaugh might still one day be his father-in-law, as Cavanaugh continued to maintain that Goolden was damaged and needed help from her family and Wardak. Cavanaugh went so far as to suggest a family-based intervention for Goolden, which Wardak took steps alongside Cavanaugh to arrange.

16. Goolden's and Cavanaugh's efforts to confuse and deceive Wardak, however, fell apart by December 2018. After Wardak instituted legal actions against them in early 2019 seeking restitution, Cavanaugh told Wardak that unless he stopped trying to recover the money he had given them, Goolden would falsely accuse him of sexual assault and rape to destroy his reputation and career.

17. Goolden made good on Cavanaugh's threat.

18. In or around May 2019, Goolden went to multiple music venues in New York where Wardak had business contacts and was an up-and-coming musical artist and producer. Goolden falsely and maliciously told managers at 1Oak, Gospel, and Knock Down Center, all nightclubs and music venues in New York City, that Wardak had raped her and that she had a "rape case" pending against him. She also falsely and maliciously stated to the club managers that Wardak (whose family is from Afghanistan) is an illegal arms dealer, and that he had threatened to kill her like his father killed his mother. All of that was a whole-cloth fabrication

by Goolden.  Goolden knew that these falsehoods would be ruinous to Wardak's reputation and career by, among other things, preventing Wardak from continuing to work in these music venues that were vital to his music business.  She made the same false and defamatory statements regarding Wardak's alleged illegal arms dealing in or around March 2019 through one of her best friends acting as her agent, Erin Gross, to venue managers in Miami, including managers of the club Space.

19.     Her smear campaign had its intended effect.  Wardak lost opportunities to perform, and his bookings at clubs in New York and Miami and related party venues were reduced after Goolden made these false charges.

20.     In addition to defaming Wardak to individuals in the music industry, Goolden falsely testified in June 2019 in a New York Family Court action – instituted by Goolden in January 2019 when Wardak filed his legal claims for restitution – that Wardak had physically assaulted and raped her in July 2018 at Wardak's Miami apartment.  This was the first time she made such charges publicly – nearly a year after the fabricated assaults supposedly happened, and only after Wardak made clear to her and her father that he would not relent in his legal efforts for restitution.  Goolden amplified her false physical and sexual assault charges through this sham action, filed the following month in July 2019, and in a *New York Post* article that followed and was widely republished.

21.     Wardak accordingly now counter-sues seeking compensatory and punitive damages for Goolden's defamation *per se*, which has cost Wardak at minimum $100,000 in losses.

## **PARTIES**

22.     Defendant/Counterclaim-Plaintiff Hamed Wardak is an individual residing and

domiciled in the Commonwealth of Puerto Rico.

23.     Plaintiff/Counterclaim-Defendant Sarah Goolden is an individual residing and domiciled in the State of New York, New York County.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 on the basis of diversity of citizenship between the parties and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

25.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in New York and this Judicial District.

## TRIAL BY JURY

26.     Counterclaim-Plaintiff demands trial by a jury on all issues so triable.

## FACTS

### Goolden's Pretextual Engagement and Exploitation of Wardak's Wealth

27.     Goolden met Wardak in 2010 while Goolden was living in, and Wardak was visiting, Washington D.C.  There was mutual romantic interest immediately upon meeting, and they had occasional romantic trysts over the years, often reconnecting as Goolden was breaking up with one of the many prominent and/or wealthy men she dated.  Goolden expressed [on several occasions] to Wardak that she would like to be his girlfriend, but Wardak was not ready to commit to a relationship with her then.

28.     In or around the years 2013-2014, Goolden confided in Wardak about her other romantic relationships, telling Wardak that she had been sexually assaulted by numerous high-profile men over the years.  She also told Wardak that the man she had been dating in 2013 was

"stalker isk." In late 2013, Wardak offered, and Goolden happily accepted, for Wardak to pay for her to fly to Miami to visit Wardak for another romantic interlude. While in Miami, Goolden told Wardak that she was having financial difficulties, and that her father was destitute and not able to help her financially. Out of genuine affection for her, Wardak gave her some financial assistance.

29. After Goolden left Miami, she and Wardak continued a mutual flirtation over the ensuing years while she moved around Asia and Europe, continuing to date prominent and wealthy men to finance her lifestyle. Goolden invited Wardak to visit or travel with her in various places and expressed her desire to visit Wardak in Puerto Rico, but they did not meet again in person until 2018, in the wake of another of Goolden's messy breakups.

30. In 2018, Goolden again ran to Wardak for romantic comfort and financial help. Wardak again flew Goolden to Miami, at her request, following her break up with another boyfriend, Arthur, who lived in Brazil. Goolden, in tears, told Wardak that Arthur had been unfaithful with one of her friends (a Russian model) and that Goolden had incurred crushing credit card debt on behalf of Arthur, who had failed to pay her back. She implored Wardak to pay off her debt and her personal expenses, insisting on a bulk money transfer rather than itemized payments of specified debts or upcoming costs. In May 2018, Wardak wired $30,000 to Goolden's personal bank account. He also gave Goolden $5,000 in cash to pay for her travel to attend her brother's college graduation.

31. Following this episode, Goolden and Wardak for the first time officially became a couple, although Wardak was aware that Goolden stayed in contact on social media and otherwise with Arthur and his family in Brazil.

32. Playing on Wardak's affection for her and his insecurity about Arthur, Goolden wheedled Wardak into paying for her trips to see him, including flights from New York to

Florida and to Puerto Rico. Goolden also requested, with the involvement of Cavanaugh, that Wardak wire her $20,000 to set up a trust for care of her dog (a Chow Chow) and $20,000 for personal expenses, including rent on her Manhattan apartment. Thus, on or about June 28, 2019, Wardak wired an additional $41,000 to Goolden's personal bank account for her living expenses and for her dog's medical care.

33. Additionally, in June 2018, at Goolden's request and because she said that she wanted Wardak to meet her father, Wardak paid to fly her, her father, and her dog in first-class to Puerto Rico, where he also paid for their entire stay, including tours on yachts and island-hopping trips in the Caribbean.

34. For the July 4th holiday that year, Goolden asked Wardak, and Wardak agreed, to fly her and two of her friends, Stephanie Raphael and Mr. El-Alwan, to Miami to be house-guests in his Miami apartment and to pay their expenses during the trip. Prior to the trip, Goolden at one point threatened to break up with Wardak if he did not agree to pay her friends' travel expenses for the weekend.

35. During that trip, Goolden cajoled Wardak to propose to her, telling him that he could buy an engagement ring and turn the weekend into a celebratory engagement party. Goolden repeatedly professed a sincere desire to marry Wardak, again playing on his genuine love for her and genuine interest in marriage to her. But Goolden threatened that unless Wardak proposed – with the ring she already had selected – her purported ex-boyfriend, Arthur, would propose first, suggesting that she would take Wardak's failure to propose right away as a lack of resolve that would lead to a lifelong missed opportunity for them to be together as a loving married couple.

36. On July 4, 2018, Wardak treated Goolden and her friends to a day on a luxury

20

yacht and later that evening to lavish dinner and drinks at a restaurant and dance venue in Miami. After a night of heavy drinking by both Goolden and her friends – and a melodramatic scene caused by Goolden and Mr. El-Alwan screaming and throwing ice at each other and later making out at the table – the party broke up, and Goolden and her friends, who were drunk, retired to Wardak's Miami apartment. Wardak, who had not been heavily drinking, went to a Miami club to meet with one of his close friends visiting from Washington, D.C. Upon returning home in the early morning hours of July 5, Wardak discovered Goolden and Mr. El-Alwan in his guestroom bed together, both completely naked but for their underwear, and Goolden topless.

37.     Later that morning on July 5, Wardak confronted Goolden about her behavior, leading to a verbal argument; Goolden, hung over, insisted that she and Wardak take it up later. That evening, Wardak and Goolden discussed Goolden's behavior the prior night and morning, and Goolden said, in sum and substance, "you need to give me a ring or Arthur will."

38.     The next day, on July 6, 2018, Wardak revealed his marriage-proposal plans to Goolden's friends, Mr. El-Alwan and Ms. Raphael, who had already been told by Goolden. Mr. El-Alwan told Wardak that he and Goolden had previously picked out the exact ring she wanted: a five-carat diamond ring from Harry Winston. Mr. El-Alwan went with Wardak to the Harry Winston boutique in Bal Harbor Shops and immediately selected the chosen five-carat ring, which Wardak purchased for approximately $160,000.

39.     At Goolden's insistence, Wardak then went shopping with her and her friends to high-end clothing and handbag stores, including the Yves Saint Laurent boutique, buying Goolden and her two friends some $40,000 worth of clothing and handbags, including outfits for their impromptu engagement dinner the following evening.

40.     With Goolden's and Wardak's friends looking on, Wardak proposed to Goolden at

21

Scarpetta, a high-end Miami restaurant, on the evening of July 6.  As seen in at least one video, Goolden joyously accepted the proposal she had demanded of Wardak and immediately kissed her new fiancé, to the applause of their friends.  They continued celebrating into the early morning hours with expensive bottle service at Liv, a nightclub at the Fontainebleau hotel.

41.     Goolden stayed the rest of the weekend with Wardak in Miami, even after her friends left, following her meltdown and subsequent apology as detailed above.  She and Wardak planned for her to stay with him in Miami an additional two weeks.  But she precipitously changed her plane ticket and left Miami on Monday, July 9, 2018 with the $160,000 engagement ring on her finger.

42.     Upon leaving, she told Wardak that she was "confused" and was going to spend time with her grandmother in Syracuse, New York while she figured things out.

**Goolden's Duplicity**

43.     Goolden did not go to Syracuse.  She traveled to Europe, presumably using the money that Wardak had given to her over the prior months.  She spent time in London with friends and then partied in Ibiza, a city with a notorious nightlife, including traveling with another "boyfriend," Richard Abrazi.  During this period, while social media tracked her high-flying social life, including posts labeled "Gangsters in Paradise," Goolden blocked Wardak on social media and ignored Wardak's entreaties to talk with him.  Wardak later learned that Goolden also traveled to Brazil in September 2018, where she saw her purported ex-boyfriend, Arthur.

44.     In the midst of Wardak's understandable confusion and his increasingly frantic efforts to talk with Goolden, Goolden's father, Brian Cavanaugh, interceded to keep Wardak from pursuing the matter.  Cavanaugh is a lawyer who pled guilty to felony mail fraud related to fraudulent loans and embezzlement of funds from an irrevocable trust that he established for a

22

90-year-old, legally blind client who had no family or support system; he was disbarred and changed his name to "Brian Cavanaugh" after his release from prison. Wardak had previously established a relationship with Cavanaugh, believing that he would soon be his father-in-law, and learned in the process of Cavanaugh's criminal past and disbarment. Wardak generously assisted Cavanaugh with various financial needs, including arranging for a top international law firm to assist Cavanaugh in reinstating his law license. Out of a sense of cultural propriety and respect, Wardak also asked Cavanaugh for his "blessing" of Wardak's intended marriage to Goolden, which Cavanaugh readily gave.

45.    In the months after Goolden left Miami for Europe and Ibiza, Cavanaugh stayed in contact with Wardak, first telling Wardak that he should stay away from Goolden and threatening legal action if Wardak pursued legal claims for restitution. Cavanaugh then switched course, attempting to reconcile with Wardak and trying to reassure Wardak with false statements that Goolden had no ill intent or false motive. Cavanaugh tried to dissuade Wardak from concluding that he had been defrauded by Goolden by telling him, for example, that Cavanaugh would facilitate the return of the engagement ring and money if Goolden and Wardak could not reconcile and save their engagement to be married.

46.    Cavanaugh also told Wardak that Goolden was mentally unstable, had substance abuse issues, and needed Wardak's help, including his continued love, understanding, and support. That greatly concerned Wardak, who, if nothing else, did not want to end his relationship with Goolden over a misunderstanding or misperception if in fact she was acting out of actual mental illness or a real disability caused by alcohol or drug dependency.

47.    Cavanaugh and Goolden apparently coordinated their communications with Wardak to keep him from pursuing his legal claim for the return of the ring and money. At the

same time that Cavanaugh sought to reassure Wardak, Goolden ignored his entreaties to talk, eventually creating a paper trail in email and text messages that she wrote demanding that Wardak cease and desist communicating with her, creating a false foundation on which to claim criminal harassment.

48.     Cavanaugh's false assurances kept Wardak in a state of emotional confusion and turmoil, especially given the contradictory messages from Goolden demanding that Wardak leave her alone and the messages from Cavanaugh that Goolden genuinely loved Wardak and needed his help to heal her mental health issues and drug problem.  That confusion led to frantic efforts by Wardak, who genuinely believed Cavanaugh's claims that Goolden was emotionally unstable and ill, to insist on speaking with her so he could assure her that he would stand by her and help her with whatever she was going through.  But those communications, motivated by Wardak's genuine love and affection, were perverted by Goolden and turned against him as trumped-up evidence of "harassment" and "threats."

49.     Cavanaugh even convinced Wardak to attempt to arrange a family-based intervention for Goolden.  In coordination with Cavanaugh, Wardak engaged a well-known intervention expert, and Cavanaugh said that he wanted to plan the intervention for around that Thanksgiving.

50.     Before that could happen, Goolden filed a police report in New York against Wardak for harassment in late September 2018, alleging that Wardak had engaged in "harassment, blackmail, slander, verbal abuse, obsessive texting, emailing, and calling constantly to send things to my apartment and my father's house. Threatening to ruin my life and threatening to show up at my house."  Notably, she made no mention of any prior physical or sexual assault or rape.

51.     Wardak did not learn of this police report until months later.  In fact, Cavanaugh had falsely told Wardak that he had stopped Goolden from filing any police report.

52.     The same day that Goolden filed the police report without any notice to Wardak, Goolden sent Mr. El-Alwan a series of text messages stating, "If I return the ring / He's going to ask for more shit / Sorry but not gonna return shit."

53.     Throughout September and October, Goolden's and Cavanaugh's attempts to keep Wardak at bay with a confused web of deceit began to falter, and, while Wardak was genuinely confused and not certain, he told both Cavanaugh and Goolden that he was fast coming to the conclusion that he had been "played" and that he would turn the matter over to his attorneys and otherwise pursue the return of the ring and money taken from him through false pretenses.

54.     On or around October 12, 2018, Goolden's brother, Kevin Goolden – whom Wardak met while preparing with Cavanaugh for the planned family intervention – told Wardak that Goolden was never in love with him and that he had been targeted to take whatever money she could inveigle out of him.  He said that Wardak was not her first victim and specifically named other men, including a high-profile billionaire and a professional hockey player, whom she also had played for their money.

55.     Wardak then hired counsel.  Starting in January 2019, he instituted legal actions against both Goolden and Cavanaugh seeking restitution for the hundreds of thousands of dollars he had given to and spent on them while believing that Goolden was to be his wife and Cavanaugh his father-in-law.

56.     In response, around the same time in January 2019, Goolden instituted an action in New York Family Court seeking an Order of Protection, claiming harassment and stalking by Wardak.  Notably, she made no allegations of physical or sexual assault to the court or any other

authorities at that time. And then suddenly in June 2019, Goolden falsely – and for the first time – testified that Wardak had physically assaulted and raped her during the Miami engagement trip the prior July. She then instituted this action in July 2019 – a day or two before her claim would have expired under the statute of limitations – based on these false allegations of assault and rape.

**Goolden's Injurious and Malicious Falsehoods**

57.     In 2019, Goolden frequented music clubs and venues in New York where she knew Wardak had music-business interests and contacts, including Knock Down, 1Oak, and Gospel, as well as various venues for private music and dance parties. At these events, starting in or around May 2019, Goolden falsely and maliciously told managers and promoters that Wardak had raped her and that she had a pending rape case against him.

58.     In May 2019, Goolden attended a private music event held in a warehouse music venue Brooklyn, New York and hosted by Black Matt with V.I.P. sections managed by Provocateur. At that event, Goolden saw Matteo Garzia, a well-known event promoter based in New York City, interacting with Wardak. When Garzia was alone, Goolden approached him and falsely and maliciously stated to Garzia that Wardak was lying when he told people that she had been engaged to him, that Wardak had raped her, and that she had a "rape case" pending against him.

59.     Also in May 2019, Goolden showed up at another event she knew Wardak frequented, at Gospel, and made her intentions clear: she brought with her an Order of Protection, described below, and showed it to the event managers, asking them to eject Wardak from the venue. She also falsely and maliciously told them that Wardak had raped her, knowing full well that this was a key business opportunity for him and that her false allegation of rape would be ruinous to Wardak's reputation and business.

26

60.     Goolden made other false statements about Wardak to multiple managers and promoters in the music business community, including to managers and promoters affiliated with the New York nightclubs 1Oak, Knock Down Center, and Gospel and, through Ms. Gross, the Miami nightclub Space.  She made false statements, both directly and through Ms. Gross acting as her agent, to various music industry participants that Wardak is an "illegal arms dealer."  That defamatory statement was made (i) in or around May 2019 by Goolden to the owner and manager of Gospel in New York, to Mateo Milleri and Carmine Conte, members of the disc jockey duo Tale of Us, and to Steve Martinez, James Zumarraga, and Alex Jas, who are all affiliated with the famous disc jockey duo, the Martinez Brothers; and (ii) by Ms. Gross, acting as Goolden's agent, to the owners of the Space nightclub in Miami, Florida in or around March 2019, and to an owner or manager of Tekk Support, a well-connected music event company, in or around January 2019.

61.     Just as Wardak never assaulted or raped Goolden, Wardak has had nothing to do with arms deals, never mind illegal arms dealing, and Goolden knew that these claims were false when she made them.  In fact, Wardak was a highly successful contractor with the U.S. government, providing crucial linguistic, logistic, and life-support services to the U.S. government during its fight against terrorism in Afghanistan.  Goolden made these false statements intending to appeal to ethnic biases, prejudicial assumptions, and discriminatory fears to imply that Wardak, as a successful U.S. businessman from a prominent Afghan family, was a dangerous, violent criminal involved in illegal international arms deals.

62.     As a result of Goolden's false and defamatory statements, Wardak lost several crucial music-business opportunities.  In particular, Wardak was unable to book any future musical performances through Tekk Support and at venues such as the Brooklyn Mirage, and both the Martinez Brothers and Tale of Us refused to collaborate on projects with him.

Specifically, directly due to Goolden's false statements, managers of various music venues in New York blackballed Wardak, banning him from clubs owned and/or managed by 1Oak and the Brooklyn Mirage. Promoters of Burning Man events in New York and Nevada and various other promotors of events and venues in Ibiza followed suit, refusing to book Wardak at their music events and venues.

63. In January 2019, Goolden filed a petition for an Order of Protection against Wardak with the Family Court of the State of New York anchored on fabricated statements that Wardak had allegedly made to Goolden six months earlier in Miami. In that petition, she made the knowingly false and malicious claims that Wardak "blackmailed [her], threatened [her], and harassed [her] and swore he would ruin [her] life if [she] wouldn't be with him." She further falsely and maliciously stated that Wardak had "told [her] his father murdered his mother so just watch what he could do."

64. Based on these malicious falsehoods, the court granted Goolden an unopposed *ex parte* temporary order of protection.

65. Goolden later falsely accused Wardak of physical assault and rape in testimony at a June 2019 hearing for a permanent order of protection in the Family Court action, even though her petition in that action made no reference to any assault, much less rape.

66. Three weeks later, on or about July 5, 2019 – a year after Goolden's and her friends' trip to Miami to visit Wardak for the July 4, 2018 holiday – Goolden filed this action, which, based on knowing and malicious falsehoods, is a sham. Her claims of assault and rape in this case are completely fabricated, brought maliciously by Goolden for the sole purpose of defaming Wardak under the guise of litigation and its attendant qualified immunity.

67. In her pleading in this action, Goolden realleges her false and malicious claim that

Wardak inflicted "sexual and physical violence," including rape, on Goolden. These allegations are false, and Goolden knew they were false when she made them.

68. Goolden's false and malicious allegations include claims that Wardak "forcibly pulled Ms. Goolden out of bed, picked her up, and then carried her to his bedroom, where he then threw her onto his bed" (Compl. ¶ 24); Wardak "[threw] glasses and plates at her" (*id.* ¶ 25); and "[d]uring the assault, Defendant Wardak threatened Ms. Goolden that he would ruin her life if she did not stay with him and agree to do what he wanted." (*id*. ¶ 26). None of that is true.

69. Wardak never physically assaulted Goolden. He did not forcibly pull her from bed, pick her up, or carry her to his bedroom. He also did not throw her onto his bed or throw plates and glasses at her. Goolden's allegations of physical assault are false, and Goolden knew or reasonably should have known them to be false.

70. Most egregiously, Goolden falsely claims that Wardak "climbed on top of Ms. Goolden, pulled off of [sic] her underwear, and forcefully held her down while he performed oral sex on her," and thereafter "pulled out his penis and sexually assaulted Ms. Goolden." (Compl. ¶¶ 51, 53.) Goolden also falsely alleges that Wardak "admitted to raping Ms. Goolden." (*Id.* ¶ 73.)

71. Again, none of that is true, and Goolden knew or reasonably should have known the allegations to be false when she made them.

72. Wardak never assaulted or raped Goolden and certainly never admitted to a rape that never occurred. In fact, on the day of the alleged rape, and for months afterward, the two privately exchanged voluminous text and email messages, which never so much as hinted at any assault, sexual or otherwise – because no such assault ever occurred.

73. Goolden additionally alleges that in May 2019, Wardak "threatened to murder Ms. Goolden's father and sent him multiple death threats." (Compl. ¶ 94.) That too is false.

29

74.     Wardak never threatened to murder Goolden's father.  Goolden's allegation of such threats is false, and Goolden knew it.

75.     Immediately after her sham Complaint was filed (and even before service of the summons and Complaint), Goolden and her lawyer spoke to the *New York Post* to publish her false and malicious allegations as widely as possible.  Goolden spoke to the reporter with the intent to damage Wardak's reputation and injure his business.

76.     On July 20, 2019, the *New York Post* published an article, titled "Model claims former Afghan defense minister's son raped her" (the "NY Post Article").  As Goolden knew it would (or should have known after speaking with the reporter prior to publication), the article repeats Goolden's knowingly false and defamatory allegations that Wardak assaulted and raped her, stating that Wardak "stalked and raped a Manhattan fashion model after she rejected him" and noting that Goolden "accuses Hamed Wardak of attacking her twice during a trip the two took to Miami on July 4th weekend 2018."

77.     The NY Post Article was picked up and re-published by several other media outlets, including, but not limited to, *The Daily Mail Online*, *ATN News*, and *The Khaama Press*.  As Goolden knew or should have known, the story prompted online commentators on social media engaging in diatribes about Wardak's race, appearance, and the supposed truth of the heinous and knowingly malicious and false assault and rape allegations in Goolden's Complaint.

**Wardak's Reputational and Economic Damages**

78.     Goolden's wrongful conduct has severely damaged Wardak's reputation, injured his nascent music business, and threatens his other business interests going forward, as Goolden intended.  The false claims of assault and rape are defamatory *per se*, and the damage to reputation is self-evident.

79.     After Goolden made the defamatory statements to music managers and promoters noted above, Wardak lost gigs playing at various venues and private parties, as well as opportunities to collaborate with well-known acts and artists.

80.     Wardak's lost economic income is at least $100,000, which reflects his investment in the music business that he otherwise would have recouped in 2019 if not for Goolden's malicious and knowingly false accusations of assault and rape that she made to the music managers and promoters, as set forth above.

81.     In addition, after the NY Post Article was published with the false assault and rape allegations, bankers and other entrepreneurs cancelled meetings and refused to take future meetings with Wardak, negatively affecting not only his music career but his myriad of other business ventures.

82.     Wardak also expended significant sums of money on legal fees to defend this sham action and for search engine optimization to mitigate the further propagation of the false and defamatory statements made by Goolden to the press.

## FIRST CAUSE OF ACTION
## DEFAMATION *PER SE*

83.     Counterclaim-Plaintiff realleges all preceding paragraphs of his counterclaims as though fully set forth herein.

84.     The oral statements by Goolden and her agent alleging that Wardak raped or otherwise physically assaulted Goolden and that Wardak was an illegal arms dealer, as detailed above, are in fact untrue.

85.     The written statements alleging that Wardak raped or otherwise physically assaulted Goolden that were published in Goolden's Complaint in this action, in the Family Court action, and/or in the *New York Post* article identified above are in fact untrue.

31

86.     Goolden made all such defamatory statements concerning Wardak, as set forth above, knowingly and intentionally.

87.     Goolden made the defamatory statements with knowledge of each statement's falsity or at least with reckless disregard of the truth.

88.     Goolden published these false and defamatory statements about Wardak to third parties, including the third parties identified above, and these third parties understood the defamatory meaning and that the defamatory statements concerned Wardak.

89.     The false and defamatory statements, as set forth above, both in writing and orally, falsely charge that Wardak committed serious crimes, *to wit*, physical and sexual assault, battery, rape, and illegal arms sales.

90.     Goolden made these defamatory written and oral statements to malign Wardak's integrity, credibility, honesty, ethics, trustworthiness, dependability, professional abilities, and fitness to perform in his businesses in the music industry and beyond.

91.     Goolden's actions were malicious, wanton, and reckless, and intended to damage Wardak's reputation and interfere with his many business interests.

92.     Goolden made the defamatory statements about Wardak to bully, harass, and intimidate him and his business counterparties.

93.     Goolden's defamatory statements were neither privileged nor authorized by law.

94.     Goolden's defamatory statements are defamatory *per se* because they falsely charge Wardak with serious crimes, namely rape, sexual or physical assault, and illegal arms dealing.

95.     In publishing the false and defamatory statements, Goolden injured Wardak, including injuring his personal and business reputations as a matter of law.

96.     As a direct and proximate result of Goolden's defamatory statements, Wardak incurred damages, including *per se* injury to reputation, pecuniary loss due to business disruption and loss of business opportunities, and mental and emotional suffering, in an amount to be determined at trial.

97.     As a result of Goolden's conduct, and as she intended and expected, Wardak lost business in the music industry, including the specific business opportunities specified above, and his music business has suffered economic and pecuniary harm in an amount to be determined at trial, but in any event in an amount no less than $100,000, including costs associated with Wardak's attempts to mitigate the damage from Goolden's defamation and his investment in his start-up music business that the business would have recouped in 2019 but for Goolden's wrongful and injurious falsehoods described herein.

98.     Wardak is entitled to recover his reasonable attorneys' fees and costs, together with interest as permitted by law, incurred as a result of Goolden's defamatory conduct.

99.     Because Goolden's actions were malicious, wanton, outrageous, and reckless, Wardak also seeks an award of punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Wardak demands judgment against Goolden awarding Wardak as follows:

   a.     Compensatory damages permitted at law in an amount to be determined at trial;

   b.     *Per se* and/or punitive damages;

   c.     Costs and disbursements of this action, together with attorneys' fees, where provided for by law;

33

d.   Pre-judgment interest and post-judgment interest available under law; and

e.   Such other and further relief as this Court may deem just and proper.

Dated: March 15, 2021
New York, New York

Respectfully submitted,

MILLSAPS & ASSOCIATES PLLC

By: /s/ *Rhett O. Millsaps II*
Rhett O. Millsaps II
745 Fifth Ave, Suite 500
New York, NY 10027
Tel: (646) 535-1137
Fax: (646) 906-8657
Email: rhett@millsaps-law.com

CHAUDHRYLAW PLLC

By: /s/ *Priya Chaudhry*
Priya Chaudhry
45 W. 29th Street, Suite 303
New York, NY 10001
Tel: (212) 785-5550
Email: priya@chaudhrylaw.com

*Attorneys for Defendant/Counterclaim-Plaintiff Hamed Wardak*

# Exhibit C



Farris Personal Phone

Sure I'm with my mum tonight after work but during the weekend at some point?

11:59 AM

I deleted Sarah off everything because no matter what I said she said she wasn't sure

1:13 PM

How can you ask a man to propose and tell me you're sure when you aren't sure

1:14 PM

I don't want negativity in my life and she's v negative and unstable

1:14 PM

I'm sorry I was every associated with her

1:14 PM

She will be fine eventually once she calms down

1:14 PM

HW_00000960



**Farris Personal Phone**

Lol
7:39 AM ✓✓

She is sick Faris
7:39 AM ✓✓

Has her dad stopped messaging you now?
7:39 AM

Not evil
7:39 AM ✓✓

Not bad
7:39 AM ✓✓

Just sick
7:39 AM ✓✓

Yeah :(
7:39 AM

We are supposed to talk
7:39 AM ✓✓

I just don't want her to do anything stupid and end up a criminal like her dad
7:39 AM

HW_00000962

[7/2/19, 4:58:38 PM] Faris New: I think it's gna open up a shit storm for me
[7/2/19, 4:58:48 PM] Faris New: But I'll run it past Alexander and see what he thinks
[7/2/19, 5:01:08 PM] Faris New: I mean I don't really know what I could provide them with anyway?
[7/2/19, 5:01:25 PM] Sarah: Babe what are you talking about you were there
[7/2/19, 5:01:29 PM] Faris New: You and him arguing then me leaving and then staying the night then ya leaving to go to the hotel in the morning?
[7/2/19, 5:01:34 PM] Sarah: Yes
[7/2/19, 5:01:46 PM] Sarah: And you saw him pull me forcibly from the bed and carry me into his room
[7/2/19, 5:01:56 PM] Sarah: And the threats stalking harassing etc
[7/2/19, 5:02:07 PM] Faris New: I don't remember that love. Yeah the threats and harassing of course
[7/2/19, 5:02:18 PM] Sarah: You don't remember that?
[7/2/19, 5:02:24 PM] Sarah: Omg he pullled me from your bed
[7/2/19, 5:02:28 PM] Sarah: And dragged me out
[7/2/19, 5:02:44 PM] Faris New: Yeah I remember him ripping the duvet off
[7/2/19, 5:02:50 PM] Faris New: And then I packed my stuff
[7/2/19, 5:02:56 PM] Sarah: And carried my into his room
[7/2/19, 5:04:07 PM] Faris New: I don't remember him carrying you love and if I get involved they're going g to want details. All I remember is him coming in. Rolling the duvet off. Then you and him start arguing
[7/2/19, 5:04:11 PM] Faris New: Then I'm waiting I. The lift
[7/2/19, 5:04:18 PM] Faris New: Go back in and it was fine
[7/2/19, 5:04:20 PM] Faris New: Next morning
[7/2/19, 5:04:26 PM] Faris New: You said we're leaving
[7/2/19, 5:06:28 PM] Faris New: Why can't they do this without me writing to them?
[7/2/19, 5:07:11 PM] Faris New: I really do t want to be involved and didn't witness anything myself other than him ripping the duvet off. I was never once in his bedroom with you and him so I can't say that in court babe or have me write that down
[7/2/19, 5:07:41 PM] Faris New: I'll talk to Alex in the morning but I really don't want to as I really don't think what I have to say will add weight to your case
[7/2/19, 5:07:55 PM] Faris New: I didn't see him get physical with you love which is what you want me to say
[7/2/19, 5:08:18 PM] Faris New: I could but then I'd be lying and that's really bad
[7/2/19, 5:09:58 PM] Sarah: No bane I don't want you to lie
[7/2/19, 5:10:03 PM] Sarah: I just thought you saw it
[7/2/19, 5:10:07 PM] Sarah: Since he did it in front of you
[7/2/19, 5:10:57 PM] Faris New: No babe i didn't see that. He ripped of the duvet. Then you started packing your stuff well that's what you were saying anyway
[7/2/19, 5:11:03 PM] Faris New: I packed mine and waited for you in the lift
[7/2/19, 5:11:34 PM] Faris New: You were in his room. He came out and told me everything was fine now
[7/2/19, 5:11:49 PM] Faris New: I asked you through the door and you said you were fine
[7/2/19, 5:11:51 PM] Faris New: I went to bed

Goolden011142

[7/2/19, 5:11:53 PM] Sarah: Ya I remember all that but I remember him pulling me
From the bed
[7/2/19, 5:11:55 PM] Faris New: The next morning I wake up
[7/2/19, 5:12:00 PM] Faris New: You're like WERE leaving
[7/2/19, 5:12:02 PM] Faris New: And we left
[7/2/19, 5:12:06 PM] Sarah: And psychically carrying me
[7/2/19, 5:12:09 PM] Sarah: Yeah
[7/2/19, 5:12:11 PM] Faris New: Babe that's 100% it
[7/2/19, 5:12:32 PM] Sarah: Yes I think you were asleep and didn't see him grabbing me
[7/2/19, 5:12:34 PM] Sarah: Anyway that's fine
[7/2/19, 5:13:07 PM] Sarah: But accounting for how drunk he got us how he threatened me you and all of us has been doing so since then
[7/2/19, 5:13:12 PM] Sarah: That's the majority of the case
[7/2/19, 5:13:18 PM] Sarah: This stalking and threatening and defamation
[7/2/19, 5:14:12 PM] Faris New: Yeah
[7/2/19, 5:14:16 PM] Faris New: No I get all that
[7/2/19, 5:16:17 PM] Faris New: Gna try get some sleep
[7/2/19, 5:16:24 PM] Faris New: I'm so exhausted it's unreal
‎[7/2/19, 5:17:05 PM] Sarah: ‎<attached: 00001263-AUDIO-2019-07-02-17-17-04.opus>
[7/2/19, 5:19:22 PM] Faris New: I will defo speak to your lawyer my love
[7/2/19, 5:19:24 PM] Faris New: Don't worry
[7/2/19, 5:19:29 PM] Sarah: Ok thanks babe
[7/2/19, 5:19:30 PM] Faris New: Sorry I'm just stressed and tired
‎[7/2/19, 5:20:03 PM] Sarah: ‎<attached: 00001268-AUDIO-2019-07-02-17-20-02.opus>
[7/2/19, 5:20:15 PM] Faris New: I know you'd do it for me my love
[7/2/19, 5:20:24 PM] Faris New: It will all be fine soon. Can't wait for this nightmare to be over
[7/2/19, 5:20:29 PM] Sarah: Same bane
[7/2/19, 5:20:33 PM] Sarah: Babe*
[7/2/19, 5:20:50 PM] Faris New: Omg did you? Hahaha
[7/2/19, 5:20:53 PM] Faris New: Why what happened
[7/2/19, 5:20:58 PM] Faris New: Ok no I really need to go to bed
[7/2/19, 5:21:06 PM] Sarah: Love you
[7/2/19, 5:21:07 PM] Sarah: Good night
[7/2/19, 8:26:50 PM] Sarah: wharman@theharmanfirm.com
[7/2/19, 8:26:56 PM] Sarah: Walker, my lawyer
[7/3/19, 6:07:19 AM] Faris New: I have thought about it and I really don't think it's appropriate for me to get involved in any legal proceedings.

It's your decision to continue to fight and countersue him not mine so this is your battle to fight. I would like to stop being drawn into this.

I hope you respect my decision and not let it cause more strain on our friendship.
[7/3/19, 6:09:58 AM] Sarah: Ok Faris thanks for being there for me when things are difficult. Obviously it will cause strain in our friendship when you choose to not be there for me for things you were involved in. I wish you well in your future endeavors. Best of luck to you.

Goolden011143

# Exhibit D

THE LAW OFFICE OF

# MILLSAPS & ASSOCIATES PLLC

July 23, 2021

<u>VIA EMAIL AND UPS</u>

Mr. Farris El-Alwan
Flat 5
4 Queens Gardens
London, United Kingdom
W2 3BA
elalwanfarris@gmail.com

   Re:  <u>*Goolden v. Wardak and Wardak v. Goolden*, No. 19-CV-6257 (ALC)</u>

Dear Mr. El-Alwan,

   I represent Defendant/Counterclaim Plaintiff Hamed Wardak in the above-referenced matter in federal court in New York.  I write to you now to request your cooperation in discovery in this case, as you are a central witness with regard to the claims and counterclaims asserted by Ms. Goolden and Mr. Wardak, respectively.

   I understand that you are familiar with the details of this case through Plaintiff/Counterclaim Defendant Sarah Goolden, with whom you apparently have exchanged thousands of WhatsApp and voice messages discussing the allegations in this case and other matters involving Mr. Wardak and Ms. Goolden from 2018 to present.  As you undoubtedly are aware, your testimony and documents in your possession, custody, or control are essential in this case, given that (among other things):  (i) you were in bed with Ms. Goolden when she alleges that Mr. Wardak first physically assaulted her in Miami in July 2018; (ii) you assisted Mr. Wardak in his purchase of the engagement ring chosen by Ms. Goolden at Harry Winston following that alleged assault; (iii) you were in the apartment with the parties when Ms. Goolden alleges that Mr. Wardak raped her on the morning of July 7, 2018; (iv) you accompanied Ms. Goolden to the W Hotel in Miami later that day; and (v) you have had extensive communications with Ms. Goolden since this time.

   Given the critical importance of your testimony and documents in your possession in this case, we have no doubt that we can obtain a court order requiring you to be cross examined in the English Courts under oath and to produce documents in your possession, custody, and control that are relevant to this case.  In lieu of a compelled court appearance, we are hopeful that you will voluntarily agree to attend a deposition in London on a mutually agreeable date and to conduct a reasonable search and produce documents (including without limitation text or WhatsApp messages, voice messages, emails, social media messages, and photographs) responsive to the requests enclosed herewith as Schedule A, as this would spare the parties and the courts in New York and London substantial effort and expense.  Mr. Wardak, however, has

Mr. Farris El-Alwan
July 23, 2021
Page 2 of 2

retained counsel in London, copied on this letter, in case you will not agree to cooperate voluntarily in this matter.

If you will agree to attend a deposition in London and to produce documents responsive to the enclosed requests, please email me at rhett@millsaps-law.com by **no later than July 30, 2021** indicating that you will do so and advising of dates in the last two weeks of August that would work for you.  If you refuse or fail to respond to this letter by July 30, then we will proceed to obtain an order from the English Courts requiring your compliance in accordance with the Evidence (Proceedings In Other Jurisdictions) Act 1975 and Part 34 of the English Civil Procedure Rules.  Be advised that if Mr. Wardak is forced to seek a court order, and you oppose that process without valid legal grounds, you may be required to pay Mr. Wardak's legal fees and other costs in obtaining the order.

Finally, I urge to you treat this request with the utmost seriousness, and I encourage you to seek advice from a lawyer regarding the content of this letter.  I look forward to your timely response.

Sincerely,

Rhett O. Millsaps II

Enclosure

Cc:    Ian Bean, Esq.
       beani@gtlaw.com

       Priya Chaudhry, Esq.
       priya@chaudhrylaw.com

       Carrie Goldberg, Esq.
       carrie@cagoldberglaw.com

       Aurore DeCarlo, Esq.
       aurore@cagoldberglaw.com

### **Schedule A**

1.      All documents and communications concerning Hamed Wardak.

2.      All communications with Hamed Wardak.

3.      All communications with Sarah Goolden from April 1, 2018 to present.

4.      All documents and communications concerning Sarah Goolden from April 1, 2018 to present.

5.      All documents and communications concerning your trip to Miami, Florida in or around July 3, 2018 to July 8, 2018, including without limitation all photographs taken and social media posts published during the trip.

6.      All documents and communications concerning the planning of the Engagement Celebration.

7.      All documents and communications concerning the Engagement Celebration, including without limitation all photographs and videos taken at the Engagement Celebration and all social media posts, including without limitation any deleted posts, concerning the Engagement Celebration.

8.      All documents and communications concerning the engagement ring given to Sarah Goolden by Hamed Wardak, including without limitation all photographs of Sarah Goolden wearing said engagement ring.

9.      All documents and communications concerning gifts of any kind that you received from Hamed Wardak, including without limitation wire transfers, cash payments, travel tickets, tangible items, and offers of services by third parties introduced by Mr. Wardak.

10.     All documents and communications concerning services performed by you for Hamed Wardak or any company owned or controlled by Hamed Wardak.

11.     All documents and communications concerning any drugs or alcohol consumed from July 3, 2018 to July 8, 2018 by you or Sarah Goolden.

12.     All documents and communications concerning the W Hotel in Miami, Florida from July 3, 2018 to July 8, 2018.

13.     All documents and communications concerning stalking, harassment, assault, or rape by any person from April 1, 2018 to present.

14.     All documents and communications concerning any police report filed by you from April 1, 2018 to present.

15.     All documents and communications concerning or with Stephanie Raphael from April 1, 2018 to present.

16.     All documents and communications concerning or with Alexandra Wu from April 1, 2018 to present.

17.     All documents and communications concerning or with Brian Cavanaugh from April 1, 2018 to present.

18.     All documents and communications concerning or with Arthur Bahia from April 1, 2018 to present.

19.     All documents and communications concerning or with Richard Abrazi from April 1, 2018 to present.

20.     All documents and communications concerning or with any person with whom Sarah Goolden was romantically involved, other than Hamed Wardak, Arthur Bahia, and Richard Abrazi, from April 1, 2018 to present.

21.     All documents and communications concerning or with Sarah Goolden's attorneys in this Litigation and any other action in which Sarah Goolden is or was a party.

22.     All documents and communications concerning the Litigation.

## Definitions and Instructions

A.      The term "Engagement Celebration" refers to the July 6, 2018 engagement dinner hosted by Hamed Wardak and/or Sarah Goolden at Scarpetta in Miami, Florida and events or gatherings that included Mr. Wardak and Ms. Goolden at other locations that night and into the morning of July 7, 2018.

B.      The term "Litigation" refers to the action *Goolden v. Wardak*, 19-cv-6257 (ALC) currently pending in the U.S. District Court, Southern District of New York.

C.      The term "communication" shall mean any transmission of information orally, by documents, or by any other medium, including but not limited to any of the following: conversations, discussions, interviews, meetings, and conferences, whether in person, by

2

telephone, or by some other medium, as well as any non-oral transmission of information, including but not limited to the sharing of information through the medium of documents as defined below.

      D.     The term "concerning" shall be interpreted broadly and shall mean concerning, mentioning, constituting, relating to, touching upon, or reflecting.

      E.     The term "document" has the same meaning and scope as that term has in Fed. R. Civ. P. 34(a), shall be given its broadest possible meaning, and shall include, without limitation, all writings, images, presentations, spreadsheets, emails, text messages, instant messages, electronically stored information, audio or video recordings, software, computer disks or diskettes, hard drives, software, and the written or digital information necessary to understand and use such materials.

      F.     "Including" shall mean "including, without limitation."

      G.     The use of the singular form of any word includes the plural and vice-versa.

      H.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively, as necessary, to bring within the scope of the discovery request all responsive information that might otherwise be construed to be outside of the scope of the discovery request.

      I.     References to any individual or entity shall be interpreted to refer to that individual or entity and any other individual or entity acting on such individual or entity's behalf, including agents, attorneys, representatives, employees, partners, members, officers, or contractors.

      J.     In producing documents pursuant to this subpoena, you are required to furnish all documents in your possession, custody, or control that are known or available to you, regardless

of whether those documents are possessed by you or by any of your agents, attorneys, investigators, representatives, financial advisors, consultants, or employees.  You must make a diligent search of your records (including but not limited to paper records, computerized records, electronic mail records, voicemail records, and video records) and of other papers and materials in your possession or available to you or your attorneys, investigators, representatives, financial advisors, consultants, or employees.

K.      Computer and electronic files should be provided in electronic form via download link or on flash drives, DVDs, or CD-ROMS in the first instance rather than printouts on paper.

L.      Any translation, alteration, draft, or non-identical copy of a document, and any document that contains any marking not appearing on the original document or that is discovered at a different location or in the possession or custody of a different person is to be considered a separate document.

M.      All documents described herein are to be produced as kept in the ordinary course, with all labels or similar markings intact, and with the name of the person from whose files it was produced. Documents attached to each other, including but not limited to by staple, clip, tape, or "Post-It" note, should not be separated.

N.      If a document responsive to any request is no longer in your possession, custody or control, identify the document, state what disposition was made of the document and the date of such disposition, and identify all persons having knowledge of the document's contents.

O.      If any document responsive to any request is withheld on the ground of the attorney-client privilege or any other applicable privilege or protection, provide a list of each withheld document, along with information sufficient to identify the nature of the document and to support the grounds upon which it is withheld, including but not limited to the persons who

created, received and/or reviewed the document, the date of its creation, the document's subject matter, and the nature of the privilege or other protection on the basis of which the document is withheld.

        P.      Unless otherwise stated, the time period for these Requests shall be from January 1, 2010 to the present.

**Subject:** Re: Goolden v. Wardak and Wardak v. Goolden, 19-cv-6257 (ALC)
**Date:**    Monday, July 26, 2021 at 3:19:14 PM Eastern Daylight Time
**From:**    Rhett O. Millsaps II
**To:**      elalwanfarris@gmail.com
**CC:**      beani@gtlaw.com, Priya Chaudhry, Aurore DeCarlo, Carrie Goldberg

P.S.  Mr. El-Alwan:  We also would be open to conducting a deposition remotely by video link, if you would
prefer that.  We will need to hear from you by this Friday (July 30) if you wish to avoid proceedings in the
English courts.

---

**From:** "Rhett O. Millsaps II" <rhett@millsaps-law.com>
**Date:** Friday, July 23, 2021 at 2:53 PM
**To:** <elalwanfarris@gmail.com>
**Cc:** "beani@gtlaw.com" <beani@gtlaw.com>, Priya Chaudhry <priya@chaudhrylaw.com>, Aurore
DeCarlo <aurore@cagoldberglaw.com>, Carrie Goldberg <carrie@cagoldberglaw.com>
**Subject:** Goolden v. Wardak and Wardak v. Goolden, 19-cv-6257 (ALC)

Dear Mr. El-Alwan,

Please see the attached letter, which also is being sent to you in hard copy by UPS.

Sincerely,

Rhett O. Millsaps II
Millsaps & Associates PLLC
745 Fifth Avenue
Suite 500
New York, NY 10151
www.millsaps-law.com

646 535 1137 (direct dial)
646 355 2816 (facsimile)

==
This message and any attached documents contain information from a law office that is confidential and may
be privileged, attorney work product, or otherwise exempt from disclosure under applicable law.  If you are
not the intended recipient, you may not read, copy, distribute, or use this information. If you have received
this message in error, please delete it and notify the sender immediately by separate e-mail.  To the extent
that this message or any attachment concerns tax matters, it is not intended to be used and cannot be used
by a taxpayer for the purpose of avoiding penalties that may be imposed by law.  Thank you.