UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH GOOLDEN,<br><br>Plaintiff,<br><br>v.<br><br>HAMED WARDAK,<br><br>Defendant. | No. 19-CV-06257 (ALC)<br><br>ECF Case |
| HAMED WARDAK,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>SARAH GOOLDEN,<br><br>Counterclaim-Defendant. | **DEFENDANT'S THIRD<br>AMENDED ANSWER AND<br>COUNTERCLAIM** |

## ANSWER

Defendant/Counterclaim-Plaintiff Hamed Wardak hereby answers the Complaint of Plaintiff/Counterclaim-Defendant Sarah Goolden as follows:

1.      Defendant denies the allegations in Paragraph 1 of the Complaint.

2.      Paragraph 2 is Plaintiff's characterization of this action as to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 2.

3.       Paragraph 3 is Plaintiff's characterization of this action as to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 3.

4.       Paragraph 4 is Plaintiff's characterization of this action as to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 4.

5.       The allegations in Paragraph 5 set forth legal conclusions to which no response is required. To the extent a response is required, Defendant denies knowledge or information

sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 5(a) and admits the allegations in Paragraph 5(b).

6.      The allegations in Paragraph 6 set forth legal conclusions as to venue to which no response is required. To the extent a response is required, Defendant disputes Plaintiff's assertion that a "substantial part of the events giving rise" to Plaintiff's legal claims, which "events" Defendant denies ever occurred, supposedly occurred in this venue, but notes that the issue of venue was already adjudicated and upheld by a prior ruling of this Court.

7.      Paragraph 7 is Plaintiff's characterization of this action as to which no response is required.

8.      Defendant denies knowledge or information sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 8.

9.      Defendant admits the allegations in Paragraph 9.

10.      Defendant denies the allegations in Paragraph 10, except admits that Defendant became wealthy through his successful entrepreneurship.

11.      Defendant denies knowledge or information sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 11.

12.      Defendant denies the allegations in Paragraph 12, except admits that Plaintiff and Defendant met in or about 2010.

13.      Defendant denies the allegations in Paragraph 13.

14.      Defendant denies the allegations in Paragraph 14, except admits that Defendant bought Plaintiff gifts.

15.      Defendant denies the allegations in Paragraph 15.

16.      Defendant denies the allegations in Paragraph 16.

17.        Defendant denies the allegations in Paragraph 17.

18.        Defendant denies the allegations in Paragraph 18, except admits that Defendant paid for Plaintiff and her two friends to fly to Miami to visit Defendant during the July 4th holiday week in 2018.

19.        Defendant denies the allegations in Paragraph 19, except admits that Plaintiff and her two friends stayed at Defendant's home during their July 2018 Miami trip.

20.        Defendant denies the allegations in Paragraph 20.

21.        Defendant denies the allegations in Paragraph 21, except admits that Defendant left his home to meet a friend at a lounge in the early morning hours of July 5, 2018.

22.        Defendant denies the allegations in Paragraph 22.

23.        Defendant denies the allegations in Paragraph 23.

24.        Defendant denies the allegations in Paragraph 24.

25.        Defendant denies the allegations in Paragraph 25.

26.        Defendant denies the allegations in Paragraph 26.

27.        Defendant denies the allegations in Paragraph 27.

28.        Defendant denies the allegations in Paragraph 28.

29.        Defendant denies the allegations in Paragraph 29.

30.        Defendant denies the allegations in Paragraph 30.

31.        Defendant denies the allegations in Paragraph 31.

32.        Defendant denies the allegations in Paragraph 32.

33.        Defendant denies the allegations in Paragraph 33.

34.        Defendant denies the allegations in Paragraph 34.

35.        Defendant denies the allegations in Paragraph 35, except admits that Defendant

paid for lunch for Plaintiff and her friends at Carpaccio in Bal Harbor.

36.    Defendant denies the allegations in Paragraph 36, except admits that Plaintiff drank heavily over the course of the July 4, 2018 week.

37.    Defendant denies the allegations in Paragraph 37.

38.    Defendant denies the allegations in Paragraph 38, except admits that Defendant proposed marriage to Plaintiff at Scarpetta in Miami on the evening of July 6, 2018.

39.    Defendant denies the allegations in Paragraph 39.

40.    Defendant denies the allegations in Paragraph 40, except admits that Plaintiff accepted Defendant's marriage proposal.

41.    Defendant denies the allegations in Paragraph 41.

42.    Defendant denies the allegations in Paragraph 42.

43.    Defendant denies the allegations in Paragraph 43.

44.    Defendant denies the allegations in Paragraph 44.

45.    Defendant denies the allegations in Paragraph 45.

46.    Defendant denies the allegations in Paragraph 46.

47.    Defendant denies the allegations in Paragraph 47.

48.    Defendant denies the allegations in Paragraph 48.

49.    Defendant denies the allegations in Paragraph 49.

50.    Defendant denies the allegations in Paragraph 50.

51.    Defendant denies the allegations in Paragraph 51.

52.    Defendant denies the allegations in Paragraph 52.

53.    Defendant denies the allegations in Paragraph 53.

54.    Defendant denies the allegations in Paragraph 54.

55.     Defendant denies the allegations in Paragraph 55.

56.     Defendant denies the allegations in Paragraph 56.

57.     Defendant denies the allegations in Paragraph 57.

58.     Defendant denies the allegations in Paragraph 58.

59.     Defendant denies the allegations in Paragraph 59.

60.     Defendant denies the allegations in Paragraph 60.

61.     Defendant denies the allegations in Paragraph 61, except admits that Plaintiff and her friends left Defendant's home for the day on July 7, 2018.

62.     Defendant denies knowledge or information sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 62.

63.     Defendant denies the allegations in Paragraph 63.

64.     Defendant denies the allegations in Paragraph 64.

65.     Defendant denies the allegations in Paragraph 65.

66.     Defendant denies the allegations in Paragraph 66.

67.     Defendant denies the allegations in Paragraph 67.

68.     Defendant denies the allegations in Paragraph 68.

69.     Defendant denies the allegations in Paragraph 69.

70.     Defendant denies the allegations in Paragraph 70.

71.     Defendant denies the allegations in Paragraph 71.

72.     Defendant denies the allegations in Paragraph 72.

73.     Defendant denies the allegations in Paragraph 73.

74.     Defendant denies the allegations in Paragraph 74.

75.     Defendant denies the allegations in Paragraph 75.

76.     Defendant denies the allegations in Paragraph 76, except admits that Defendant was arrested for violating a Court Order to stay away from Plaintiff.

77.     Defendant denies the allegations in Paragraph 77.

78.     Defendant denies the allegations in Paragraph 78.

79.     Defendant denies the allegations in Paragraph 79.

80.     Defendant denies the allegations in Paragraph 80, except admits that Defendant sent Plaintiff emails regarding Plaintiff's alleged drug addiction.

81.     Defendant denies the allegations in Paragraph 81, except admits that Defendant sent Plaintiff links regarding mental health resources.

82.     Defendant denies the allegations in Paragraph 82, except admits that Defendant sent Plaintiff messages asserting that he thought she was an escort, sex trafficker, and/or racist based on her behavior and Defendant's discussions with Plaintiff and her father.

83.     Defendant denies the allegations in Paragraph 83.

84.     Defendant denies the allegations in Paragraph 84.

85.     Defendant denies the allegations in Paragraph 85.

86.     Defendant denies the allegations in Paragraph 86.

87.     Defendant denies the allegations in Paragraph 87, except admits that Defendant gave Plaintiff's father plane tickets, travel expenses, and money for a personal trainer and other expenses, and arranged for legal representation for Plaintiff's father to reinstate his law license.

88.     Defendant denies the allegations in Paragraph 88.

89.     Defendant denies the allegations in Paragraph 89.

90.     Defendant denies the allegations in Paragraph 90.

91.     Defendant denies the allegations in Paragraph 91.

92.     Defendant denies the allegations in Paragraph 92.

93.     Defendant denies the allegations in Paragraph 93.

94.     Defendant denies the allegations in Paragraph 94.

95.     Defendant denies the allegations in Paragraph 95.

96.     Defendant denies the allegations in Paragraph 96.

97.     Defendant realleges his responses to Paragraphs 1 through 96. To the extent a further response is required, Defendant denies the allegations in Paragraph 97.

98.     Defendant denies the allegations in Paragraph 98.

99.     Defendant denies the allegations, other than gender, in Paragraph 99.

100.    Defendant denies the allegations in Paragraph 100.

101.    Defendant denies the allegations in Paragraph 101.

102.    The allegations in Paragraph 102 set forth legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

103.    Defendant realleges his responses to Paragraphs 1 through 102. To the extent a further response is required, Defendant denies the allegations in Paragraph 103.

104.    Defendant denies the allegations in Paragraph 104.

105.    Defendant denies the allegations in Paragraph 105.

106.    Defendant denies the allegations in Paragraph 106.

107.    Defendant denies the allegations in Paragraph 107.

108.    The allegations in Paragraph 108 set forth legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

109.    Defendant realleges his responses to Paragraphs 1 through 108 and asserts that the allegations in Paragraph 109 are moot because this cause of action for defamation *per se* was

7

dismissed with prejudice by the Decision and Order filed July 23, 2020 and Order filed August 15, 2020. To the extent a further response is required, Defendant denies the allegations in Paragraph 109.

110.    The allegations in Paragraph 110 are moot because this cause of action for defamation *per se* was dismissed with prejudice by the Court's Decision and Order filed July 23, 2020 and Order filed August 15, 2020. To the extent a further response is required, Defendant denies the allegations in Paragraph 110.

111.    The allegations in Paragraph 111 are moot because this cause of action for defamation *per se* was dismissed with prejudice by the Court's Decision and Order filed July 23, 2020 and Order filed August 15, 2020. To the extent a further response is required, Defendant denies the allegations in Paragraph 111.

112.    The allegations in Paragraph 112 are moot because this cause of action for defamation *per se* was dismissed with prejudice by the Court's Decision and Order filed July 23, 2020 and Order filed August 15, 2020. To the extent a further response is required, Defendant denies the allegations in Paragraph 112.

113.    The allegations in Paragraph 113 set forth legal conclusions to which no response is required and, in any event, are moot because these legal conclusions were rejected by the Court when this cause of action for defamation *per se* was dismissed with prejudice by the Decision and Order filed July 23, 2020 and Order filed August 15, 2020. To the extent any response is required, Defendant denies the allegations in Paragraph 113.

114.    Defendant realleges his responses to Paragraphs 1 through 113. To the extent a further response is required, Defendant denies the allegations contained in Paragraph 114.

115.    Defendant denies the allegations in Paragraph 115.

116.    Defendant denies the allegations in Paragraph 116.

117.    Defendant denies the allegations in Paragraph 117.

118.    Defendant denies the allegations in Paragraph 118.

119.    The allegations in Paragraph 119 set forth legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

120.    The allegations in Paragraph 120 set forth legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

## GENERAL DENIAL

Unless specifically admitted herein, Defendant denies each and every allegation in the Complaint and demands strict proof thereof.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof where such burden properly rests with Plaintiff and without waiving, and hereby expressly reserving, the right to assert any and all such defenses at such time and to such extent as discovery and factual or legal developments may establish a basis therefore, Defendant hereby asserts, as and for separate and additional defenses to the Complaint, as follows:

### First Affirmative Defense

Plaintiff's Complaint fails to state a claim upon which relief may be granted or for which the damages sought can be awarded.

### Second Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrines of bad faith, unclean hands, laches, and/or estoppel.

9

### Third Affirmative Defense

To the extent Plaintiff is entitled to any damages recovery on any of her claims, which Defendant denies, Plaintiff has failed to take action or has taken insufficient action to mitigate those damages. Consequently, any damages suffered by Plaintiff must be reduced in an amount by which she could have mitigated those damages.

### Fourth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, on the basis that Plaintiff would be unjustly enriched if allowed to recover all or any portion of the damages alleged in the Complaint.

### Fifth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff's injuries or damages, which injuries or damages are denied, were not caused in fact or proximately caused by acts and/or omissions of Defendant.

### Sixth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, to the extent she has not suffered any actual injury or damages as a result of the conduct alleged in the Complaint.

### Seventh Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations, statutes of repose, and/or equitable doctrines, including laches.

### Eighth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, on the basis of the Plaintiff's intentional acts and/or omissions, including fraud.

**Ninth Affirmative Defense**

Defendant is not liable for punitive damages because neither Defendant, nor any of his employees or agents, committed any act with malice or reckless indifference to Plaintiff's federally or state protected rights, or approved, authorized, ratified, or had actual knowledge of any such acts.

**Tenth Affirmative Defense**

Plaintiff's claims are not brought in good faith, and Defendant shall seek attorneys' fees and costs under all applicable fee-shifting statutes.

**Eleventh Affirmative Defense**

If any judgment is awarded in Plaintiff's favor, any damages award should be set off by the damages caused by Plaintiff and incurred by Defendant, including the damages sought in connection with the counterclaims asserted herein.

## RESERVATION OF RIGHTS

Defendant reserves his right to amend and supplement his answer to assert any other defenses as may appear during the course of this action.

\*     \*     \*

**WHEREFORE**, Defendant hereby demands judgment against Plaintiff, dismissing the Complaint in its entirety with prejudice, and awarding to Defendant his attorneys' fees, costs, interest, and such other and further relief as the Court deems equitable and just.

## COUNTERCLAIM

Defendant/Counterclaim-Plaintiff Hamed Wardak ("Wardak"), for his counterclaim against Plaintiff/Counterclaim-Defendant Sarah Goolden ("Goolden"), alleges, upon knowledge as to himself and otherwise upon information and belief, as follows:

1. In a subversion of the groundswell social movement for redress of sexual and physical assault against women, Goolden, a New York socialite who frequents nightlife parties and clubs in New York, Miami, Los Angeles, London, and Ibiza, falsely cloaked herself in fabricated "#MeToo" claims to perpetrate a shakedown of Wardak, a successful self-made entrepreneur and an up-and-coming music producer. Goolden, who met Wardak in 2010 and was romantically involved with him on and off in the years leading up to this case, played on his genuine affection for and desire to marry her to lure him into spending large sums – over $300,000 – on luxury goods and services, alcohol-fueled partying, a trust fund for her dog, and travel for her father and friends in the course of just a few months around the summer of 2018. After cajoling Wardak into publicly proposing to her with a $160,000 diamond ring that she had pre-selected, Goolden abruptly broke off the engagement and soon thereafter became hostile to Wardak. When Wardak confronted her, Goolden and her father kept him at bay with a confusing web of deception, and, after that failed, threatened that she would falsely charge him with rape in order to destroy his career and reputation unless he stopped pursuing his valid demands for restitution.

2. Wardak did not stop. Goolden made good on her threat.

3. In the summer of 2019, Goolden made knowingly false and malicious claims that Wardak had assaulted and raped her the previous summer in his Miami apartment, while her friends who were overnight guests also were in the apartment. Her claims are false. They are an

utter fabrication from start to finish, intended solely to destroy Wardak's reputation and career. There was no rape, no sexual assault, and no assault or battery.

4.      In truth, Goolden fleeced Wardak.  Over the course of a few months, between May and July 2018, Goolden cajoled and induced Wardak to pay for a trust fund for her dog, her personal expenses to the tune of tens of thousands of dollars, and luxury travel expenses for her, her friends, and her father, and to arrange for top-notch legal representation for her father to reinstate his law license following his disbarment after pleading guilty and serving prison time in a criminal case against him for defrauding his 90-year-old blind client.  While in Miami during the July 4th holiday, Goolden imposed on Wardak's hospitality, staying at his Miami apartment with two of her friends, going on all-expense-paid luxury shopping trips, a yacht cruise, and expensive meals and nightlife benders – all paid for by Wardak.

5.      During the trip, Goolden implored Wardak to propose marriage, telling him that if he did not propose, her purported ex-boyfriend Arthur would.  She and one of her male friends importuned Wardak to buy her a five-carat Harry Winston engagement ring valued at approximately $160,000.  They then pushed him to continue the splurge and to buy her and her friends approximately $40,000 worth of designer clothes and handbags.

6.      While Wardak drinks sparingly, Goolden and her friends spent that July week on a bender, getting drunk day and night at Wardak's expense.  Goolden even asked Wardak to arrange for an intravenous-drip hydration service at Wardak's home after one such daytime bender so that Goolden and her friends could continue drinking heavily into the night.

7.      The Thursday morning when Goolden falsely alleges that Wardak first assaulted her, July 5, 2018, Goolden had been drinking heavily and had passed out in the guest bedroom (of Wardak's apartment) with her two friends; more particularly, Goolden was topless in bed with

13

her male friend, with whom she had publicly and ostentatiously engaged in a long, passionate kiss at dinner the previous evening.  No assault or battery occurred then by Wardak, just as no assault or rape occurred the following Saturday morning, July 7, 2018, as falsely alleged by Goolden.  Simply, Wardak has never assaulted, battered, or raped Goolden at any time.

8. Instead, Goolden successfully pressured Wardak to publicly propose to her on Friday, July 6, 2018, with an exorbitant engagement ring and before an audience of her and his friends.  Goolden, Wardak, and two of Goolden's friends were bedecked in expensive clothes paid for by Wardak, on Goolden's insistence, for this engagement party.

9. Then, the next day, Goolden hastily left Wardak's apartment in a fit of anxiety with her friends, saying that she and her friends were going to stay at a hotel.  Goolden later text messaged Wardak that evening to apologize repeatedly for her behavior earlier in the day, saying, among other things, that she was "really in need of working on" herself, that Wardak did not "deserve to deal with [her] anxiety attacks and erratic emotions," that she "just really panic[s] a lot," that she has "commitment issues," and that she would "do whatever [she] can to make things right."  Goolden then returned to Wardak's apartment and stayed until the following Monday, when she abruptly left with the $160,000 engagement ring on her finger.

10. Almost immediately thereafter – all in July 2018 – Goolden ghosted Wardak while she went gallivanting in Mykonos, Greece with her purported ex-boyfriend Arthur – the same one she had referenced to pressure Wardak to propose to her several weeks earlier – and in Ibiza, Spain with a third romantic partner.  Around that time, Goolden blocked Wardak and certain of his friends from her social media accounts and switched her Instagram profile from public to private.  She later traveled to Brazil, where she again visited with Arthur.

11. Following Goolden's dramatic departure from Miami and sudden shift in

14

communications with Wardak, Wardak was alternately in shock, concerned, hurt, angry, and confused. He and his friends suspected that he had been badly used by Goolden and her friends, and Wardak told Goolden that he would take lawful measures, including instituting lawsuits, to seek recompense.

12.     Goolden's father, Brian Cavanaugh, continued to string Wardak along. Cavanaugh corroborated others who had told Wardak that Goolden had a substance abuse problem and was mentally unstable. He insisted that Wardak was "special" to Goolden. According to Cavanaugh, Goolden had never introduced her past boyfriends to him, but she had wanted him to meet Wardak. Cavanuagh told Wardak that he was a "hero" for caring so much for Goolden, despite her mental and emotional problems, and he told Wardak that Goolden needed Wardak's continued love and support to overcome her mental health issues.

13.     Genuinely confused and alternating between concern for Goolden and suspicion and anger that she had played him for his generosity – or worse, used him as a pawn to make her on-and-off again boyfriend Arthur jealous – Wardak persisted in trying to communicate with Goolden despite her failure to respond. When Wardak reiterated his suspicion that he had been defrauded, demanding restitution or promising legal action, Goolden only then responded with text messages asking Wardak to cease all contact and stating that he was frightening her.

14.     In September 2018, rather than attempting to settle the matter amicably, Goolden filed a self-serving, duplicitous police report against Wardak, accusing him of harassment; notably, nowhere in the police report did Goolden allege that she had been physically or sexually assaulted by Wardak at any time. The same day, Goolden told Farris El-Alwan, one of her friends whom Wardak had flown to Miami for the July 4th weekend, and the same friend whom Goolden passionately, publicly kissed and then was topless in bed with, that she would not return

the engagement ring, saying, "If I return the ring / He's going to ask for more shit / Sorry but not gonna return shit."

15.    Meanwhile, throughout the autumn of 2018, Cavanaugh maintained contact with Wardak and even made attempts to build a seemingly genuine relationship with him.  Wardak paid for Cavanaugh to travel to and stay in New York City to visit him and gave Cavanaugh gifts, believing that Cavanaugh might still one day be his father-in-law, as Cavanaugh continued to maintain that Goolden was damaged and needed help from her family and Wardak.  Cavanaugh went so far as to suggest a family-based intervention for Goolden, which Wardak took steps alongside Cavanaugh to arrange.

16.    Goolden's and Cavanaugh's efforts to confuse and deceive Wardak, however, fell apart by December 2018.  After Wardak instituted legal actions against them in early 2019 seeking restitution, Cavanaugh told Wardak that unless he stopped trying to recover the money he had given them, Goolden would falsely accuse him of sexual assault and rape to destroy his reputation and career.

17.    Goolden made good on Cavanaugh's threat.

18.    In or around May 2019, Goolden went to multiple music venues in New York where Wardak had business contacts and was an up-and-coming musical artist and producer. Goolden falsely and maliciously told managers at 1Oak, Gospel, and Knock Down Center, all nightclubs and music venues in New York City, that Wardak had raped her and that she had a "rape case" pending against him.  She also falsely and maliciously stated to the club managers that Wardak (whose family is from Afghanistan) is an illegal arms dealer, and that he had threatened to kill her like his father killed his mother.  All of that was a whole-cloth fabrication by Goolden.  Goolden knew that these falsehoods would be ruinous to Wardak's reputation and

16

career by, among other things, preventing Wardak from continuing to work in these music venues that were vital to his music business.

19.     Goolden's smear campaign had its intended effect.  Wardak lost opportunities to perform, and his bookings at clubs in New York and Miami and related party venues were reduced after Goolden made these false charges.

20.     In addition to defaming Wardak to individuals in the music industry, Goolden amplified her false physical and sexual assault charges through this sham action, which she brought maliciously and solely for the purpose of defaming Wardak, and which already has had its intended effect through a *New York Post* article that followed, in which Ms. Goolden participated and which was widely republished.

21.     Wardak accordingly now counter-sues seeking compensatory and punitive damages for Goolden's defamation *per se*, which has cost Wardak at minimum $100,000 in losses.

## PARTIES

22.     Defendant/Counterclaim-Plaintiff Hamed Wardak is an individual residing and domiciled in the Commonwealth of Puerto Rico.

23.     Plaintiff/Counterclaim-Defendant Sarah Goolden is an individual residing and domiciled in the State of New York, New York County.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 on the basis of diversity of citizenship between the parties and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

25.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events giving rise to this action occurred in New York and this Judicial District.

## TRIAL BY JURY

26.     Counterclaim-Plaintiff demands trial by a jury on all issues so triable.

## FACTS

### Goolden's Pretextual Engagement and Exploitation of Wardak's Wealth

27.     Goolden met Wardak in 2010 while Goolden was living in, and Wardak was visiting, Washington D.C.  There was mutual romantic interest immediately upon meeting, and they had occasional romantic trysts over the years, often reconnecting as Goolden was breaking up with one of the many prominent and/or wealthy men she dated.  Goolden expressed on several occasions to Wardak that she would like to be his girlfriend, but Wardak was not ready to commit to a relationship with her then.

28.     In or around the years 2013-2014, Goolden confided in Wardak about her other romantic relationships, telling Wardak that she had been sexually assaulted by numerous high-profile men over the years.  She also told Wardak that the man she had been dating in 2013 was "stalker isk."  In late 2013, Wardak offered, and Goolden happily accepted, for Wardak to pay for her to fly to Miami to visit Wardak for another romantic interlude.  While in Miami, Goolden told Wardak that she was having financial difficulties, and that her father was destitute and not able to help her financially.  Out of genuine affection for her, Wardak gave her some financial assistance.

29.     After Goolden left Miami, she and Wardak continued a mutual flirtation over the ensuing years while she moved around Asia and Europe, continuing to date prominent and wealthy men to finance her lifestyle.  Goolden invited Wardak to visit or travel with her in various places and expressed her desire to visit Wardak in Puerto Rico, but they did not meet

18

again in person until 2018, in the wake of another of Goolden's messy breakups.

      30.    In 2018, Goolden again ran to Wardak for romantic comfort and financial help. Wardak again flew Goolden to Miami, at her request, following her break up with another boyfriend, Arthur, who lived in Brazil. Goolden, in tears, told Wardak that Arthur had been unfaithful with one of her friends (a Russian model) and that Goolden had incurred crushing credit card debt on behalf of Arthur, who had failed to pay her back. She implored Wardak to pay off her debt and her personal expenses, insisting on a bulk money transfer rather than itemized payments of specified debts or upcoming costs. In May 2018, Wardak wired $30,000 to Goolden's personal bank account. He also gave Goolden $5,000 in cash to pay for her travel to attend her brother's college graduation.

      31.    Following this episode, Goolden and Wardak for the first time officially became a couple, although Wardak was aware that Goolden stayed in contact on social media and otherwise with Arthur and his family in Brazil.

      32.    Playing on Wardak's affection for her and his insecurity about Arthur, Goolden wheedled Wardak into paying for her trips to see him, including flights from New York to Florida and to Puerto Rico. Goolden also requested, with the involvement of Cavanaugh, that Wardak wire her $20,000 to set up a trust for care of her dog (a Chow Chow) and $20,000 for personal expenses, including rent on her Manhattan apartment. Thus, on or about June 28, 2019, Wardak wired an additional $41,000 to Goolden's personal bank account for her living expenses and for her dog's medical care.

      33.    Additionally, in June 2018, at Goolden's request and because she said that she wanted Wardak to meet her father, Wardak paid to fly her, her father, and her dog in first-class to Puerto Rico, where he also paid for their entire stay, including tours on yachts and island-hopping

trips in the Caribbean.

34.     For the July 4th holiday that year, Goolden asked Wardak, and Wardak agreed, to fly her and two of her friends, Stephanie Raphael and Mr. El-Alwan, to Miami to be house-guests in his Miami apartment and to pay their expenses during the trip. Prior to the trip, Goolden at one point threatened to break up with Wardak if he did not agree to pay her friends' travel expenses for the weekend.

35.     During that trip, Goolden cajoled Wardak to propose to her, telling him that he could buy an engagement ring and turn the weekend into a celebratory engagement party. Goolden repeatedly professed a sincere desire to marry Wardak, again playing on his genuine love for her and genuine interest in marriage to her. But Goolden threatened that unless Wardak proposed – with the ring she already had selected – her purported ex-boyfriend, Arthur, would propose first, suggesting that she would take Wardak's failure to propose right away as a lack of resolve that would lead to a lifelong missed opportunity for them to be together as a loving married couple.

36.     On July 4, 2018, Wardak treated Goolden and her friends to a day on a luxury yacht and later that evening to lavish dinner and drinks at a restaurant and dance venue in Miami. After a night of heavy drinking by both Goolden and her friends – and a melodramatic scene caused by Goolden and Mr. El-Alwan screaming and throwing ice at each other and later making out at the table – the party broke up, and Goolden and her friends, who were drunk, retired to Wardak's Miami apartment. Wardak, who had not been heavily drinking, went to a Miami club to meet with one of his close friends visiting from Washington, D.C. Upon returning home in the early morning hours of July 5, Wardak discovered Goolden and Mr. El-Alwan in his guestroom bed together, both completely naked but for their underwear, and Goolden topless.

37.     Later that morning on July 5, Wardak confronted Goolden about her behavior, leading to a verbal argument; Goolden, hung over, insisted that she and Wardak take it up later. That evening, Wardak and Goolden discussed Goolden's behavior the prior night and morning, and Goolden said, in sum and substance, "you need to give me a ring or Arthur will."

38.     The next day, on July 6, 2018, Wardak revealed his marriage-proposal plans to Goolden's friends, Mr. El-Alwan and Ms. Raphael, who had already been told by Goolden. Mr. El-Alwan told Wardak that he and Goolden had previously picked out the exact ring she wanted: a five-carat diamond ring from Harry Winston. Mr. El-Alwan went with Wardak to the Harry Winston boutique in Bal Harbor Shops and immediately selected the chosen five-carat ring, which Wardak purchased for approximately $160,000.

39.     At Goolden's insistence, Wardak then went shopping with her and her friends to high-end clothing and handbag stores, including the Yves Saint Laurent boutique, buying Goolden and her two friends some $40,000 worth of clothing and handbags, including outfits for their impromptu engagement dinner the following evening.

40.     With Goolden's and Wardak's friends looking on, Wardak proposed to Goolden at Scarpetta, a high-end Miami restaurant, on the evening of July 6. As seen in at least one video, Goolden joyously accepted the proposal she had demanded of Wardak and immediately kissed her new fiancé, to the applause of their friends. They continued celebrating into the early morning hours with expensive bottle service at Liv, a nightclub at the Fontainebleau hotel.

41.     Goolden stayed the rest of the weekend with Wardak in Miami, even after her friends left, following her meltdown and subsequent apology as detailed above. She and Wardak planned for her to stay with him in Miami an additional two weeks. But she precipitously changed her plane ticket and left Miami on Monday, July 9, 2018 with the $160,000 engagement

21

ring on her finger.

42.     Upon leaving, she told Wardak that she was "confused" and was going to spend time with her grandmother in Syracuse, New York while she figured things out.

**Goolden's Duplicity**

43.     Goolden did not go to Syracuse. She first traveled to Mykonos, Greece with her purported ex-boyfriend Arthur – the same one she had referenced to pressure Wardak to propose to her earlier that same month. She then, also in July 2018, traveled to Europe, presumably using the money that Wardak had given to her over the prior months. She spent time in London with friends and partied in Ibiza, a city with a notorious nightlife, including traveling with another "boyfriend," Richard Abrazi. During this period, while social media tracked her high-flying social life, including posts labeled "Gangsters in Paradise," Goolden blocked Wardak on social media and ignored Wardak's entreaties to talk with him. Wardak later learned that Goolden also traveled to Brazil in September 2018, where she again saw her purported ex-boyfriend, Arthur.

44.     In the midst of Wardak's understandable confusion and his increasingly frantic efforts to talk with Goolden, Goolden's father, Brian Cavanaugh, interceded to keep Wardak from pursuing the matter. Cavanaugh is a lawyer who pled guilty to felony mail fraud related to fraudulent loans and embezzlement of funds from an irrevocable trust that he established for a 90-year-old, legally blind client who had no family or support system; he was disbarred and changed his name to "Brian Cavanaugh" after his release from prison. Wardak had previously established a relationship with Cavanaugh, believing that he would soon be his father-in-law, and learned in the process of Cavanaugh's criminal past and disbarment. Wardak generously assisted Cavanaugh with various financial needs, including arranging for a top international law firm to assist Cavanaugh in reinstating his law license. Out of a sense of cultural propriety and respect,

Wardak also asked Cavanaugh for his "blessing" of Wardak's intended marriage to Goolden, which Cavanaugh readily gave.

45.     In the months after Goolden left Miami for Europe with her other lovers, Cavanaugh stayed in contact with Wardak, first telling Wardak that he should stay away from Goolden and threatening legal action if Wardak pursued legal claims for restitution.  Cavanaugh then switched course, attempting to reconcile with Wardak and trying to reassure Wardak with false statements that Goolden had no ill intent or false motive.  Cavanaugh tried to dissuade Wardak from concluding that he had been defrauded by Goolden by telling him, for example, that Cavanaugh would facilitate the return of the engagement ring and money if Goolden and Wardak could not reconcile and save their engagement to be married.

46.     Cavanaugh also told Wardak that Goolden was mentally unstable, had substance abuse issues, and needed Wardak's help, including his continued love, understanding, and support.  That greatly concerned Wardak, who, if nothing else, did not want to end his relationship with Goolden over a misunderstanding or misperception if in fact she was acting out of actual mental illness or a real disability caused by alcohol or drug dependency.

47.     Cavanaugh and Goolden apparently coordinated their communications with Wardak to keep him from pursuing his legal claim for the return of the ring and money.  At the same time that Cavanaugh sought to reassure Wardak, Goolden ignored his entreaties to talk, eventually creating a paper trail in email and text messages that she wrote demanding that Wardak cease and desist communicating with her, creating a false foundation on which to claim criminal harassment.

48.     Cavanaugh's false assurances kept Wardak in a state of emotional confusion and turmoil, especially given the contradictory messages from Goolden demanding that Wardak leave

23

her alone and the messages from Cavanaugh that Goolden genuinely loved Wardak and needed

his help to heal her mental health issues and drug problem.  That confusion led to frantic efforts

by Wardak, who genuinely believed Cavanaugh's claims that Goolden was emotionally unstable

and ill, to insist on speaking with her so he could assure her that he would stand by her and help

her with whatever she was going through.  But those communications, motivated by Wardak's

genuine love and affection, were perverted by Goolden and turned against him as trumped-up

evidence of "harassment" and "threats."

49.     Cavanaugh even convinced Wardak to attempt to arrange a family-based

intervention for Goolden.  In coordination with Cavanaugh, Wardak engaged a well-known

intervention expert, and Cavanaugh said that he wanted to plan the intervention for around that

Thanksgiving.

50.     Before that could happen, Goolden filed a police report in New York against

Wardak for harassment in late September 2018, alleging that Wardak had engaged in

"harassment, blackmail, slander, verbal abuse, obsessive texting, emailing, and calling constantly

to send things to my apartment and my father's house. Threatening to ruin my life and

threatening to show up at my house."  Notably, she made no mention of any prior physical or

sexual assault or rape.

51.     Wardak did not learn of this police report until months later.  In fact, Cavanaugh

had falsely told Wardak that he had stopped Goolden from filing any police report.

52.     The same day that Goolden filed the police report without any notice to Wardak,

Goolden sent Mr. El-Alwan a series of text messages stating, "If I return the ring / He's going to

ask for more shit / Sorry but not gonna return shit."

53.     Throughout September and October, Goolden's and Cavanaugh's attempts to keep

24

Wardak at bay with a confused web of deceit began to falter, and, while Wardak was genuinely confused and not certain, he told both Cavanaugh and Goolden that he was fast coming to the conclusion that he had been "played" and that he would turn the matter over to his attorneys and otherwise pursue the return of the ring and money taken from him through false pretenses.

54.     On or around October 12, 2018, Goolden's brother, Kevin Goolden – whom Wardak met while preparing with Cavanaugh for the planned family intervention – told Wardak that Goolden was never in love with him and that he had been targeted to take whatever money she could inveigle out of him.  He said that Wardak was not her first victim and specifically named other men, including a high-profile billionaire and a professional hockey player, whom she also had played for their money.

55.     Wardak then hired counsel.  Starting in January 2019, he instituted legal actions against both Goolden and Cavanaugh seeking restitution for the hundreds of thousands of dollars he had given to and spent on them while believing that Goolden was to be his wife and Cavanaugh his father-in-law.

56.     In response, around the same time in January 2019, Goolden instituted an action in New York Family Court seeking an Order of Protection, claiming harassment and stalking by Wardak.  Notably, she made no allegations of physical or sexual assault to the court or any other authorities at that time.  And then suddenly in June 2019, Goolden falsely – and for the first time – testified that Wardak had physically assaulted and raped her during the Miami engagement trip the prior July.  She then instituted this action in July 2019 – a day or two before her claim would have expired under the statute of limitations – based on these false allegations of assault and rape, maliciously and solely to defame Wardak.

**Goolden's Injurious and Malicious Falsehoods**

57.     In 2019, Goolden frequented music clubs and venues in New York where she knew Wardak had music-business interests and contacts, including Knock Down, 1Oak, and Gospel, as well as various venues for private music and dance parties.  At these events, starting in or around May 2019, Goolden falsely and maliciously told managers and promoters that Wardak had raped her and that she had a pending rape case against him.

58.     In May 2019, Goolden attended a private music event held in a warehouse music venue Brooklyn, New York and hosted by Black Matt with V.I.P. sections managed by Provocateur.  At that event, Goolden saw Matteo Garzia, a well-known event promoter based in New York City, interacting with Wardak.  When Garzia was alone, Goolden approached him and falsely and maliciously stated to Garzia that Wardak was lying when he told people that she had been engaged to him, that Wardak had raped her, and that she had a "rape case" pending against him.

59.     Also in May 2019, Goolden showed up at another event she knew Wardak frequented, at Gospel, and made her intentions clear: she brought with her an Order of Protection, described below, and showed it to the event managers, asking them to eject Wardak from the venue.  She also falsely and maliciously told them that Wardak had raped her, knowing full well that this was a key business opportunity for him and that her false allegation of rape would be ruinous to Wardak's reputation and business.

60.     Goolden made other false statements about Wardak to multiple managers and promoters in the music business community, including to managers and promoters affiliated with the New York nightclubs 1Oak, Knock Down Center, and Gospel.  Namely, Goolden falsely claimed that Wardak is an "illegal arms dealer."  That defamatory statement was made in or

around May 2019 by Goolden to the owner and manager of Gospel in New York, to Mateo

Milleri and Carmine Conte, members of the disc jockey duo Tale of Us, and to Steve Martinez,

James Zumarraga, and Alex Jas, who are all affiliated with the famous disc jockey duo, the

Martinez Brothers.

61.     Just as Wardak never assaulted or raped Goolden, Wardak has had nothing to do

with arms deals, never mind illegal arms dealing, and Goolden knew that these claims were false

when she made them.  In fact, Wardak was a highly successful contractor with the U.S.

government, providing crucial linguistic, logistic, and life-support services to the U.S.

government during its fight against terrorism in Afghanistan.  Goolden made these false

statements intending to appeal to ethnic biases, prejudicial assumptions, and discriminatory fears

to imply that Wardak, as a successful U.S. businessman from a prominent Afghan family, was a

dangerous, violent criminal involved in illegal international arms deals.

62.     As a result of Goolden's false and defamatory statements, Wardak lost several

crucial music-business opportunities.  In particular, Wardak was unable to book any future

musical performances through Tekk Support and at venues such as the Brooklyn Mirage, and

both the Martinez Brothers and Tale of Us refused to collaborate on projects with him.

Specifically, directly due to Goolden's false statements, managers of various music venues in

New York blackballed Wardak, banning him from clubs owned and/or managed by 1Oak and the

Brooklyn Mirage.  Promoters of Burning Man events in New York and Nevada and various other

promotors of events and venues in Ibiza followed suit, refusing to book Wardak at their music

events and venues.

63.     In January 2019, in response to Wardak's filing of legal actions against Goolden

for restitution, Goolden filed a petition for an Order of Protection against Wardak with the

27

Family Court of the State of New York, using Wardak's emails and text messages from the prior months as a basis to allege that Wardak was harassing and stalking her. Her petition made no reference to any assault, much less rape. Based on her allegations, the court granted Goolden an unopposed *ex parte* temporary Order of Protection, and Wardak later consented without admission to a two-year final Order of Protection.

64. On or about July 5, 2019 – a year after Goolden's and her friends' trip to Miami to visit Wardak for the July 4, 2018 holiday – Goolden filed this action, which, based solely on knowing and malicious falsehoods, is a sham. Her claims of assault and rape in this case are completely fabricated, brought maliciously by Goolden for the sole purpose of defaming Wardak under the guise of litigation and its attendant privilege.

65. In her pleading in this action, Goolden realleges her false and malicious claim that Wardak inflicted "sexual and physical violence," including rape, on Goolden. These allegations are false, and Goolden knew they were false when she made them.

66. Goolden's false and malicious allegations include claims that Wardak "forcibly pulled Ms. Goolden out of bed, picked her up, and then carried her to his bedroom, where he then threw her onto his bed" (Compl. ¶ 24); Wardak "[threw] glasses and plates at her" (*id.* ¶ 25); and "[d]uring the assault, Defendant Wardak threatened Ms. Goolden that he would ruin her life if she did not stay with him and agree to do what he wanted." (*id.* ¶ 26). None of that is true.

67. Wardak never physically assaulted Goolden. He did not forcibly pull her from bed, pick her up, or carry her to his bedroom. He also did not throw her onto his bed or throw plates and glasses at her. Goolden's allegations of physical assault are false, and Goolden knew or reasonably should have known them to be false.

68. Most egregiously, Goolden falsely claims that Wardak "climbed on top of Ms.

28

Goolden, pulled off of [sic] her underwear, and forcefully held her down while he performed oral

sex on her," and thereafter "pulled out his penis and sexually assaulted Ms. Goolden." (Compl. ¶¶

51, 53.)  Goolden also falsely alleges that Wardak "admitted to raping Ms. Goolden." (*Id.* ¶ 73.)

69.     Again, none of that is true, and Goolden knew or reasonably should have known

the allegations to be false when she made them.

70.     Wardak never assaulted or raped Goolden and certainly never admitted to a rape

that never occurred.  In fact, on the day of the alleged rape, and for months afterward, the two

privately exchanged voluminous text and email messages, which never so much as hinted at any

assault, sexual or otherwise – because no such assault ever occurred.

71.     Goolden additionally alleges that in May 2019, Wardak "threatened to murder Ms.

Goolden's father and sent him multiple death threats." (Compl. ¶ 94.)  That too is false.

72.     Wardak never threatened to murder Goolden's father.  Goolden's allegation of

such threats is false, and Goolden knew it.

73.     Immediately after her sham Complaint was filed (and even before service of the

summons and Complaint), Goolden and her lawyer spoke to the *New York Post* to publish her

false and malicious allegations as widely as possible.  Goolden spoke to the reporter with the

intent to damage Wardak's reputation and injure his business.

74.     On July 20, 2019, the *New York Post* published an article, titled "Model claims

former Afghan defense minister's son raped her" (the "NY Post Article").  As Goolden knew it

would (or should have known after speaking with the reporter prior to publication), the article

repeats Goolden's knowingly false and defamatory allegations that Wardak assaulted and raped

her, stating that Wardak "stalked and raped a Manhattan fashion model after she rejected him"

and noting that Goolden "accuses Hamed Wardak of attacking her twice during a trip the two

took to Miami on July 4th weekend 2018."

75.     The NY Post Article was picked up and re-published by several other media outlets, including, but not limited to, *The Daily Mail Online*, *ATN News*, and *The Khaama Press*. As Goolden knew or should have known, the story prompted online commentators on social media engaging in diatribes about Wardak's race, appearance, and the supposed truth of the heinous and knowingly malicious and false assault and rape allegations in Goolden's Complaint.

**Wardak's Reputational and Economic Damages**

76.     Goolden's wrongful conduct has severely damaged Wardak's reputation, injured his nascent music business, and threatens his other business interests going forward, as Goolden intended.  The false claims of assault and rape are defamatory *per se*, and the damage to reputation is self-evident.

77.     After Goolden made the defamatory statements to music managers and promoters noted above, Wardak lost gigs playing at various venues and private parties, as well as opportunities to collaborate with well-known acts and artists.

78.     Wardak's lost economic income is at least $100,000, which reflects his investment in the music business that he otherwise would have recouped in 2019 if not for Goolden's malicious and knowingly false accusations of assault and rape that she made to the music managers and promoters, as set forth above.

79.     In addition, after the NY Post Article was published with the false assault and rape allegations, bankers and other entrepreneurs cancelled meetings and refused to take future meetings with Wardak, negatively affecting not only his music career but his myriad of other business ventures.

80.     Wardak also expended significant sums of money on legal fees to defend this

sham action and for search engine optimization to mitigate the further propagation of the false and defamatory statements made by Goolden to the press.

## FIRST CAUSE OF ACTION
## DEFAMATION *PER SE*

81.     Counterclaim-Plaintiff realleges all preceding paragraphs of his counterclaims as though fully set forth herein.

82.     The oral statements by Goolden alleging that Wardak raped or otherwise physically or sexually assaulted Goolden and that Wardak was an illegal arms dealer, as detailed above, are in fact untrue.

83.     The written statements alleging that Wardak raped or otherwise physically or sexually assaulted Goolden that were published in Goolden's sham Complaint in this action – which Goolden brings maliciously and solely to defame Wardak – and in the *New York Post* article identified above are in fact untrue.

84.     Ms. Goolden willfully, knowingly, and maliciously encouraged the *New York Post* to publish her false allegations of physical and sexual assault by giving the reporter a statement soon after filing her Complaint rather than retracting her false claims.

85.     Goolden made all such defamatory statements concerning Wardak, as set forth above, knowingly and intentionally.

86.     Goolden made the defamatory statements with knowledge of each statement's falsity or at least with reckless disregard of the truth.

87.     Goolden published these false and defamatory statements about Wardak to third parties, including the third parties identified above, and these third parties understood the defamatory meaning and that the defamatory statements concerned Wardak.

88.     The false and defamatory statements, as set forth above, both in writing and orally,

31

falsely charge that Wardak committed serious crimes, *to wit*, physical and sexual assault, battery, rape, and illegal arms sales.

89.     Goolden made these defamatory written and oral statements to malign Wardak's integrity, credibility, honesty, ethics, trustworthiness, dependability, professional abilities, and fitness to perform in his businesses in the music industry and beyond.

90.     Goolden's actions were malicious, wanton, and reckless, and intended to damage Wardak's reputation and interfere with his many business interests.

91.     Goolden made the defamatory statements about Wardak to bully, harass, and intimidate him and his business counterparties.

92.     Goolden's defamatory statements were neither privileged nor authorized by law, including the statements made in the Complaint in this action because Goolden brings this action maliciously and solely to defame Wardak.

93.     Goolden's defamatory statements are defamatory *per se* because they falsely charge Wardak with serious crimes, namely rape, sexual or physical assault, and illegal arms dealing.

94.     In publishing the false and defamatory statements, Goolden injured Wardak, including injuring his personal and business reputations as a matter of law.

95.     As a direct and proximate result of Goolden's defamatory statements, Wardak incurred damages, including *per se* injury to reputation, pecuniary loss due to business disruption and loss of business opportunities, and mental and emotional suffering, in an amount to be determined at trial.

96.     As a result of Goolden's conduct, and as she intended and expected, Wardak lost business in the music industry, including the specific business opportunities specified above, and

his music business has suffered economic and pecuniary harm in an amount to be determined at trial, but in any event in an amount no less than $100,000, including costs associated with Wardak's attempts to mitigate the damage from Goolden's defamation and his investment in his start-up music business that the business would have recouped in 2019 but for Goolden's wrongful and injurious falsehoods described herein.

97.     Wardak is entitled to recover his reasonable attorneys' fees and costs, together with interest as permitted by law, incurred as a result of Goolden's defamatory conduct.

98.     Because Goolden's actions were malicious, wanton, outrageous, and reckless, Wardak also seeks an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Wardak demands judgment against Goolden awarding Wardak as follows:

a.     Compensatory damages permitted at law in an amount to be determined at trial;

b.     *Per se* and/or punitive damages;

c.     Costs and disbursements of this action, together with attorneys' fees, where provided for by law;

d.     Pre-judgment interest and post-judgment interest available under law; and

e.     Such other and further relief as this Court may deem just and proper.

Dated:  May 25, 2021
        New York, New York

Respectfully submitted,

MILLSAPS & ASSOCIATES PLLC

By: /s/ *Rhett O. Millsaps II*
Rhett O. Millsaps II
745 Fifth Ave, Suite 500
New York, NY 10027
Tel: (646) 535-1137
Fax: (646) 906-8657
Email:  rhett@millsaps-law.com

CHAUDHRYLAW PLLC

By: /s/ *Priya Chaudhry*
Priya Chaudhry
45 W. 29th Street, Suite 303
New York, NY  10001
Tel: (212) 785-5550
Email:  priya@chaudhrylaw.com

*Attorneys for Defendant/Counterclaim-Plaintiff Hamed Wardak*