**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SARAH GOOLDEN,

        Plaintiff,

        v.

HAMED WARDAK,

        Defendant.

---

HAMED WARDAK,

        Counterclaim-Plaintiff,

        v.

SARAH GOOLDEN,

        Counterclaim-Defendant.

---

No. 19-CV-06257 (ALC)(DCF)

ECF Case

 

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIM

Dated:  New York, New York
        November 4, 2021

MILLSAPS & ASSOCIATES PLLC
745 Fifth Avenue, Suite 500
New York, NY  10151
Tel:  (646) 535-1137
Email:  rhett@millsaps-law.com

CHAUDHRYLAW PLLC
45 W. 29th Street, Suite 303
New York, NY  10001
Tel: (212) 785-5550
Email:  priya@chaudhrylaw.com

*Attorneys for Defendant/Counterclaim-Plaintiff Hamed Wardak*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES……………….……………………...…………………..ii

INTRODUCTION AND FACTS………………………………………..……………..1

ARGUMENT………………………………………………………………..…………..7

I.      LEGAL STANDARD……………......………………………..…..........................7

II.     THE CHALLENGED ALLEGATIONS FALL SQUARELY WITHIN THE
*WILLIAMS* EXCEPTION TO THE PRIVILEGE ……...……………………...……….....8

III.    DOCUMENTS PRODUCED BY PLAINTIFF SUPPORT THE CHALLENGED
ALLEGATIONS IN THE COUNTERCLAIM …………………...………….….….11

IV.   RESPONSES TO ANTICIPATED ARGUMENTS IN PLAINTIFF'S REPLY………..16

CONCLUSION……………..……………..………………..……………...…...............19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)……………………………...…………………………………….7

*Becker v. Cephalon, Inc.,*
    No. 14-CV-3864, 2015 WL 5472311 (S.D.N.Y. Sept. 15, 2015)……..………..11, 12, 15

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)………………………...…………………………………...……..7

*Bruno v. Guerra,*
    146 Misc. 2d 206 (N.Y. Sup. Ct. 1990)…...……..…………..…………………...……4

*City of Pontiac Gen. Emp. Ret. Sys. v. MBIA, Inc.,*
    637 F.3d 169 (2d Cir. 2011)…………………………………………………………….7

*Flomenhaft v. Finkelstein,*
    127 A.D.3d 634 (1st Dep't 2015)…………………………………………...…16

*Frydman v. Verschleiser,*
    172 F. Supp. 3d 653 (S.D.N.Y. 2016)………..……………………………..…*passim*

*Gaden v. Gaden,*
    29 N.Y.2d 80 (N.Y. 1971)……..……………………………………………...……..4

*Halcyon Jets, Inc. v. Jet One Group, Inc.,*
    69 A.D.3d 534 (1st Dep't 2010)…………….…………………………….....8, 11

*In re Bear Stearns Companies, Inc. Sec., Derivative, and ERISA Litig.,*
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)…………………………………………....12

*Lipschutz v. Kiderman,*
    76 A.D.3d 178 (2d Dep't 2010)…………………………………………..……..4

*Lokai Holdings LLC v. Twin Tiger USA LLC,*
    306 F. Supp. 3d 629 (S.D.N.Y. 2018) (Carter, J.)………………………..……….7

*Mosesson v. Jacob D. Fuchsberg Law Firm,*
    257 A.D.2d 381 (1st Dep't 1999)………………………………………………..9

*Orientview Technologies LLC v. Seven For All Mankind, LLC,*
    No. 13 Civ. 0538, 2013 WL 4016302 (S.D.N.Y. Aug. 7, 2013)……………..……..7

*Peck v. Peck*,
  No. 157281/2017, 2018 WL 2386358 (N.Y. Sup. Ct. May 25, 2018)………...………...16

*Porrazzo v. Bumble Bee Foods, LLC*,
  822 F. Supp. 2d 406 (S.D.N.Y. 2011)……………………………………………....12

*Pure Diets India Limited v. Genco*,
  18-CV-3086 (VEC), 2019 WL 428834 (S.D.N.Y. Feb. 4, 2019)…………………….11

*Riel v. Morgan Stanley*,
  No. 06cv524 (TPG), 2007 WL 541955 (S.D.N.Y. Feb. 16, 2007)…………………….18

*Tuck v. Tuck*,
  14 N.Y.2d 341 (N.Y. 1964)………………………...……………………….…………4

*Walker v. Schult*,
  717 F.3d 119 (2d Cir. 2013)…………………………………………………………….8

*Williams v. Williams*,
  23 N.Y.2d 592 (N.Y. 1969)……………...………………………….…............6, 8, 10, 11

## Rules

Fed. R. Civ. P. 12(b)(6)……………...……………………………………….…….1, 7

Fed. R. Civ. P.15(a)(2)……………………………………………………….……...16

Fed. R. Evid. 201(b)(2)……………………………………………………………...11

N.Y. Civ. Rights Law § 74…………...……….....………………………………....9

N.Y. Civ. Rights Law § 80-b………….....…………………………………………….4

Defendant/Counterclaim-Plaintiff Hamed Wardak ("Mr. Wardak") respectfully submits this memorandum of law in opposition to the partial Motion to Dismiss Defendant's Counterclaim filed by Plaintiff/Counterclaim-Defendant Sarah Goolden ("Ms. Goolden") pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion" or "Mot.").

## Introduction and Facts

For eight years beginning in 2010, Ms. Goolden cultivated Mr. Wardak as a romantic interest and generous source of financial support. Cc. ¶¶ 1, 27-30.[1] After their initial meetings, Ms. Goolden flirted with Mr. Wardak by phone and text message as she hopped around the globe at the expense of other men or "modeling" agencies. *Id*. ¶¶ 27-29. On numerous occasions over the years, Mr. Wardak flew Ms. Goolden to be with him – often at her request following her breakup with another man – and treated her to lavish experiences and gifts. *Id*. ¶¶ 27-30. Ms. Goolden also was not bashful about asking Mr. Wardak for direct financial assistance, which he freely provided by wire transfer and cash. *Id*. ¶¶ 28, 30, 32. Ms. Goolden repeatedly expressed her desire to be Mr. Wardak's girlfriend, but he (quite wisely, it turns out) declined to commit to her until May 2018, when he flew Ms. Goolden to visit him in Miami after one of her purported breakups. *Id*. ¶¶ 27, 30-31.

Once Ms. Goolden got Mr. Wardak to agree to be her exclusive boyfriend in early May 2018, she went all in. First she had Mr. Wardak fly her repeatedly from New York to Miami to be with him and extracted $76,000 in wire transfers and cash from Mr. Wardak that May and June; in June, Ms. Goolden also had Mr. Wardak fly her, her dog, and her father, Brian Cavanaugh – all first class – to Puerto Rico to visit Mr. Wardak at his home there and to

---

[1] Mr. Wardak's Third Amended Answer and Counterclaim is hereinafter referred to as "Counterclaim" or "Cc."

introduce him to Mr. Cavanaugh. Cc. ¶¶ 4, 30-33. Mr. Wardak immediately extended his generosity to Mr. Cavanaugh. Mr. Wardak learned that Mr. Cavanaugh was a lawyer who had served prison time and been disbarred for defrauding his 90-year-old, blind client and had subsequently changed his last name from Goolden to Cavanaugh. Mr. Wardak – to show his commitment to Ms. Goolden – arranged and offered to pay for a top global law firm to try to reinstate Mr. Cavanaugh's law license. *Id*. ¶¶ 4, 44.

The coup de grâce came the next month, when Ms. Goolden had Mr. Wardak fly her and two of her close friends to Miami for the July 4th weekend. Cc. ¶¶ 4, 34. The three stayed with Mr. Wardak in his penthouse home there, where Ms. Goolden sprung an ultimatum on Mr. Wardak: either he propose to her that weekend – with a $160,000 Harry Winston ring that Ms. Goolden had preselected – or Ms. Goolden's purported ex-boyfriend, Arthur, would propose to her soon thereafter, and Mr. Wardak would lose what he then believed was a genuine mutual love that had bloomed after eight years. *Id*. ¶¶ 5, 34-37.

Her ploy worked. On July 6, 2018 – only two months after he agreed to be her boyfriend – Mr. Wardak acquiesced and went with Ms. Goolden's friend to Harry Winston, where Ms. Goolden's friend pointed out the selected ring, which Mr. Wardak immediately purchased. *Id*. ¶ 38. Video taken later that evening shows Ms. Goolden joyfully accepting Mr. Wardak's proposal with the ring at a pricey restaurant in front of an assembled group of their friends. *Id*. ¶ 40. The last minute, lavish engagement party for twelve – where Ms. Goolden and her two visiting friends wore designer outfits purchased (at Mr. Wardak's expense) for the occasion earlier that day at Ms. Goolden's insistence – also was Ms. Goolden's idea and fully paid for by Mr. Wardak. *Id*. ¶¶ 8, 35, 39-40.

The next day, July 7, 2018, Ms. Goolden hastily left Mr. Wardak's apartment in a fit of anxiety, telling Mr. Wardak that she and her friends were going to stay in a hotel because things were moving so fast and she needed some space to think. Cc. ¶ 9. Later that same evening, Ms. Goolden sent Mr. Wardak text messages apologizing for her behavior, saying, among other things, that she was "really in need of working on" herself, that Mr. Wardak did not "deserve to deal with [her] anxiety attacks and erratic emotions," that she "just really panic[s] a lot," that she has "commitment issues," and that she would "do whatever [she] can to make things right." *Id*. Ms. Goolden then returned to Mr. Wardak's apartment and stayed until the following Monday, July 9, when she abruptly left with the $160,000 engagement ring on her finger. *Id*. ¶¶ 9, 41.

In the three remaining weeks of July 2018, Ms. Goolden ghosted Mr. Wardak, blocking him on social media while she gallivanted in Mykonos, Greece with Arthur (her aforementioned purported ex-boyfriend) and in Ibiza, Spain with a third romantic partner.[2] Cc. ¶¶ 10, 42-43. Mr. Wardak, at turns shocked, angry, confused, and concerned about Ms. Goolden's wellbeing, spent those weeks frantically trying to get answers from Ms. Goolden and her father. *Id*. ¶¶ 11-13, 44.

For their part, Ms. Goolden and her father spent the next several months gaslighting Mr. Wardak: Ms. Goolden demanded that Mr. Wardak stop attempting to contact her, asserting that his text messages and emails demanding answers and return of property were frightening her; meanwhile, Mr. Cavanaugh told Mr. Wardak that Ms. Goolden was mentally ill, struggling with addiction issues, and needed Mr. Wardak's help. Cc. ¶¶ 12-15, 45-54. In or around October 2018, Mr. Cavanaugh even enlisted Mr. Wardak's help to plan a family intervention for Ms. Goolden. *Id*. ¶¶ 49, 54. It was during that process that Mr. Wardak met Ms. Goolden's brother,

---

[2] Was Ms. Goolden wearing the engagement ring she inveigled from Mr. Wardak during her immediately adjacent jaunts with Arthur and her third paramour? Since she blocked Mr. Wardak on social media and appears to have deleted posts around that time, we may never know.

who told Mr. Wardak that Ms. Goolden never was in love with him and had targeted him to take whatever she could inveigle out of him; he additionally revealed that Wardak was not Ms. Goolden's first victim and specifically named other men, including a high-profile billionaire and a professional hockey player, whom she also had played for their money. *Id*. ¶ 54.

Thus, by the end of 2018, the goose that laid the Goolden eggs was cooked. Realizing that he had been the victim of a long-con, in January 2019 Mr. Wardak commenced legal actions against Ms. Goolden for restitution. Cc. ¶¶ 1, 16, 54-55. Ms. Goolden countered by filing a petition for an Order of Protection in New York Family Court based on claims that Mr. Wardak was stalking and harassing her; notably, she made no claims in her petition papers that Mr. Wardak had ever physically or sexually assaulted her. *Id*. ¶¶ 56, 63-65; Declaration of Rhett O. Millsaps II in Opposition to Plaintiff's Motion to Dismiss ("Millsaps Decl.") ¶ 2, Ex. A.

Then, on June 17, 2019 – as she was preparing to file this action two weeks later, on July 5 – Ms. Goolden suddenly claimed in a New York Family Court hearing that Mr. Wardak had physically and sexually assaulted her almost one year prior during their engagement weekend in Miami. Cc. ¶¶ 56, 63-64. As Mr. Wardak wanted nothing further to do with Ms. Goolden, in October 2019 he resolved the New York Family Court action by entering a two-year Order of Protection by consent without admission. Millsaps Decl. ¶ 3, Ex. B. But Mr. Wardak's legal actions against Ms. Goolden for restitution continued.[3]

---

[3] Mr. Wardak's Florida suit against Ms. Goolden did not end until May 2020 – nearly one year after Ms. Goolden filed this sham lawsuit – when Mr. Wardak voluntarily dismissed it without prejudice following the magistrate judge's recommendation that the case be dismissed based on Florida's "heart balm" statute. Millsaps Decl. ¶ 4. Mr. Wardak could have alleged (but chose not to) those claims against Ms. Goolden as counterclaims in the present action; unlike Florida, New York modified its "heart balm" statute to permit recovery of gifts given in contemplation of marriage. *See* §80-b of the N.Y. Civil Rights Law; *Tuck v. Tuck*, 14 N.Y.2d 341, 345 (N.Y. 1964); *Gaden v. Gaden*, 29 N.Y.2d 80, 85-86 (N.Y. 1971); *Lipschutz v. Kiderman*, 76 A.D.3d 178, 183 (2d Dep't 2010); *Bruno v. Guerra*, 146 Misc.2d 206, 207-08 (N.Y. Sup. Ct. 1990).

In further retaliation for Mr. Wardak's ongoing legal pursuit for restitution, Ms. Goolden commenced this action on July 5, 2019 – on the eve of the expiration of her claims under the statute of limitations – incredibly alleging that Mr. Wardak had physically assaulted and raped her in Miami nearly one year prior, on July 7, 2018.

To put this in context, Ms. Goolden now alleges that in the early morning hours after their last-minute, lavish engagement party that she orchestrated – and while her two closest friends were sleeping in the same apartment – Mr. Wardak forcibly held her down while performing oral sex on her and then raped her. *See* Complaint ¶¶ 38-56. If Ms. Goolden's story were true, it would mean, as discussed above, that hours after Mr. Wardak raped her, Ms. Goolden sent Mr. Wardak numerous text messages apologizing for her behavior following their engagement (and never mentioned any rape or assault); she returned to his home that evening and stayed two more nights before departing Miami with the engagement ring on her finger; and not once in the many private text messages and emails between Ms. Goolden and Mr. Wardak in the following days, weeks, and months did Ms. Goolden ever mention this incident. That's because it never happened.

As summarized above, the documentary and other evidence in this case overwhelmingly will show that Ms. Goolden is a practiced fabulist who manufactured her belated civil claims of assault and rape maliciously and solely to defame Mr. Wardak. She did this in response to the separate valid legal actions that he filed in January 2019 seeking restitution after he concluded that he had been badly used by Ms. Goolden. When Mr. Wardak demanded justice, Ms. Goolden played the ultimate trump card by falsely calling him a rapist.

Accordingly, Mr. Wardak's Counterclaim alleges a claim for defamation *per se* against Ms. Goolden based in part on statements made by Ms. Goolden – which are *not* challenged in the

Motion – to various third parties asserting that Mr. Wardak raped her and that he was an "illegal arms dealer" (the "Unchallenged Allegations"). In fact, Mr. Wardak did not rape Ms. Goolden and never has sold arms; on the contrary, he ran a successful contracting business providing life-support, linguistic, and logistical services to the U.S. government in Afghanistan. Cc. ¶ 61. Mr. Wardak's Counterclaim for defamation *per se* also is based on alleged malicious and knowingly false statements by Ms. Goolden of assault and rape by Mr. Wardak in the sham complaint in this action (the "Complaint") and a resulting story in the *New York Post* that was widely recirculated, which quotes Ms. Goolden and her malicious and knowingly false Complaint allegations (collectively, the "Challenged Allegations").

In her Motion, Ms. Goolden seeks to dismiss the Counterclaim insofar as it is based on the Challenged Allegations, but she does *not* seek to dismiss the Counterclaim insofar as it is based on the Unchallenged Allegations. Thus, even if the Court were to grant the Motion in full, the Counterclaim would stand insofar as it is based on the Unchallenged Allegations.

The Court now must resolve only the issue of whether Mr. Wardak's Counterclaim for defamation survives the Motion insofar as it is based on the alleged malicious and knowingly false statements by Ms. Goolden in the sham Complaint and the *New York Post* story. For the reasons set forth below, it does.

While statements made in the course of litigation generally are shielded by a so-called "absolute" privilege under New York law, there is a well-settled "exception to the general privilege for statements in judicial proceedings…where the statements are made maliciously and solely for the purpose of defaming the defendant." *Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 672-73 (S.D.N.Y. 2016) (Koeltl, J.) (citing *Williams v. Williams*, 23 N.Y.2d 592, 595 (1969), and other cases). In his Counterclaim, Mr. Wardak clearly alleges that Ms. Goolden's

claims in this case "are an utter fabrication from start to finish, intended solely to destroy Wardak's reputation and career. There was no rape, no sexual assault, and no assault or battery." Cc. ¶ 3. And Mr. Wardak does not allege this in conclusory fashion; on the contrary, he lays out in great detail in twenty-one pages (as summarized above) precisely how and why the evidence will show that Ms. Goolden brought this sham action maliciously and solely to defame him. Mr. Wardak's Counterclaim thus fits squarely within the *Williams* exception to the privilege, which Ms. Goolden's Motion wholly fails to acknowledge, let alone address, presumably because it is fatal to the Motion.

For these reasons, Mr. Wardak respectfully requests that the Court deny Ms. Goolden's Motion in its entirety. If the Court is considering granting Ms. Goolden's Motion, then Mr. Wardak respectfully requests oral argument on the Motion.

## Argument

## I.     LEGAL STANDARD

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 637 (S.D.N.Y. 2018) (Carter, J.) (quoting *Orientview Technologies LLC v. Seven For All Mankind, LLC*, No. 13 Civ. 0538, 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013). To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). The "court must accept all factual allegations in the complaint as true and draw

all reasonable inferences in the [claimant's] favor." *Lokai Holdings*, 306 F. Supp. 3d at 637

(citing *City of Pontiac Gen. Emp. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011).

Ultimately, on a motion to dismiss "[t]he issue is not whether a plaintiff will ultimately prevail

but whether the claimant is entitled to offer evidence to support the claims." *Walker v. Schult*,

717 F.3d 119, 124 (2d Cir. 2013).

## II.     THE CHALLENGED ALLEGATIONS FALL SQUARELY WITHIN THE *WILLIAMS* EXCEPTION TO THE PRIVILEGE

While statements made in the course of litigation generally are shielded by a so-called

"absolute" privilege under New York law, there is a well-settled "exception to the general

privilege for statements in judicial proceedings…where the statements are made maliciously and

solely for the purpose of defaming the defendant." *Frydman*, 172 F. Supp. 3d at 672 (citing

*Williams*, 23 N.Y.2d at 595 (holding that a claim for defamation lay in that case even though no

claim for abuse of process did) and other cases). As the New York Court of Appeals explained in

*Williams*:   "[I]t was never the intention of the Legislature in enacting section 74 to allow 'any

person' to maliciously institute a judicial proceeding alleging false and defamatory charges, and

to then circulate a press release or other communication based thereon and escape liability by

invoking the statute. Society has a pervasive and strong interest in preventing and redressing

attacks upon reputation, and the courts are delegated with the responsibility of protecting that

right." 23 N.Y.2d at 599. *See also Halcyon Jets, Inc. v. Jet One Group, Inc*., 69 A.D.3d 534, 534-

35 (1st Dep't 2010) ("Defendants' intention to use the federal action as" a "device to protect a

report thereof and thereby disseminate defamatory information…is a factual issue that is

sufficiently pleaded and cannot be presently be [*sic*] decided").

Ms. Goolden's Motion seeks to partially dismiss the Counterclaim insofar as it is based

on her allegations of physical and sexual assault in the instant Complaint and the subsequent

*New York Post* story, asserting New York's general statutory privilege for such statements. *See* Mot. at 6-9. Tellingly, nowhere in the Motion does Ms. Goolden even acknowledge the *Williams* exception, let alone attempt to explain why it does not apply here, and for good reason: it is fatal to her Motion. Given the detailed and voluminous facts alleged in the Counterclaim explaining precisely why the allegations in the Complaint (and repeated in the *New York Post* story, with Ms. Goolden's participation) are not credible and are brought maliciously and solely to defame Mr. Wardak, his defamation Counterclaim based on these statements is precisely what the court in *Williams* sought to protect.

*Frydman* is directly on point in this regard. In *Frydman*, the court denied a motion to dismiss claims of defamation based on allegedly defamatory lawsuits – which were actively being litigated – and a purportedly privileged whistleblower letter sent to the SEC, ruling that the plaintiffs in that case had adequately alleged New York's exception to the "absolute" privilege asserted by Ms. Goolden here. *See* 172 F. Supp. 3d at 673.

Judge Koeltl rejected the *Frydman* defendants' arguments – which were the same as Ms. Goolden's here – that "the allegedly defamatory statements in the defendants' lawsuits and in the whistleblower letter the defendants sent to the SEC [were] absolutely privileged because they were made in a judicial proceeding and to a regulator." *Id*. at 672 (citing N.Y. Civil Rights Law § 74 and quoting *Mosesson v. Jacob D. Fuchsberg Law Firm*, 257 A.D.2d 381, 381 (1st Dep't 1999) ("[A] statement made in the course of legal proceedings is absolutely privileged if it is at all pertinent to the litigation.")). As Judge Koeltl went on to explain, even if the subject statements are pertinent to the litigation at issue and thus normally privileged under New York law, "there is an exception to the general privilege for statements in judicial proceedings and communications to regulators where the statements are made maliciously and solely for the

*purpose of defaming the defendant." Id.* Ms. Goolden's circular argument that her false and defamatory allegations of physical and sexual assault cannot fall under the exception to the privilege because they are pertinent to this litigation – which is wholly based on those false claims – is absurd and would swallow whole the exception to the general privilege.

In his Counterclaim, Mr. Wardak alleges that Ms. Goolden's claims in this case "are an utter fabrication from start to finish, intended solely to destroy Wardak's reputation and career. There was no rape, no sexual assault, and no assault or battery." Cc. ¶ 3. Mr. Wardak further alleges that the "claims of assault and rape in this case are completely fabricated, brought maliciously by Goolden for the sole purpose of defaming Wardak under the guise of litigation and its attendant qualified immunity." *Id.* ¶ 64. And Mr. Wardak does not allege this in conclusory fashion; on the contrary, he lays out in great detail in twenty-one pages (as summarized above in the Introduction and Facts) precisely how and why the documentary and other evidence will show that Ms. Goolden brought this sham action alleging physical and sexual assault maliciously and solely to defame him, in retaliation for Mr. Wardak's pursuit of his legal claims for restitution. *See*, *e.g.*, *id.* ¶¶ 16-17 ("After Wardak instituted legal actions against them in early 2019 seeking restitution, Cavanaugh told Wardak that unless he stopped trying to recover the money he had given them, Goolden would falsely accuse him of sexual assault and rape to destroy his reputation and career. Goolden made good on Cavanaugh's threat."); *id.* ¶ 73 ("Immediately after her sham Complaint was filed (and even before service of the summons and Complaint), Goolden and her lawyer spoke to the *New York Post* to publish her false and malicious allegations as widely as possible. Goolden spoke to the reporter with the intent to damage Wardak's reputation and injure his business.").

Mr. Wardak's Counterclaim thus fits squarely within the *Williams* exception to the privilege and cannot be dismissed as a matter of law. *See Frydman*, 172 F. Supp. 3d at 673 (applying the *Williams* exception and ruling that the plaintiffs' defamation claims based on allegations in two lawsuits were "an open question of fact that cannot be resolved on a motion to dismiss"); *Halcyon Jets*, 69 A.D.3d at 534-35; *Williams*, 23 N.Y.2d at 599 ("it is impossible to conceive of the Legislature's intending to protect the defendant's perversion of judicial proceedings. It would be contrary to reason to say that the Legislature considered it necessary to protect such defamation in order to implement the salutary aims of the statute").

## III. DOCUMENTS PRODUCED BY PLAINTIFF SUPPORT THE CHALLENGED ALLEGATIONS IN THE COUNTERCLAIM

While Mr. Wardak's well-pleaded Challenged Allegations in the Counterclaim are sufficient in themselves to withstand Ms. Goolden's Motion, substantial evidence also has been produced by Ms. Goolden herself to support the Challenged Allegations that Ms. Goolden brought this action alleging assault and rape maliciously and solely to harm Mr. Wardak (and thus her Complaint and the *New York Post* story fall within New York's exception to the absolute privilege).

It is black-letter law that in resolving a motion to dismiss the Court may "consider 'facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.'" *Pure Diets India Limited v. Genco*, 18-CV-3086 (VEC), 2019 WL 428834, at *3 (S.D.N.Y. Feb. 4, 2019) (quoting *Becker v. Cephalon, Inc*., No. 14-CV-3864, 2015 WL 5472311, at *3, 5 (S.D.N.Y. Sept. 15, 2015)). Under Rule 201, such facts include those "not subject to reasonable dispute because [they] ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *Becker*, 2015 WL 5472311 at *3. In the motion to dismiss context, the Court may "take judicial notice to determine

what statements the documents contain, not for the truth of the matters asserted." *Becker*, 2015 WL 5472311 at *3 (citing *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 412 (S.D.N.Y. 2011)). *See also In re Bear Stearns Companies, Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 581-82 (S.D.N.Y. 2011) (denying motion to strike extraneous documents submitted in opposition to motion to dismiss and taking "judicial notice of the fact that th[o]se documents contain[ed] certain information").

Ms. Goolden has produced voluminous documents containing her own prior statements that are not subject to reasonable dispute because Ms. Goolden herself produced them. For instance, Ms. Goolden produced hundreds of pages of Whatsapp messages that she exchanged with her friend, Farris El-Alwan, who was in the bed with her when she alleges that Mr. Wardak first physically assaulted her by pulling her out of bed by her hair and carrying her to his room. *See* Complaint ¶¶ 23-24. The following exchange between the two[4] – on the eve of Ms. Goolden's filing of her Complaint in this action – puts the lie to that claim by Ms. Goolden:

> [7/2/19, 5:01:08 PM] Faris New: I mean I don't really know what I could provide them with anyway?
> [7/2/19, 5:01:25 PM] Sarah: Babe what are you talking about you were there
> [7/2/19, 5:01:29 PM] Faris New: You and him arguing then me leaving and then staying the night then ya leaving to go to the hotel in the morning?
> [7/2/19, 5:01:34 PM] Sarah: Yes
> [7/2/19, 5:01:46 PM] Sarah: And you saw him pull me forcibly from the bed and carry me into his room
> [7/2/19, 5:01:56 PM] Sarah: And the threats stalking harassing etc
> [7/2/19, 5:02:07 PM] Faris New: I don't remember that love. Yeah the threats and harassing of course
> [7/2/19, 5:02:18 PM] Sarah: You don't remember that?
> [7/2/19, 5:02:24 PM] Sarah: Omg he pullled me from your bed
> [7/2/19, 5:02:28 PM] Sarah: And dragged me out
> [7/2/19, 5:02:44 PM] Faris New: Yeah I remember him ripping the duvet off
> [7/2/19, 5:02:50 PM] Faris New: And then I packed my stuff
> [7/2/19, 5:02:56 PM] Sarah: And carried my into his room

---

[4] We reproduce the exchanges in the exact format in which Plaintiff produced them.

[7/2/19, 5:04:07 PM] Faris New: I don't remember him carrying you love and if I get involved they're going g to want details. All I remember is him coming in. Rolling the duvet off. Then you and him start arguing

[7/2/19, 5:07:55 PM] Faris New: I didn't see him get physical with you love which is what you want me to say
[7/2/19, 5:08:18 PM] Faris New: I could but then I'd be lying and that's really bad
[7/2/19, 5:09:58 PM] Sarah: No bane I don't want you to lie
[7/2/19, 5:10:03 PM] Sarah: I just thought you saw it
[7/2/19, 5:10:07 PM] Sarah: Since he did it in front of you
[7/2/19, 5:10:57 PM] Faris New: No babe i didn't see that. He ripped of the duvet. Then you started packing your stuff well that's what you were saying anyway
[7/2/19, 5:11:03 PM] Faris New: I packed mine and waited for you in the lift
[7/2/19, 5:11:34 PM] Faris New: You were in his room. He came out and told me everything was fine now
[7/2/19, 5:11:49 PM] Faris New: I asked you through the door and you said you were fine
[7/2/19, 5:11:51 PM] Faris New: I went to bed

Millsaps Decl. ¶ 5, Ex. C.[5]

In another example that supports the Challenged Allegations in Mr. Wardak's

Counterclaim, Ms. Goolden produced the following Whatsapp messages that she sent to another

friend:

[5/22/20, 11:18:03 PM] Sarah: Babe
[5/22/20, 11:18:31 PM] Sarah: The bumblefuck FL judge just ruled and finally threw my case out
[5/22/20, 11:18:43 PM] Sarah: Why she did it at 10pm Friday of Memorial Day weekend is beyond me
[5/22/20, 11:18:45 PM] Sarah: But yessssssss
[5/22/20, 11:18:47 PM] Sarah: Bye loser
[5/22/20, 11:18:54 PM] Sarah: Now you get to get harassed by me
[5/22/20, 11:18:58 PM] Sarah: Until you pay mother fucker
[5/22/20, 11:19:01 PM] Sarah:       »       »       »       »       »       »
[5/22/20, 11:19:04 PM] Sarah: ✌ *

Millsaps Decl. ¶ 6, Ex. D.

---

[5] Mr. El-Alwan is scheduled to be deposed in London on December 6, 2021, under an order of the British court in response to a Letter of Request for International Judicial Assistance issued by Judge Freeman on September 28, 2021. Dkt. No. 96.

Ms. Goolden produced similar messages that she exchanged on Instagram with her

brother:

> Jul 12, 2019, 11:42 AM
> Kevin Goolden
> It's cool tho I paid 40% of the legal fee so I'll just take my 40% cut of the $4 million when you win
>
> Jul 12, 2019, 11:42 AM
> Kevin Goolden
> In all seriousness tho I stopped checking his IG. Hopefully that is done
>
> Jul 12, 2019, 11:42 AM
> Sarah Goolden
> Lmaooo
>
> Jul 12, 2019, 11:42 AM
> Sarah Goolden
> I have to check it bc I gotta find out when the next big gig is to serve him lmaooooo
>
> Jul 12, 2019, 11:43 AM
> Sarah Goolden
> I sewer I should have done this on a buy in stock basis like
>
> Jul 12, 2019, 11:43 AM
> Sarah Goolden
> It's clear that I'm going to win
>
> Jul 12, 2019, 11:43 AM
> Sarah Goolden
> It's a slam dunk
>
> Jul 12, 2019, 11:43 AM
> Sarah Goolden
> Who wants to buy stake in my case ?!

Millsaps Decl. ¶ 7, Ex. E (select portions highlighted).

Other documents produced by Ms. Goolden reveal that she cannily disseminated the *New York Post* story with her false allegations to others, including in November 2019 to her professor at Columbia University with her master's thesis proposal: "A long-form story about the

14

prevalence of stalking and how easy it is to stalk someone, written in the first person and highlighting what I [Ms. Goolden] have gone through." Millsaps Decl. ¶ 8, Ex. F.

Ms. Goolden has produced multiple drafts of her thesis – titled "You Can't Delete a Stalker" – submitted in and around February and March 2020 and based on her purported experiences with Mr. Wardak. Notably, nowhere in any of her drafts does Ms. Goolden ever mention any alleged physical or sexual assault by Mr. Wardak – or the nature of their eight-year-long relationship, their short-lived engagement, and the hundreds of thousands of dollars that Ms. Goolden inveigled from Mr. Wardak over two months in 2018 – despite comments from her professor on one of the drafts prompting Ms. Goolden to explain (i) whether Mr. Wardak ever threatened to or did hit her and (ii) "how on earth" Mr. Wardak was able to obtain Ms. Goolden's bank records using a subpoena. *See* Millsaps Decl. ¶¶ 9-10, Exs. G-H. Presumably Ms. Goolden disregarded these instructions from her professor because they did not fit her chosen fantasy narrative, and perhaps because her professor advised that Ms. Goolden's thesis would "end up publishable." Millsaps Decl. ¶ 9, Ex. G.

At trial, Mr. Wardak will prove the Challenged Allegations in his Counterclaim using these and many other pieces of documentary evidence produced by Ms. Goolden and her friends to show that Ms. Goolden is a practiced fabulist who selectively tailors her false narratives depending on her particular goal and audience – and that she brought this action alleging assault and rape maliciously and solely to harm him. It is well within the Court's purview to "take judicial notice to determine what statements…the documents contain" that could further support an inference by the Court that the Challenged Allegations in Mr. Wardak's Counterclaim are plausible. *Becker*, 2015 WL 5472311 at *3.

If the Court here declines to take judicial notice of the statements in these documents produced by Ms. Goolden for the limited purpose of drawing all inferences in Mr. Wardak's favor to resolve the Motion, then Mr. Wardak should be granted leave to further amend his Counterclaim to include them; Ms. Goolden herself produced them in discovery, they go to the heart of Mr. Wardak's Counterclaim, and Federal Rule of Civil Procedure 15 directs courts to "freely give leave" for a party to file an amended pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2).

## IV.     RESPONSES TO ANTICIPATED ARGUMENTS IN PLAINTIFF'S REPLY

*First*, Ms. Goolden might attempt to argue in her reply, as she did in prior motion papers, that "[t]o demonstrate that Goolden's Complaint constitutes 'sham litigation', Wardak *must* allege that the 'context in which the allegedly offending statement was made was a litigation that the plaintiffs filed but never prosecuted.'" Dkt. No. 79, p. 6 [Goolden Opp. to cross-motion to amend] (emphasis added) (quoting *Flomenhaft v. Finkelstein*, 127 A.D.3d 634, 637 (1st Dep't 2015).

The cases that Ms. Goolden has previously cited for this argument – *Flomenhaft* and *Peck v. Peck*, No. 157281/2017, 2018 WL 2386358, *7 (N.Y. Sup. Ct. May 25, 2018) – do not establish any such pleading requirement. These cases state that "[a] proceeding *may be found* to be a sham where it is abandoned or withdrawn or discontinued," *Peck*, 2018 WL 2386358 at *7 (emphasis added), but they do not stand for the proposition that a proceeding is a sham for the purposes of the exception to the defamation privilege *only if* the proceeding is abandoned or withdrawn or discontinued. Indeed, as noted above, the defamation claims in *Frydman* were based on statements made in an otherwise privileged SEC letter and three ongoing lawsuits; Judge Koeltl denied defendants' motion to dismiss those defamation claims insofar as they were

based on the SEC letter and allegations in two of the ongoing lawsuits, ruling, "The plaintiffs allege that the statements in the letter to the SEC and the allegations in the lawsuits were made maliciously and solely for the purpose of harming the plaintiffs. Whether the first and third lawsuits and the SEC letter meet this standard is an open question of fact that cannot be resolved on a motion to dismiss." 172 F. Supp. 3d at 673.

*Second*, Ms. Goolden might attempt to argue in her reply papers that:

> The Family Court's decision to grant Ms. Goolden an Order of Protection is sufficient evidence that her Complaint was not malicious or a sham, because the Order of Protection was based on facts that in part comprise the statements in her Complaint and later published in the NY Post. See, *Frydman v. Verschleiser*, 172 F.Supp.3d 653 at 673 (S.D.N.Y. 2016) (finding sufficient evidence that the defendant's underlying action was not an objective sham filed for the sole purpose of disseminating false allegations to the public where state court had withheld imposition of sanctions when dismissing defamation defendant's underlying action).[6]

Millsaps Decl. ¶ 11. This is incorrect. The New York Family Court did *not* make a decision to grant Ms. Goolden an Order of Protection; rather, Mr. Wardak entered an Order of Protection *by consent without admission*. The October 30, 2019 Order of Protection makes that clear on its face, stating: "After allocution and consent without admission on the part of the respondent [Mr. Wardak], final order of protection is entered into for a period of two years…". Millsaps Decl. ¶ 3, Ex. B. The Family Court made no fact findings or any decision in that matter, and thus Mr. Wardak's defamation claim here is akin to the two lawsuits in *Frydman* on which the plaintiffs' successful defamation claims were based. *See* 172 F. Supp. 3d at 673.

*Third*, Ms. Goolden might attempt to argue in her reply, as she did in her prior opposition to Mr. Wardak's cross-motion to amend, that the exception to the privilege does not apply here

---

[6] When the parties met and conferred by email regarding Ms. Goolden's prior motion to dismiss, Ms. Goolden's counsel made precisely this incorrect argument. In anticipation of Ms. Goolden repeating that mistake in her reply papers, we address it here.

because she "took no action to disseminate her Complaint" and "she could not stop the New York Post from reporting on it." Dkt No. 79, p. 5. First, Judge Koeltl's ruling that the exception to the privilege applied in *Frydman* did not depend on whether the defendants had circulated the allegedly libelous complaints to the press – though the "lawsuits allegedly led to false and defamatory newspaper accounts that cost Frydman business," 172 F. Supp. 3d at 661 – but rather depended only on the sole legal requirement for the exception: that the plaintiff had adequately alleged that "the statements in the letter to the SEC and the allegations in the lawsuits were made maliciously and solely for the purpose of harming the plaintiffs." *Id*. at 673; *see also id*. at 672 (quoting *Riel v. Morgan Stanley*, No. 06cv524 (TPG), 2007 WL 541955, *12 (S.D.N.Y. Feb. 16, 2007) (the exception applies when an "action was brought maliciously and solely for the purpose of later defaming the plaintiff").

Second, it would be factually incorrect and disingenuous for Ms. Goolden to assert that she had no part in the *New York Post* story that resulted from the filing of her sham Complaint in this action. Ms. Goolden obviously could have retracted her false allegations of assault and rape when the reporter contacted her prior to publishing the story, but instead Ms. Goolden encouraged publication of her false claims by giving the reporter a fresh quote.[7] Cc. ¶ 73. Ms. Goolden likewise knew or should have known prior to publicly filing her Complaint that the tabloids would notice and immediately run with it, given its sensational nature and Mr. Wardak's prominence. And indeed that is exactly what happened. *Id*. ¶ 75.

---

[7] After repeating the false allegations of assault and rape in Ms. Goolden's complaint, the *New York Post* story ends with a fresh quote: "'This has been the most traumatic thing I've ever gone through,' Goolden told The Post. 'It's a nightmare that will not end.'" https://nypost.com/2019/07/20/model-claims-former-afghan-defense-ministers-son-raped-her/ (last visited November 3, 2021).

## **Conclusion**

For the foregoing reasons, Mr. Wardak respectfully requests that the Court deny

Plaintiff's Motion in its entirety. If the Court is considering granting Plaintiff's Motion, then Mr.

Wardak respectfully requests oral argument.

DATED:  New York, New York
          November 4, 2021

Respectfully submitted,

MILLSAPS & ASSOCIATES PLLC

By: /s/ *Rhett O. Millsaps II*
Rhett O. Millsaps II
745 Fifth Ave, Suite 500
New York, NY 10027
Tel: (646) 535-1137
Email:  rhett@millsaps-law.com

CHAUDHRYLAW PLLC

By: /s/ *Priya Chaudhry*
Priya Chaudhry
45 W. 29th Street, Suite 303
New York, NY  10001
Tel: (212) 785-5550
Email:  priya@chaudhrylaw.com

*Attorneys for Defendant/Counterclaim-Plaintiff Hamed Wardak*